UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

|  |  |  |
|---|---|---|
| DR. JAMES TAYLOR and MRS. DINAH TAYLOR, | ) ) | |
| | ) | Civil No: 6:16-cv-109-GFVT |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| UNIVERSITY OF THE | ) | **ORDER** |
| CUMBERLANDS, | ) | |
| | ) | |
| Defendant. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Dr. James Taylor was employed as President of the University of the Cumberlands for 35 years beginning in August of 1980.  Following his retirement from that position, and after serving as Chancellor of the University for a short time, Dr. Taylor insisted on enforcement of a disputed agreement made between the University and Dr. and Mrs. Taylor.  The University refused to fulfill the terms of the disputed agreement which, among many benefits, provide Dr. James Taylor and Mrs. Dinah Taylor with compensation for life following Dr. Taylor's retirement from the position of President.  Subsequently, Dr. Taylor brought suit against the University alleging breach of contract, promissory estoppel, slander, intentional infliction of emotional distress, unjust enrichment, and seeking reformation.  In the alternative to a breach of contract claim, Dr. Taylor alleges that the University terminated benefits protected under the Employee Retirement Income Security Act of 1974 ("ERISA").  Presently before the Court is the Defendant's Motion to Dismiss [**R. 12**] and Supplemental Motion to Dismiss [**R.  18**], which, for the reasons set forth below, will be **GRANTED in part and DENIED in part**.

**I**

**A**

Given the present context, the factual summary that follows is taken from the amended

complaint [R. 16] and construed in favor of the plaintiff.  *See Crugher v. Prelesnik*, 761 F.3d

610, 614 (6th Cir. 2014) (citation omitted).  Dr. James Taylor was employed as President of the

University of the Cumberlands for 35 years beginning in August of 1980.  [R. 6, ¶ 4.]  Dr. Taylor

was President of the University during times of significant expansion and development,

including the transition from Cumberland College to the University of the Cumberlands.  The

Plaintiff alleges that Dr. Taylor's compensation was "significantly lower than the Presidents of

other similarly situated colleges."  [*Id.*, ¶ 7.]

The Plaintiffs also allege that, through a series of University Board of Trustees meetings

beginning in October of 2005 and continuing to October, 2015, the University entered into and

reaffirmed commitment to an agreement to provide Dr. James Taylor and Mrs. Dinah Taylor

with compensation for life following Dr. Taylor's retirement from the position of President.  The

agreement that was made on April 19, 2012, [*see* R. 16-1] was first discussed generally at the

October 21, 2005, Board of Trustees meeting for the University.  [R. 16, ¶ 8.]  During a closed

executive session, the plaintiffs allege the board unanimously adopted a resolution made by

Trustee Bill Hacker and seconded by Trustee Dave Huff that would "continue Dr. Taylor and

Ms. Dinah Taylor's salary and benefits following his retirement from the position of President,

and to appoint him as Chancellor of the University immediately thereafter."  [*Id.*]

The resolution adopted by the Board explicitly stated, "In the event Dr. Taylor

predeceases his wife, such compensation and benefits shall go to Dinah Taylor," and that the

University Bylaws and President's contract shall be amended "to include the establishment of the

position of Chancellor and the salary and benefits for Dr. and Mrs. Taylor." [*Id.*, ¶ 8(a)-(b).] Jim Oaks, Chairman of the Board of Trustees, hired the law firm of Guenther, Jordan & Price, P.C. to prepare the necessary amendments. [*Id.*, ¶ 9.] The agreement itself, which the parties refer to as the "disputed agreement" or the "Taylor Agreement," was not further addressed by the Board until seven years later at the April 19, 2012, meeting. Plaintiffs state that the "Taylor agreement was unanimously approved by the Board of Trustees on that date," and have attached the signed agreement as Exhibit A to the Complaint. [*Id.*, ¶ 11.] The agreement was prepared by attorney Steven J. Moore and signed by Dr. Taylor, Mrs. Taylor, Jim Oaks, the "University of the Cumberlands Authorized Representative," and a notary public. [*See* R. 16-1.]

The Taylor Agreement states that the University agrees to provide a number of retirement benefits to Dr. and Mrs. Taylor after his retirement from the Presidency including health insurance benefits, continued pay of Dr. Taylor's full salary, and the University agreed to provide the Taylors with a residence or apartment in Williamsburg. [R. 16, ¶ 12.] These benefits were to be provided for the lives of Dr. and Mrs. Taylor. At the time of his retirement on October 15, 2014, the complaint states that the Board "unanimously reconfirmed the University's commitment to provide a benefit package for Dr. and Mrs. Taylor to include salary in effect on January 1, 2015, all previously approved insurance for Dr. and Mrs. Taylor, plus all other perks they were receiving at that time." [*Id.*, ¶ 13.] Dr. Taylor stepped down as President and entered the role of Chancellor while Mrs. Taylor "continued to serve as ambassador for the University." [*Id.*, ¶ 14.] The University contests the Plaintiffs' description of Board action at the Executive Sessions and challenges the validity and accuracy of the minutes that the Plaintiff referenced in the complaint.

After Dr. Taylor's retirement, the University attempted to reduce the amount of benefits owed to Dr. and Mrs. Taylor by offering Dr. Taylor a one-year renewable contract that provided for a reduced salary that was significantly less than had been provided for in the disputed agreement.  [R. 16, ¶ 15.]  The University warned Dr. Taylor that failure to accept this one-year renewable contract would result in the loss of all prior benefits including his "University owned apartment in Williamsburg, KY, the University owned vehicle he drives, and the cellular telephone he uses, all of which were benefits to him under the Taylor Contract."  [*Id.*]  Despite the threat of losing all benefits, Dr. Taylor refused these offers and insisted on enforcement of the Taylor Agreement as originally negotiated by the parties.  [*Id.*]  Subsequently, the University informed Dr. and Mrs. Taylor that "their Agreement . . . will not be honored and their retirement benefits have been terminated."  [*Id.*, ¶ 16.]

Plaintiffs allege that the Taylor Agreement was valid and that the University has breached the contract by refusing to pay benefits to Dr. and Mrs. Taylor.  [R. 16, ¶¶ 17-20.]  In the alternative, Plaintiffs allege that the Taylor Agreement constituted a "top hat ERISA pension plan and a welfare plan as defined by 29 USCS § 1002," and that "ERISA, 28 U.S.C. 1132 (a)(1)(B) authorizes the Taylors to recover benefits due under the terms of the plan."  [*Id.*, ¶¶ 42-47.]  The Taylor Agreement contained a number of retirement benefits, in addition to monetary compensation, such as health care and long term care for both Dr. Taylor and Mrs. Dinah Taylor.  [*Id.*, ¶¶ 46.]  The Plaintiffs also state that promissory estoppel should result in the agreement being enforced because their detrimental reliance on the agreement "should reasonably have been expected to induce action or forbearance," by the Plaintiffs. [*Id.*, ¶¶ 22-23.]

The Plaintiffs allege, in addition to the contract and common law damages, that the University representatives have engaged in slander as they made false statements that have been

published to third parties.  [R. 16, ¶ 26.]  The amended complaint alleges that these false

statements suggest that Dr. Taylor "hid the Taylor agreement from the University and from the

Board of Trustees, and that he had the contract drawn up in a deceitful or scheming manner."

[*Id.*]  Dr. Taylor and Mrs. Taylor believe that these statements were made by the University with

reckless disregard for the truth or knowledge of the falsity of the statements, and that Dr. Taylor

was harmed by their publication. Since these statements "includ[e] allegations of underhanded or

dishonest actions by Dr. Taylor, [they] are actionable as slander per se."  [*Id.*, ¶ 28.]

    The amended complaint also presents claims under intentional infliction of emotional

distress.  Both Dr. and Mrs. Taylor were harmed when the University used "economic coercion

against an elderly couple, including threats of the loss of their residence and health insurance, as

well as their income, in an effort to accomplish a breach of a longstanding and enforceable

contract."  [*Id.*, ¶ 33.]  Plaintiffs allege that the discontinuance of retirement benefits has in fact

caused severe emotional distress as the elderly couple has been forced to decide where to live,

how to pay for healthcare and related costs, where to obtain insurance, and how to meet

remaining financial obligations.  [*Id.*, ¶ 35.]  Dr. Taylor and Mrs. Taylor seek punitive damages

and allege that the University has acted "with malice and oppression, and the conduct of the

University was at all times of a willful and wanton character." [*Id.*, ¶ 38.]

    Dr. and Mrs. Taylor also claim that, due to the Board of Trustee's vote which continued

Mrs. Taylor's salary as of Dr. Taylor's retirement, the Taylor Agreement should "be reformed to

correct the mutual mistake and to comport with the true intent of the parties."  [R. 16, ¶ 41.]

Last, the Plaintiffs allege that the University has benefited from unjust enrichment.  Dr. Taylor,

in reliance of the Taylor Agreement, continued to work as President for an additional two years

after that agreement was signed.  [*Id.*, ¶ 49.]  During this time he raised significant amounts of

money for the University from donors and trained the next President that had been selected by

the Board of Trustees.  [*Id.*]  While training his replacement, Dr. Taylor facilitated introductions

so that the incoming President could meet University donors so as to "encourage donations to the

University in the future."  [*Id.*, ¶ 50.]  Dr. Taylor states that, if not for his reliance on the Taylor

agreement, he would not have performed these activities nor would he have been under an

obligation to do so.  [*Id.*]

**B**

This case is before the Court pursuant to its diversity jurisdiction under 28 U.S.C.

§ 1332(a)(1).  Plaintiffs Dr. James Taylor and Mrs. Dinah Taylor are a married couple that reside

in Bonita Springs, Florida, and are residents of the State of Florida.  Defendant University of the

Cumberlands, Inc. is incorporated in Kentucky as a non-profit entity that has its principal place

of business in Williamsburg, Kentucky.  [R. 16, ¶¶ 1-3.]  Plaintiffs' complaint alleges

uncontested damages exceeding $75,000, as the combined salary and benefits amount to at least

$395,000 per year.  [*Id.*, ¶ 3.]  Plaintiffs' also allege that jurisdiction is appropriate in civil

actions to recover employee benefits that are protected by the Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001. ("ERISA").

Defendants first moved to dismiss the complaint [R. 12.] and the motion was fully

briefed, but, an Amended Complaint was filed pursuant to Federal Rule of Civil Procedure

15(a)(1)(B).  [R. 16.]  Defendants now move to dismiss for failure to state a claim [R. 12] and

have filed a supplemental motion to dismiss [R. 18] that addresses the additional issues raised in

the amended complaint.  Seeing that the parties have not agreed to dismissal of any claims, all of

the plaintiffs' claims remain before the Court including breach of contract or in the alternative

termination of ERISA protected benefits, promissory estoppel, slander, intentional infliction of

6

emotional distress, unjust enrichment, and a request for punitive damages as well as reformation of the contract.

## II

## A

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a complaint which fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In making such a motion, "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief."  *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991)).  Federal Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, to survive a motion to dismiss, the complaint "must contain either direct or inferential allegations" establishing each material element required for recovery under some actionable legal theory.  *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (internal citation and quotation marks omitted).

When reviewing a Rule 12(b)(6) motion, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff."  *DirecTV, Inc.*, 487 F.3d at 476 (citation omitted).  The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences."  *Id.* (citation omitted).  Moreover, as is now well known, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In other words, the facts that are pled must rise to the level of plausibility, not just possibility – "facts that are merely consistent with a defendant's liability . . . stop[ ] short of the

line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  According to the Sixth Circuit, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *DirecTV, Inc.*, 487 F.3d at 476 (citing *Twombly*, 550 U.S. at 556).  Thus, the plaintiff must at least "provide the grounds of his entitlement to relief, [which] requires more than labels and conclusions. . . ." *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted).

When ruling on a Rule 12(b)(6) motion, a district court generally may not consider matters presented outside the pleadings unless it converts the motion into one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d); *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405 (6th Cir. 2012).  The district court, however, also has the discretion to ignore such evidence and resolve the motion solely on the basis of the pleadings.  *Heinrich*, 668 F.3d at 405; *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 502-03 (6th Cir. 2006) (collecting cases).  Certain matters beyond the allegations in the complaint such as "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (citations and internal quotation marks omitted).  Additionally, the Sixth Circuit has held that when a *defendant* attaches undisputed documents to a motion to dismiss, they "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.* (citations and internal quotation marks omitted).

Here, Dr. and Mrs. Taylor attached the April 19, 2012, disputed agreement to their amended complaint.  [R. 16-1.]  This the Court can consider without converting the motion into one for summary judgment.  *See Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).

The University of the Cumberlands contests most of the factual allegations in the Complaint. [*See* R. 12-1.]  The University did reference affidavits and external materials such as board minutes, but generally all documents considered by the Court were either part of the Court's record, matters of public record, or had been referred to in the complaint and are essential to the plaintiffs' claim.  [*See* R.12-1 n.2.]

**B**

At the outset, the University asserts that the Plaintiffs' claims fail, even if their factual allegations are true, because the disputed agreement is unenforceable as a matter of law and the agreement is "not a plan covered by ERISA."  [R. 18-1 at 10.]  Fundamentally, the complaint must provide the defendant with "fair notice" of the claims asserted against him and the grounds for those claims.  *See Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 319 (2007).  In the instant action some, but not all, of the Plaintiffs' claims must be dismissed.

**1**

Dr. and Mrs. Taylor allege that the University breached the terms of the Taylor Agreement or in the alternative that the University Terminated ERISA protected benefits.  Even though the Complaint states that the "Taylor Agreement was a valid, enforceable contract," this Court "need not accept as true legal conclusions or unwarranted factual inferences" made in the complaint.  *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  Therefore, this Court must determine independently whether the disputed agreement, which is attached to the amended complaint [R. 16] as Exhibit A, establishes, in a plausible manner, a legal right that can survive the Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

Under Kentucky law, to prove that there has been a breach of contract, "the complainant must establish three things: 1) the existence of a contract; 2) breach of that contract; and 3)

damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007)).  Therefore, "[t]o establish a breach of contract claim under Kentucky law, the plaintiff must show by clear and convincing evidence that an agreement existed between the parties." *MidAmerican Distribution, Inc. v. Clarification Technology, Inc.*, 807 F. Supp. 2d 646, 666-67 (E.D. Ky. 2011), aff'd, 485 F. App'x 779 (6th Cir. 2012).  Here, the University only challenges the existence of a contract and alleges that the disputed agreement is "unenforceable because Dr. and Mrs. Taylor failed to provide any viable consideration for it." [R. 12 at 10.]  The agreement itself recognizes the service of the Plaintiffs, notes that they have exceeded expectations in "raising hundreds of millions of dollars for the University," and states that "Dr. and Mrs. Taylor have and will agree to continue to serve as the Chancellor (Dr. Taylor) for the University of the Cumberlands and Ambassador (Mrs. Dinah Taylor) for the University of the Cumberlands after their tenure as President and First Lady and including the rest of their lives."  [R. 16-1 at 1.]

The Taylor Agreement provides multiple benefits to the Plaintiffs including: Dr. Taylor's yearly salary as President to the Plaintiffs for the rest of their individual lives, Dr. Taylor is appointed as Chancellor of the University following his retirement, the plaintiffs receive all benefits already conferred at the execution of the agreement including long term health care and assisted living facility costs, Dr. Taylor's brother Stan Edward Taylor and his wife are provided an apartment for life from the University for $200 per month in rent, Dr. and Mrs. Dinah Taylor are provided with an apartment or residence free of cost in Williamsburg, and Mrs. Taylor is the beneficiary of a $1 million life insurance policy that the University has purchased or will purchase.  *See id.*  In exchange for these benefits Dr. and Mrs. Taylor have agreed to a number of

terms.  Dr. Taylor "agrees to continue to serve as President . . . until he may decide to retire" and following retirement he "agrees to accept the position of Chancellor . . . for as long as he may desire to perform the duties."  Mrs. Taylor agrees "to always be an Ambassador for the University," and both plaintiffs "agree to serve the University in any capacity requested and agree to continue their fundraising efforts in identifying . . . donors and / or potential donors" for the University.  [*Id.*]

The University now argues that this agreement lacks valid consideration, and therefore cannot be enforced, because the agreement was entered into solely based upon the plaintiffs' past performance which cannot serve as valid consideration.  The contract itself states that, "The University of the Cumberlands and the Board of Trustees agree that the compensation and benefits contained in this agreement is/are for the past decades of duties and/or work performed by Dr. and Mrs. Taylor all for the benefit of The University of the Cumberlands."  [*Id.* at 4.]  The University cites to *Sawyer v. Mills*, 295 S.W3d 79, 86 (Ky. 2009) which states that, "[i]t is a general rule that past consideration is insufficient to support a promise."  *Id.* (quoting 17A Am. Jur. 2d *Contracts* § 152 (2009)).  Further, *Sawyer v. Mills* states that "the agreement and consideration must be dependent on each other."  *Id.* at 88.

*Sawyer v. Mills* is distinguishable from the present action in multiple respects.  In *Sawyer* the Plaintiff "concedes she had completed her performance prior to the . . . oral agreement" which means "[the contract] was supported only by past performance, which is no consideration at all."  *Sawyer v. Mills*, 295 S.W.3d 79, 86 (Ky. 2009).  To the contrary, Dr. and Mrs. Taylor argue that in their written agreement, "the Agreement contains at least five promises of performance by the Taylors, promises which were, in fact, fulfilled by the Taylors."  [R. 15 at 3.]  The Plaintiffs allege that the following promises constitute adequate consideration on behalf of

11

the Taylor's:

1. Dr. Taylor agreed to serve as president until he may decide to retire.
2. Dr. Taylor agreed to accept the position of Chancellor for as long as he desired to perform the duties of Chancellor.
3. Mrs. Taylor agreed to always be an Ambassador for the University.
4. Dr. and Mrs. Taylor agreed to serve the University in any capacity requested; and
5. Dr. and Mrs. Taylor agreed to continue their fundraising efforts for the University.

[R. 15 at 14.]

The legal principle that past performance is inadequate as consideration under Kentucky law is also supported by *Greenup v. Wilhoite*, 279 S.W. 655, 666 (Ky. 1926), which also holds that "[t]here is a well-established rule that every writing evidencing an indebtedness imports a consideration…" *Id.* While the University of the Cumberlands did not owe a monetary debt to the Plaintiffs, the disputed agreement does recognize that "Dr. Taylor and Mrs. Taylor have greatly exceeded all fundraising expectations, raising hundreds of millions of dollars for the University," and that "the Board of Trustees desires to compensate Dr. and Mrs. Taylor for their decades of service to the University." [R. 16-1 at 1.] This language which notes indebtedness for service suggests that the contract is supported by valid consideration.

In contract issues such as these there is a presumption of universal application "that an admitted and duly executed writing is supported by a legal consideration, and the burden is cast on the one executing it to overcome that presumption." *Shrout's Adm'r v. Vaughan*, 204 S.W.2d 969, 970 (1947). Seeing that the disputed agreement has been signed by the Chairman of the Board of Trustees, an authorized representative of the University, both Plaintiffs, and a notary public, this presumption shall apply. The Plaintiffs further argue that the business judgment rule should apply, and the court should not question "adequacy of consideration" as to the Taylor Agreement, as the "Court is ill-equipped to second-guess the Board of Trustees regarding their determination of the value to the University of its continued association of the Taylors." [R. 15

at 15.]  Without citing authority, the Defense merely states that "the multitude of cases regarding the business judgment rule . . . have no application to this Motion, which presents a purely legal question regarding the Disputed Agreement's enforceability."  [R. 17 at 9.]

The Plaintiffs cite to an unpublished Kentucky Court of Appeals opinion, *Davis v. Innwood Condo. Prop. Owners Ass'n*, which finds that "the business judgment rule is codified for non-profit corporations" in the Kentucky Revised Statutes.  *Davis v. Innwood Condo. Prop. Owners Ass'n*, No. 2013-CA-001221-MR, 2014 Ky. App. Unpub. LEXIS 500, at *10-11 (Ct. App. June 27, 2014).  Seeing that the Defense does not cite authority to contest application of the business judgment rule in this context, and under belief that the University Board members entered into this agreement with "an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [University]," the business judgment rule may apply in this context.  *Id.* (citing *Allied Ready Mix Co Inc. ex. Rel. Mattingly v. Allen*, 994 S.W.2d 4, 8 (Ky. App. 1998)).

The University argues that, even if the disputed agreement is supported by consideration, "it has no definite end date and, thus, is terminable at will."  [R. 12-1 at 14.]  "The rule in this state is that if a contract covers no definite period, it may be terminated by either party at will."  *Elec. & Water Plant Bd. Of City of Frankfort, Kentucky v. S Cent. Bell Tel. Co.*, 805 S.W.2d 141, 143 (Ky. Ct. App. 1990) (citing *Brownsboro Rd. Rest., Inc. v. Jerrico, Inc.*, 674 S.W.2d 40, 41 (Ky. Ct. App. 1984)).  In *Brownsboro Rd. Rest., Inc. v. Jerrico, Inc.*, 674 S.W.2d 40 (Ky. Ct. App. 1984) the court states that "[t]he law does not favor contracts running into perpetuity. Our state is committed to the rule that where a contract covers no definite period, it may be terminated by either party at will."  *Id.* at 41.  But, *Brownsboro Rd. Rest., Inc.*, also stands for the proposition that a franchise agreement that does not have a set termination date "falls into the

category of contracts which specify no time for termination. Such contracts will not, in absence of unequivocal language, be construed as running into perpetuity." *Id.* Much like the franchise agreements that do not have a set termination date, this contract has a termination clause but that date is unascertainable until the death of Dr. and Mrs. Taylor.

Unlike *Brownsboro* or the other cases cited by the Defendant, the instant action concerns a contract for what are, in effect, retirement or severance benefits from the University to the Defendants for the lives of Dr. and Mrs. Taylor. While *Brownsboro* and *Elec. & Water Plant Bd. Of City of Frankfort, Kentucky*, support the proposition that contracts are terminable at will when the provisions of the contract extend into perpetuity, these cases are distinguishable from the disputed agreement. In the disputed agreement, section "V. Termination" states that, "This agreement shall remain in full force and effect and continue to be legally binding until and upon the death of Dr. James H. Taylor and upon the death of Mrs. Dinah Taylor." [R. 16-1 at 5.] Black's Law Dictionary defines the term "perpetuity" as. "[t]he state of continuing for all future time; the condition of persisting forever." Black's Law Dictionary (10th ed. 2014). While the future date of Dr. and Mrs. Taylor's passing is unknown, this day is certainly not one existing in perpetuity.

Accordingly, the contract is not terminable at will, as the contract is constrained to a definite yet unascertainable period therefore, the plaintiffs may have a viable legal claim to breach of contract. There are significant factual disputes surrounding the drafting, signing, and execution of the disputed agreement as well as competing interpretations of University Board minutes and closed Executive Session minutes. Fair disposition of this case requires this court to allow discovery to proceed. In denying the motion to dismiss as to the breach of contract claim, this Court notes that, "[d]istrict courts have the inherent power to manage and control their own

14

docket." *Ransaw v. United States*, No. 1:10 CV 01672, 2011 WL 1752160, at *2 (N.D. Ohio May 5, 2011). "[M]atters of docket control and conduct of discovery are committed to the sound discretion of the district court." *In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir.1996). Requiring discovery as to the breach of contract claim will not unfairly prejudice either party neither will it result in procedures that produce "actual or substantial prejudice to the complaining litigant." *Id.*

The plaintiffs' allegations in the amended complaint [R. 16] provide the basis for a "reasonable inference that the defendant is liable for the misconduct alleged." *DirecTV, Inc. v. Treesh,* 487 F.3d 471, 476 (citing *Twombly*, 550 U.S. at 556). This reasonable basis is founded upon the facts which suggest "grounds of [their] entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted). Accordingly, the motion to dismiss as to the breach of contract claim is denied. Further, seeing that neither party briefed nor discussed the claim of reformation of the contract, besides in a cursory manner, that claim shall also survive the motion to dismiss.

**2**

The University argues that the Disputed Agreement is not governed by ERISA, should not be considered to provide ERISA-protected benefits, and that this is not a "pension plan welfare benefit plan or top hat plan." [R. 18-1 at 7.] Dr. and Mrs. Taylor allege that the Disputed Agreement constitutes both an employee welfare benefit plan and employee pension benefit plan because it provides welfare benefits (health care, death benefits) and retirement compensation. [R. 19 at 3.] The definitions of Employee welfare benefit plans ("welfare plan") and employee pension benefit plans ("pension plan") both state that these benefits originate in a "plan, fund, or program." *See* 29 U.S.C. § 1002(1), (2). Besides determining whether the

Disputed Agreement is governed by ERISA, it is helpful to consider whether the agreement itself

establishes a plan, fund, or program.

In *Thompson v. American Home Assur. Co.*, 95 F.3d 429, 434 (6th Cir. 1996) the Sixth

Circuit adopted the *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982) (en banc) test which

states that "[t]he existence of an ERISA plan is a question of fact, to be answered in light of all

the surrounding circumstances and facts from the point of view of a reasonable person."

*Thompson v. American Home Assur. Co.*, 95 F.3d 429, 434 (6th Cir. 1996); *see also Williams v.

WCI Steel Co.*, 170 F.3d 598 (6th Cir. 1999) (using the *Dillingham* test, as adopted by the Sixth

Circuit in *Thompson* to determine whether a plan met the minimum requirements of ERISA*). To

determine whether a "plan is an ERISA plan" the Court must perform a three-step factual

inquiry:

> **First**, the court must apply the so-called safe harbor regulations established by the
> Department of Labor to determine whether the program was exempt from ERISA.
> **Second**, the court must look to see if there was a plan by inquiring whether from the
> surrounding circumstances a reasonable person [could] ascertain the (1) intended
> benefits, (2) the class of beneficiaries, (3) the source of financing, and (4) procedures for
> receiving benefits. **Finally**, the court must ask whether the employer established or
> maintained the plan with the intent of providing benefits to its employees.

*Thompson,* 95 F.3d at 434-435 (internal quotation marks omitted) (emphasis added)

Neither parties suggest that the safe harbor regulations apply, therefore, this Court must turn to

the four elements discussed in the second prong of the three-step factual inquiry.

First, the Court must look to see whether "from the surrounding circumstances a

reasonable person could ascertain the intended benefits." *Thompson v. American Home Assur.

Co.*, 95 F.3d 429, 434-435 (6th Cir. 1996). The Plaintiffs argue that, despite the Disputed

Agreement's unclear terms as to intended benefits, the agreement "provides a clear method for

calculating the compensation" by setting the yearly compensation to be determined "by the

Amount of Dr. Taylor's salary, upon the date of the execution of this Agreement, or the salary of Dr. Taylor upon the date of Dr. Taylor's retirement as President, whichever yearly salary is greater." [R. 19 at 5.] By looking to surrounding circumstances, the terms of the Disputed Agreement itself, and parol evidence, the Plaintiffs' argue that the intended salary and welfare benefits are ascertainable. [R. 19 at 6.]

The University cites persuasive authority, *Jervis v. Elerding*, 504 F. Supp. 606, 608 (C.D. Cal. 1980), to support the proposition that "a contract between an employer and individual employee providing for post-retirement or post-termination in-kind compensation is not a plan, fund, or program within the definitional framework of ERISA." *Id.* In *Jervis v. Elerding* a retiring employee was offered a post-retirement salary as well as an apartment, free of cost. *Id.* at 606. The Court ultimately dismissed the action, as the benefits constituting in-kind compensation were not within the ERISA framework and proper redress would more appropriately be sought under a breach of contract action. *See id.* at 609. Importantly, the court was able to reach this conclusion because, "[t]he clause was part of the present compensation arrangement, inserted as consideration for plaintiff's continued services to defendant, rather than as part of a plan providing for retirement income or deferral of income." *Id.* While this case is merely persuasive, numerous Courts of Appeals, excluding the Sixth Circuit Court of Appeals, have affirmatively adopted the conclusion reached in *Jervis. See Nagy v. Riblet Prod. Corp.*, 79 F.3d 572, 574 (7th Cir.), certified question answered, 683 A.2d 37 (Del. 1996); *Williams v. Wright*, 927 F.2d 1540, 1546 (11th Cir. 1991); *Fraver v. N. Carolina Farm Bureau Mut. Ins. Co.*, 801 F.2d 675, 678 (4th Cir. 1986).

ERISA protected benefits include "medical, surgical, or hospital care or benefits in the event of sickness, accident, disability, death, or unemployment" as well as "vocational benefits,

apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services" but excludes other forms of in-kind compensation.  29 U.S.C. § 1002(1), (2).  Therefore, the Plaintiffs' claims as to non-ERISA benefits such as Stan Edward Taylor's residence in Williamsburg, Dr. and Mrs. Taylor's apartment or residence in Williamsburg, and benefits such as a University car and cell phone, cannot be brought under an ERISA claim.  *See id.*; *Jervis v. Elerding*, 504 F. Supp. 606, 608 (C.D. Cal. 1980).  To determine whether the claim for Dr. Taylor's salary to Dr. and Mrs. Taylor for life and the associated healthcare benefits can be brought under an ERISA action, the remaining elements of the *Dillingham* test must be considered.  *Thompson*, 95 F.3d at 434.  The University repeatedly asserted that the disputed agreement did "not otherwise set forth the amount of Dr. Taylor's salary" in a manner that is readily ascertainably but this Court is confident that discovery would allow a reasonable person using the surrounding circumstances to determine the salary and medical benefits owed Dr. Taylor and Mrs. Taylor at the time established in the disputed agreement. [*See* R. 18 at 16.]

Next, part two of the *Dillingham* test asks "whether from the surrounding circumstances a reasonable person [could] ascertain . . . the class of beneficiaries" covered by the Disputed Agreement.  *Thompson*, 95 F.3d at 434-435.  There is no serious dispute as to the identity of the beneficiaries, in this case Dr. and Mrs. Taylor. Rather, there is a dispute, albeit nuanced, regarding whether Dr. Taylor, and potentially his wife, can be considered members of a "class." [R. 18-1.]  The University cites to *Dakota, Minn. & Eastern R.R. Corp. v. Schieffer*, 648 F.3d 935, 938 (8th Cir. 2011) which states that "the words 'plan' and 'program' in § 1002(1) strongly imply benefits that an employer provides to a class of employees."  But, "[e]ven more significantly, the plain language of the statute — the reference to 'participants or their beneficiaries' — reflects the congressional intent that a covered 'plan' is one that provides

18

welfare benefits to more than one person." *Id.* (holding that Congress' "use of the plural" in the ERISA statute stating that ERISA benefits are for "participants or their beneficiaries" evidences Congressional intent).

In the instant action, the Disputed Agreement would provide benefits to both Dr. and Mrs. Taylor.  The University argues that these benefits originate solely from Dr. Taylor's position as President and that these benefits do not derive from Mrs. Taylor's prior position at the University, therefore they are not a class of employees.  [R. 18 at 14.]  The University does admit that the Sixth Circuit has not issued a ruling addressing whether a single employee can constitute a "one-person" ERISA plan.  [*Id.* at n.9.]  Plaintiffs cite to *DuBrul v. Citrosuco N. Am., Inc.*, 892 F. Supp. 2d 892, 906 (S.D. Ohio 2012) to support the proposition that "even if the alleged plan does apply to only one individual, Defendants still are not entitled to dismissal of Plaintiff's ERISA claims at this stage of the litigation."  *Id.* at 906.  *Dubrul* is easily distinguishable from the instant action because in *Dubrul* "four other highly compensated and select management employees received similar agreements" which suggested that the agreement in that case was "not a purely individual contract since a triggering event . . . could occur more than once and at a different time for each employee."  *Id.*; *see also*, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, n. 9 (1987)( recognizing that an "ongoing, predictable" obligation triggered at different times by different employees suggests an ERISA plan may exist).

The Disputed Agreement [R. 16-1] seems to be an individual contract, rather than a document establishing a fund, plan, or program that would provide ERISA covered benefits. The complaint does not allege that other employees were offered a similar plan or retirement package.  While it is true that "[t]he weight of authority indicates that one-person plans may qualify as ERISA plans" the plan must also "satisfy the other factors necessary for the plausible

existence of an ERISA plan" otherwise the action must be dismissed. *DuBrul v. Citrosuco N. Am., Inc.*, 892 F. Supp. 2d 892, 905 (S.D. Ohio 2012); *see also Combs v. Ky. Wesleyan Coll.*, No. 4:05-CV-139-JHM, 2008 U.S. Dist. LEXIS 2339 (W.D. Ky. Jan. 10, 2008) (holding that "the class of beneficiaries is the individual retiree and where applicable, his family").

Third, "the court must look to see if there was a plan by inquiring whether from the surrounding circumstances a reasonable person could ascertain the . . . source of financing." *Thompson v. American Home Assur. Co.*, 95 F.3d 429, 434 (6th Cir. 1996). *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 18 (1987) provides that "if an employer has an administrative scheme for paying benefits, it should not be able to evade the requirements of the statute merely by paying those benefits out of general assets." *Id.* at 15-16. Further, "[s]ome severance benefit obligations by their nature necessitate an ongoing administrative scheme, but others do not." *Id.* In Dr. and Mrs. Taylor's case, management of their benefit agreement does not require an extensive or additional administrative scheme. While it is true that "[a]s a matter of federal law, an employer who promises to pay benefits for the lifetime of a retired employee must keep that promise" the proper remedy may be through a breach of contract claim rather than through an ERISA mechanism. *Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 604 (6th Cir. 1999).

Plaintiffs argue that the "source of funding is not an issue in the court's opinion," [R. 19 at 9, referencing *Williams* 170 F.3d at 603] but, in *Williams*, the only reason the "source of funding" was not an issue is because a $21 million trust was established by the agreement. *Williams* 170 F.3d at 603. There, the "Memorandum Agreement clearly states that the $21 million set aside is to be allocated among the Recipient Employees." *Id.* In contrast, the individual contract between the University and Dr. Taylor notes that the "University shall pay" or "will continue to provide and/or pay all benefits" but no funding source is identified, assets

are not set aside into a trust, nor is the University's general fund referenced.  [*See* R. 16-1.]
Rather, what may be established in the Disputed Agreement is more akin to an "*ad hoc* pension
arrangement with individual retirees [that] d[oes] not constitute an ERISA plan."  *Williams* 170
F.3d at 603 (citing *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809 (7th Cir. 1994)).  Despite
the fact that the agreement does not specify a source of funds, it may be possible that a
reasonable individual looking to surrounding circumstances would believe the University's
general fund to be the source of financing for the agreed benefits.  *See Thompson v. American
Home Assur. Co.*, 95 F.3d 429, 434-435 (6th Cir. 1996).

Finally, this court must look to the procedures for receiving benefits.  *Id.*  In the disputed
agreement, under Section 1. "Duties and/or Obligations of The University of the Cumberlands,"
paragraph two states: "The manner of payment: monthly, quarterly or otherwise shall be
established by Dr. or Mrs. Taylor in written form and delivered to the Chairman of the Board of
Trustees."  [R. 16-1 at 2.]  Further, the remaining healthcare benefits are defined in paragraph
five and six as determined by the date of execution of the Disputed Agreement.  *Id.*  Besides
these sparse instructions, the disputed agreement lacks additional procedures for receiving
benefits or filing claims.  Much like *Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 604 (6th Cir.
1999) the Disputed Agreement fails the *Dillingham* test since, "it does not create the requisite
scheme to administer the benefits."  *Id.*  The instant action is also similar to *Elmore v. Cone Mills
Corp.,* 23 F.3d 855 (4th Cir. 1994) (*en banc*), a case where "the intended benefits, beneficiaries,
and source of funding were arguably clear" but "the procedure for recovering benefits was not
ascertainable until later when a formal Employee Stock Option Plan was created."  *Williams*, 170
F.3d at 604 (stating that the Fourth Circuit held the plan in *Elmore* to be deficient and fail the
*Dillingham* test due to a lack of sufficient procedures for recovering benefits).

The Sixth Circuit also agreed that "*Dillingham* requires more than just the existence of an administrative scheme. If a reasonable person cannot ascertain the claims procedures in a purported plan, then the plan is not an employee benefit plan under ERISA." *Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 604 (6th Cir. 1999).  Here, no actual claims procedures are detailed.  Rather, the Disputed Agreement seems to be an extension of previous benefits that Dr. Taylor was already receiving at the end of his Presidency and start of his tenure as Chancellor. *See Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) (stating that "[a] decision to extend benefits is not the establishment of a plan or program").  The Disputed agreement in the instant action is nearly identical to the contract addressed in *Melton v. Physicians in Emergency Med.*, No. 3:04-CV-183-S, 2006 U.S. Dist. LEXIS 9123, (W.D. Ky. Mar. 3, 2006), which states:

> Lastly, and perhaps most importantly, the contract completely fails to identify procedures for receiving the benefits. Dr. Melton's individual employment contract simply lacks the administrative program or procedures characteristic of ERISA plans. For instance, the employment contract did not detail when the elimination period would begin, how and when the benefits would be paid, how and when an employee must make a disability claim, the procedures to follow for appeal, or any other procedures typical of ERISA plans.

*Id.* at *11-13.

When looking to the surrounding circumstances and text of the disputed agreement, it is clear that the procedures for receiving benefits provided by the agreement are not sufficiently ascertainable. Therefore, the plaintiffs' Amended Complaint [R. 16] has failed to state a viable claim under ERISA, as the disputed agreement fails the *Dillingham* test. Accordingly, the Defendant University's Motion to Dismiss shall be GRANTED as to Count VII, Termination of ERISA Protected Benefits.

**3**

"Under Kentucky law, the elements of promissory estoppel are: (1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the

promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided

only by enforcement of the promise." *Harris v. Burger King*, 993 F. Supp. 2d 677, 691 (W.D.

Ky. 2014) (internal citation and quotation marks omitted); *see also Sawyer v. Mills*, 295 S.W.3d

79, 89 (Ky. 2009).  Additionally, there is a presumption of at-will employment in Kentucky law,

meaning that generally an employee can be discharged "for good cause, for no cause, or for a

cause that some might view as morally indefensible." *Wymer v. JH Props., Inc.*, 50 S.W.3d 195,

198 (Ky. 2001); *see also Lewis-Smith*, 85 F. Supp. 3d at 915 ("Generally, in the absence of a

specific contractual provision to the contrary, employment in Kentucky is terminable at-will")

(quoting *Miracle v. Bell Cnty. Emergency Med. Servs.*, 237 S.W.3d 555, 558 (Ky. Ct. App.

2007)).  In Kentucky, "[a]n at-will employee can claim promissory estoppel only if [he] can

show a specific promise of job security." *Harris*, 993 F. Supp. 2d at 691 (citing *DePrisco v.

Delta Air Lines, Inc.*, 90 F. App'x 790, 796 (6th Cir. 2004)).  Moreover, "[r]eliance on the

promise must be justified." *Id.* (citations omitted).

Here, Dr. Taylor and Mrs. Taylor consider the disputed agreement to represent a

"promise" from the University for job security, continued compensation, and a number of

benefits.  The Plaintiffs' complaint merely alleges reliance upon the terms of the Taylor

Agreement which include serving as Chancellor (Dr. Taylor) and Ambassador (Mrs. Taylor) for

life as well as receiving a salary equal to Dr. Taylor's yearly salary as president for "the rest of

both of their individual lives."  [R. 16 at 4; R. 16-1 at 2.]  Dr. Taylor further alleges that because

of his reliance on the Disputed Agreement he continued to work for the University from the

execution of the agreement in 2012 to October of 2015 when he resigned.  [R. 6 at 5.]

In *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636 (Ky. Ct. App.

2003), promissory estoppel was not properly invoked "because the element of reasonable

reliance is missing." *Id.* at 642.  The Kentucky Court of Appeals explains that "[a] key element of promissory estoppel, conveniently ignored by [Plaintiff], is that the defendant must reasonably expect an oral promise or understanding to induce reliance on the part of the plaintiff.' *Id.* Unlike *Rivermont Inn*, Dr. and Mrs. Taylor's reliance was produced by a written agreement with the University that was produced with significant formality, not merely an oral promise. Further, neither Plaintiff had received notice of any kind, other than affirmative support and commitment from the University Board of Trustees, which would suggest the agreement could not be relied upon.

Besides a brief reference to the promissory estoppel claim by footnote [R. 12-1 at 10, n. 4] and citing to a case that states the standard for promissory estoppel in Kentucky [R. 17 at 11], the Defendant University did not cite to legal authority that suggests the claim under promissory estoppel should be dismissed, therefore the motion to dismiss as to this claim shall be denied. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived."). The facts alleged in the amended complaint are sufficient to support a plausible claim for promissory estoppel. But, if the Disputed Agreement is found to be a duly executed contract supported by adequate consideration, additional damages under a promissory estoppel claim would be inappropriate. *See Sparton Technologies, Inc. v. Ulti-Link, LLC*, 248 Fed. Appx. 684, 690 (6th Cir. 2007) (holding that since the jury found a contract existed this finding "precludes, as a matter of law, a damage award based on promissory estoppel concerning the same subject matter").

**4**

The University of the Cumberlands' sole defense against a charge of slander *per se* in

four comprehensive filings rests on a single footnote which states that, "each of these claims relies and is built upon the enforceability of the Disputed Agreement. Because the Disputed Agreement is unenforceable, none of these claims against the University can be established."  [R. 12-1 at 10, n. 4.]  In Kentucky four elements are required for a defamation action: (1) defamatory language, (2) about the plaintiff, (3) which is published and, (4) which causes injury to reputation.  *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981); *see also Fortney v. Guzman*, 482 S.W.3d 784, 789 (Ky. Ct. App. 2015), review denied (Mar. 9, 2016). Kentucky law separates libel and slander actions into two categories: defamatory words that are actionable *per se* and those that are actionable *per quod*.  *Digest Publishing Co. v. Perry Publishing Co.*, 284 S.W.2d 832, 834 (Ky. 1955).  For words to be actionable under defamation *per se,* the words

> must tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society. But it is not necessary that the words imply a crime or impute a violation of laws, or involve moral turpitude or immoral conduct.

*CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) (quoting *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 383 (1933)).

In determining whether the Defendant has engaged in slander *per se*, "[t]he Court must consider if the words directly tend to the prejudice or injury of a person in his profession, trade or business."  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) (quoting *White v. Hanks*, 255 S.W.2d 602 (Ky. 1953)).  Slanderous words are actionable *per se* when they "either directly or indirectly import[] fraud, dishonesty, or sharp or unethical practices."  *White v. Hanks* 255 S.W.2d 602, 603 (Ky. 1953).  Dr. Taylor alleges in the Amended Complaint [R. 16] that the "agents of the University" published statements to third parties that suggest "Dr. Taylor hid the Taylor agreement from the University . . . and that he had the contract drawn up in a

deceitful or scheming manner."  [R. 16, ¶ 26.]  If true, the agents of the University would be making comments that directly implicate Dr. Taylor as a dishonest, unethical, or fraudulent person.  Regardless of the Contract's enforceability, it is plausible that further discovery would uncover evidence that these words are actionable under Kentucky law.  *See White v. Hanks* 255 S.W.2d 602, 603 (Ky. 1953).

The Plaintiffs have pled allegations of slander *per se* that have "facial plausibility" in a manner "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *DirecTV, Inc.*, 487 F.3d at 476 (citing *Twombly*, 550 U.S. at 556).  Further, Defendants did not adequately address or develop arguments challenging the Plaintiffs' complaint as to the charge of slander.  Despite the Defendant filing a motion to dismiss [R. 12] and reply [R.17] followed by a supplemental motion to dismiss [R. 18] and a reply to the supplemental motion [R. 20], the accusation of slander was solely addressed by one footnote totaling three sentences.  [R. 12-1 at 10, n.4.]  Further, since the accusation of slander is not dependent upon the contract's validity, the University's argument in footnote 4 is largely unresponsive.  *Id.*

The Sixth Circuit has held that "[w]e consider issues not fully developed and argued to be waived."  *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995); *see e.g.*, *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived."); *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) (holding that "[w]e consider issues not fully developed and argued to be waived.")). In light of this instruction, the defendants' inadequate and unresponsive briefing as to this charge, and the sufficiently detailed complaint, the Defendants' motions to dismiss as to slander, Count III, shall be denied.

**5**

The Kentucky Supreme Court recognized the tort of intentional infliction of emotional

distress in *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990).  The necessary elements

to succeed in a cause of action for intentional infliction of emotional distress are:

> 1) the wrongdoer's conduct must be intentional or reckless;
> 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
> 3) there must be a causal connection between the wrongdoer's conduct and the plaintiff's emotional distress; and
> 4) the emotional distress must be severe.

*Id.* at 2-3.

The bar for success in an intentional infliction of emotional distress claim is extraordinarily high,

as illustrated by the Kentucky Supreme Court's recitation of Comment d, § 46 of the

Restatement (Second) of Torts which states:

> It has not been enough that the defendant has acted with an intent which is tortious ..., or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,'.... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Id.* at 3 (quoting *Restatement (Second) of Torts*, § 46 Comment d); *see also Kroger Co. v.*

*Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996) (holding that "only outrageous and intolerable

conduct" is covered by the tort of intentional infliction of emotional distress)

Dr. Taylor and Mrs. Taylor argue that intentionally breaching the Taylor agreement was

tantamount to "economic coercion against an elderly couple" that included "threats of the loss of

their residence and health insurance, as well as their income."  [R. 16, ¶ 33.]  These threats were

allegedly brought after Dr. Taylor had retired.  At this time the University attempted to "coerce

Dr. and Mrs. Taylor into accepting a [*sic*] substantially less than is owed with threats to cease

paying any benefits owed under the Taylor Agreement."  [R. 16, ¶ 15.]  Dr. Taylor "was told if

he did not accept this new contract that his relationship with the University would terminate," including all benefits. *Id.*

Just as with the charge for slander, the University of the Cumberlands' sole defense against a charge of intentional infliction of emotional distress in four comprehensive filings rests on a single footnote which states that, "each of these claims relies and is built upon the enforceability of the Disputed Agreement. Because the Disputed Agreement is unenforceable, none of these claims against the University can be established." [R. 12-1 at 10, n.4.] Resultantly, no state or federal case law addressing this portion of the complaint has been referenced by the defense. Elements one and three of the plaintiffs' claim are almost certainly established by the complaint as the University has allegedly behaved in an intentional or reckless manner and the plaintiff's distress is a direct result of the University's refusal to adhere to the terms of the disputed agreement. But, fact specific comparison to case law is required to determine whether the Defendant's conduct is outrageous or intolerable and whether Dr. and Mrs. Taylor's distress is severe.

The instant action is not too dissimilar from *Kroger Co. v. Willgruber*, 920 S.W.2d 61 (Ky. 1996). In *Willgruber*, Andrew Willgruber was employed by Kroger Company for 32 years and was ultimately promoted to National Sales Manager of Country Oven Bakery. *Id.* at 62. Mr. Willgruber was positively reviewed by his employer and "the bakery prospered under his sales direction." *Id.* at 63. There were no work related issues until a newly hired plant manager wrote "fictitious monthly evaluation reports" that described Mr. Willgruber's job performance as poor. Finally, at a Christmas luncheon Mr. Willgruber was "presented with a resignation letter and possible severance package," but "to qualify for the severance package, he was required to sign a release forever discharging Kroger for any and all liability arising from his separation from the

company." *Id.* Further, he was guaranteed a new job at bakery in South Carolina, but this opportunity was never formally offered again. *Id.* At the luncheon, Mr. Willgruber was given twenty-one days to resign or be fired, but, not three days later, he was "forced to clean out his desk while friends and co-workers looked on." *Id.* Mr. Willgruber then suffered through two years that he described as a "living hell" where he encountered "physical sickness, emotional pain, inability to eat or sleep," and emotional distress that led him to attempt suicide. *Id.*

On appeal, Kroger Co. challenged the second element of proof necessary for the tort which states that, "The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996). To determine whether the defendant's conduct was "outrageous and intolerable" the Kentucky Supreme Court discussed previous decisions relating to this tort. In *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990), a pregnant woman alleged that her hospital room intercom had been disconnected, that there was a 12-15 minute delay resulting in late arrival of nurses, that one nurse told her to "shut up" and that another nurse told her "that the hospital would dispose of her dead baby." *Kroger Co v. Willgruber*, 920 S.W.2d at 66. The Kentucky Supreme Court found that this behavior may have been negligent or reckless but that the employees "did not intentionally or recklessly cause severe emotional distress."

The standard for outrageous and intolerable conduct was further detailed in *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984). Here the outrageous and intolerable conduct "against Mrs. Craft consisted of (a) keeping her under surveillance; (b) telling her on the CB radio that her husband would be put in jail; and (c) driving so as to force her into an opposing lane of traffic." *Kroger Co v. Willgruber*, 920 S.W.2d at 66. With this body of case law in mind, the Kentucky Supreme Court in *Willgruber* looked to Kroger Company's repeated misrepresentations, Mr. Willgruber's

29

"complete mental breakdown," the Company representative's knowledge of this breakdown, and the fact that that same representative then pressured Mrs. Willgruber to "have her husband sign the papers." *Id.* at 66.  The Court referenced Comment f to § 46 of the Restatement (Second) of Torts which "provides that extreme and outrageous behavior may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress." *Id.*  Finally, in holding that the conduct by Kroger was, in fact, outrageous, the Court found that "Kroger's actions did not constitute some petty insult, minor indignity or impolite triviality" and "[n]or was its conduct typical of what occurs when an employment relationship ends." *Id.*

Similarly, in the instant action, Dr. Taylor had been employed by the University for 35 years and the University was generally aware, during its attempts to coerce Dr. Taylor into accepting an annually renewable contract, that Dr. Taylor and his wife are both elderly and were relying on the disputed agreement to provide compensation, housing, and retirement benefits. Additional discovery is necessary to understand whether Dr. and Mrs. Taylor's emotional distress is "severe". *See Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990).  In the complaint, Dr. and Mrs. Taylor allege that "the University has caused severe emotional distress" and that this distress includes "worry, mental stress and concern…" about a number healthcare costs, insurance, economic obligations, and the necessities of life.  [R. 16, ¶¶ 34-35.]  This is similar to the complaint in *Miller v. Currie*, 50 F.3d 373, 378 (6th Cir. 1995), which states "Miller specifically alleged that the emotional distress she suffered was severe and that she suffered physically as a result." *Id.* The Sixth Circuit Court of Appeals found that it cannot be said that "this is merely a case where some one's feelings are hurt," and accordingly that "the allegation is sufficient to survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss." *Id.*  The complaint in the instant action also shows serious harm more than mere hurt feelings.  While this guidance

is persuasive, not mandatory, due to the Sixth Circuit's application of Ohio law, the reasoning and analysis is nevertheless helpful.

Beyond the plausibility of the Plaintiffs' claim and rather clear persuasive instruction from the Court of Appeals, it should again be noted that the Defendant University failed to address the allegation beyond a single footnote in the motions and replies that were filed in the record. Accordingly, the Defendants' motion to dismiss the claim for intentional infliction of emotional distress is denied.  *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived."); *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) (holding that "[w]e consider issues not fully developed and argued to be waived.")).

**6**

Unjust enrichment was created "as a basis of restitution to prevent one person from keeping money or benefits belonging to another."  *Rose v. Ackerson*, 374 S.W.3d 339, 343 (Ky. App. 2012) (quoting *Haeberle v. St. Paul Fire and Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. App. 1989)).  The Plaintiffs, Dr. and Mrs. Taylor plead Count VIII, unjust enrichment, as an alternative claim.  [R. 19 at 17.]  Demands for relief may include claims in the alternative.  *See* Fed. R. Civ. P. 8.  Kentucky Courts have created a three element test to sustain a claim for unjust enrichment which requires: "(1) benefit conferred upon defendant at plaintiff's expense, (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value."  *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012).  The University argues that the Plaintiffs have failed to state facts sufficient to satisfy the third requirement of the test as "Dr. Taylor has acknowledged that he continued to be compensated by the University through April 6, 2016, and he has not alleged that he provided

any benefits to the University after that date.  [R. 18 at 20.]  Seeing that the Kentucky courts merely require "payment for its value" and not necessarily "adequate payment," it seems that Dr. and Mrs. Taylor's alternative claim for unjust enrichment should fail as Dr. Taylor was compensated for his work through April 2016.  [R. 18 at 20.]  Therefore, as to this count the complaint has failed to state a claim for which relief can be granted. Accordingly, the motion to dismiss as to Count 8, Unjust Enrichment, is granted.

### III

To survive a motion to dismiss, the complaint "must contain either direct or inferential allegations" establishing each material element required for recovery under some actionable legal theory.  *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005) (internal quotation marks omitted)). Here, Dr. and Mrs. Taylor have presented law and facts, in compliance with federal pleading standards and precedent, establishing that the plaintiffs may be entitled to relief on a number of claims. Accordingly, and the Court being otherwise advised, it is hereby **ORDERED** as follows:

1.    The Defendants' Motion to Dismiss for failure to state a claim [**R. 12**] and the Supplemental Motion to Dismiss for failure to state a claim [**R. 18**] are **GRANTED** as to Count VII, "Termination of ERISA Protected Benefits," and Count VIII "Unjust Enrichment."

2.    The Defendants' Motion to Dismiss for failure to state a claim [**R. 12**] and the Supplemental Motion to Dismiss for failure to state a claim [**R. 18**] are **DENIED** as to all remaining claims.

This the 7th day of February, 2017.

Gregory F. Van Tatenhove
United States District Judge