UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DR. JAMES TAYLOR and MRS. DINAH TAYLOR, | ) ) ) | Civil No: 6:16-cv-109-GFVT |
| Plaintiffs, | ) ) | |
| V. | ) ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| UNIVERSITY OF THE CUMBERLANDS, | ) ) ) | **ORDER** |
| Defendant. | | |

*** *** *** ***

Dr. James Taylor was employed as President of the University of the Cumberlands for 35 years beginning in August of 1980. Following his retirement from that position, and after serving as Chancellor of the University for a short time, Dr. Taylor insisted on enforcement of a contract – which the parties now refer to as the "Disputed Agreement" – purportedly made between the University and Dr. and Mrs. Taylor. The University refused to fulfill the terms of the Disputed Agreement, which, among many other benefits, provided Dr. James Taylor and Mrs. Dinah Taylor with compensation for life following Dr. Taylor's retirement from the position of President. Subsequently, Dr. Taylor brought suit against the University alleging breach of contract, promissory estoppel, slander, intentional infliction of emotional distress, and seeking punitive damages and reformation. Nearly three months later, the Taylors amended their complaint to include allegations of unjust enrichment and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). In February 2017, the Court, addressing the University's 12(b)(6) Motion, dismissed the Taylors' unjust enrichment and ERISA claims.

Presently before the Court is the Taylors' Motion for Partial Summary Judgment [**R. 38**], which, for the reasons set forth below, will be **DENIED**.

I

Given the present context, the factual summary that follows is taken from the record, with all facts and inferences drawn in the light most favorable to the University as the nonmoving party. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citation omitted). Dr. James Taylor was employed as President of the University of the Cumberlands for 35 years beginning in August of 1980. [R. 16 at 2.] He served as President of the University during times of significant expansion and development, including the transition from Cumberland College to the University of the Cumberlands.

The Taylors allege that, through a series of University Board of Trustees meetings beginning in October 2005, and continuing to October 2015, the University entered into and reaffirmed commitment to an agreement to provide Dr. James Taylor and Mrs. Dinah Taylor with compensation for life following Dr. Taylor's retirement from the position of President. [*See id.* at 2-3.] According to the Taylors, the Disputed Agreement memorialized on April 19, 2012 [*see* R. 16-1] was first discussed generally at the University's Board of Trustees Meeting held October 21, 2005. [R. 16 at 2.] The Taylors contend that, during a closed executive session on April 19, 2012, the board unanimously adopted a resolution made by Trustee Bill Hacker and seconded by Trustee Dave Huff that would, among many other things, "continue Dr. Taylor and Ms. Dinah Taylor's salary and benefits following his retirement from the position of President, and to appoint him as Chancellor of the University immediately thereafter." [*Id.*]

The purported resolution explicitly states, "In the event Dr. Taylor predeceases his wife, such compensation and benefits shall go to Dinah Taylor," and that the University Bylaws and

President's contract shall be amended "to include the establishment of the position of Chancellor and the salary and benefits for Dr. and Mrs. Taylor." [*Id.*] The Disputed Agreement details the consideration for its terms by declaring "that the compensation and other benefits included in this agreement are not conditional upon Dr. Taylor remaining as The President of the University of the Cumberlands or accepting the position as Chancellor," and that the parties "agree that the compensation and benefits contained in this agreement is/are for the past decades of duties and/or work performed by Dr. and Mrs. Taylor all for the benefit of The University of the Cumberlands." [R. 16-1 at 3-4.]

According to the Taylors, the parties preliminarily agreed on some form of retirement package for Dr. and Mrs. Taylor in October 2005. [R. 16 at 2.] In doing so, the Board approved the creation of the position of Chancellor. [*Id.*] Dr. Taylor was to assume the position of Chancellor upon his retirement as President. [*Id.*] Jim Oaks, Chairman of the Board of Trustees, hired the law firm of Guenther, Jordan & Price, P.C. to prepare the necessary amendments to the Bylaws in order to create the Chancellor position. [R. 16 at 3.] The retirement package itself, however, was not further addressed by the Board until seven years later at its meeting held April 19, 2012. Although the Taylors contend the terms of the agreement were agreed upon in October 2005, it was not until the spring of 2012 that Dr. Taylor unilaterally approached attorney Steven J. Moore to draft the Disputed Agreement. [*See* R. 38-1 at 2.] The Disputed Agreement was signed by Dr. Taylor,[1] Jim Oaks as the then-Chairman of the Board of Trustees, and a notary public.[2] [*See* R. 16-1.] However, while Jim Oaks acknowledges his signature on the Disputed Agreement [*See* R. 46 at 15], he claims he never agreed to compensate Dr. and Mrs. Taylor for

---

[1] Dr. Taylor signed not only his name, but also the name of his wife, Dinah Taylor. [R. 38-1 at 3.]
[2] The University contends that the Disputed Agreement is a product of fraud. [R. 23 at 9; R. 46 at 20.] For support, the University notes that the Disputed Agreement was signed by a notary public "subscrib[ing], sw[earing], and acknowledg[ing]" Mrs. Dinah Taylor's signature. [R. 16-1; R. 46 at 15; R. 46-1 at 28-30.]

3

the rest of their lives without Dr. Taylor serving as Chancellor and continuing to fundraise for the University after his retirement as President. [*See* R. 46-2 at 30-35.]

The Disputed Agreement calls for the University to provide to Dr. and Mrs. Taylor, after Dr. Taylor's retirement from the Presidency, a number of retirement benefits including health insurance benefits, Dr. Taylor's full salary, and a residence or apartment in Williamsburg, Kentucky. [R. 16 at 3.] These benefits were to be provided for the lives of Dr. and Mrs. Taylor. The complaint states that on October 15, 2014, the Board "unanimously reconfirmed the University's commitment to provide a benefit package for Dr. and Mrs. Taylor to include salary in effect on January 1, 2015, all previously approved insurance for Dr. and Mrs. Taylor, plus all other perks they were receiving at that time." [*Id.*] On October 15, 2015, Dr. Taylor stepped down as President and entered the role of Chancellor, while Mrs. Taylor "continued to serve as ambassador for the University." [*Id.*] The University contests the Taylors' description of Board actions at the Executive Session and challenges the validity and accuracy of the minutes that the Taylors reference in the complaint.

After Dr. Taylor's retirement, the University attempted to reduce the amount of benefits owed to Dr. and Mrs. Taylor by offering Dr. Taylor a one-year renewable contract that provided for a salary significantly less than had been provided for in the Disputed Agreement. [*Id.* at 3-4.] The University warned Dr. Taylor that failure to accept this one-year renewable contract would result in the loss of all prior benefits including his "University owned apartment in Williamsburg, KY, the University owned vehicle he drives, and the cellular telephone he uses, all of which were benefits to him under the [Disputed Agreement]." [*Id.* at 4.] Despite the threat of losing all benefits, Dr. Taylor refused these offers and insisted on enforcement of the Disputed Agreement as purportedly negotiated by the parties. [*Id.*] Subsequently, the University informed

Dr. and Mrs. Taylor that "their Agreement . . . will not be honored and their retirement benefits have been terminated." [*Id*.]

Dr. and Mrs. Taylor now move for summary judgment on their breach of contract claim based on Mr. Oaks's apparent authority to execute the Disputed Agreement. [R. 38.] The Taylors claim that (1) the University held Jim Oaks out as having the authority to execute contracts binding the University because Mr. Oaks was the then-Chairman of the Board of Trustees; (2) Dr. and Mrs. Taylor were reasonable in their belief that Mr. Oaks had the authority to sign contracts on behalf of the University, and, therefore, when he signed the Disputed Agreement he bound the University to the terms contained therein; and (3) the Taylors' beliefs regarding Mr. Oaks authority are traceable to the University's representations, especially those representations contained in the board meeting minutes. [*See* R. 38-1 at 5-7.]

The University contests summary judgment on several points. First, the University argues that Dr. and Mrs. Taylor are not entitled to summary judgment because they have not satisfied the burden of showing an absence of a genuine dispute of material fact. [R. 46 at 19-20.] Second, the University asserts Jim Oaks lacked actual or apparent authority to execute the Disputed Agreement so as to bind the University. [*Id.* at 20.] Next, the University states the board meeting minutes cited by the Taylors in support of their motion for summary judgment do not support the motion. [*Id.* at 29.] The University then argues that the Disputed Agreement is void as a matter of law. [*Id.* at 31.] Lastly, the University contends that Dr. and Mrs. Taylor's motion for summary judgment is premature given four months of discovery remained at the time the motion was filed. [*Id.* at 38.] For all of these reasons, the University urges the Court to deny the Taylors' motion for summary judgment.

## II

### A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The movant has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the nonmoving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

At the outset, the Taylors assert that summary judgment is appropriate simply because Jim Oaks "unquestionably had apparent authority to execute the agreement, and Dr. and Mrs. Taylor were entitled to rely upon that apparent authority because they had no knowledge to the contrary." [R. 38-1 at 2.] The Taylors also contend that the University is prohibited from introducing parol evidence to contradict what the Taylors claim to be official minutes of certain

Board of Trustee meetings. [*Id.* at 9.] Because the University held Mr. Oaks out as someone who could contractually bind the University and because the Taylors were reasonable in their reliance on Mr. Oaks's apparent authority, the argument goes, the University is prohibited from introducing any evidence contradicting the board meetings' minutes and the Taylors are entitled to judgment as a matter of law.

Under agency principles, actual authority and apparent authority are quite different from one another. Actual authority exists when a principal manifests in the agent the authority, and the agent consents to such authority, to act on the principal's account. *Kindred Nursing Centers Ltd. P'ship v. Brown*, 411 S.W.3d 242, 249 (Ky. Ct. App. 2011) (internal citation omitted). However, apparent authority exists when the principal holds the agent out as possessing authority to bind the principal. *Mill St. Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990) (internal citations omitted). "It is a matter of appearances on which third parties come to rely." *Id.* The party claiming apparent authority has the burden of proving such authority, here the Taylors. *See id.* (internal citations omitted). At issue here is whether the Taylors can prove Jim Oaks had apparent authority to bind the University to the terms of the Disputed Agreement.

The Kentucky Supreme Court has adopted the following: "Apparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." *Dean v. Commonwealth Bank & Trust Co.*, 434 S.W.3d 489, 500 (Ky. 2014) (quoting *Restatement (Third) of Agency* § 3.03 (2006)); *see also Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 594 (Ky. 2012) ("An agent is said to have apparent authority to enter transactions on his or her principal's behalf with a third party when the principal has manifested to the third party that the agent is so authorized, and the

7

third party reasonably relies on that manifestation."). The elements of apparent authority "are chiefly factual matters," *see Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 426 n.1 (6th Cir. 1998), and the reasonableness of a third party's belief "is usually a question for the trier of fact." *Dean*, 376 S.W.3d at 594. For purposes of this case, then, the three inquiries are (1) whether the University manifested that Jim Oaks had authority, (2) whether the Taylors reasonably believed that Jim Oaks had authority based on the manifestations, and (3) whether Dr. and Mrs. Taylor's beliefs were directly traceable to the University's manifestations. If the Taylors can satisfy their initial burden of answering these three questions in the affirmative, the University will then be required to go beyond the pleadings and put forth specific facts demonstrating the existence of a genuine issue for trial. *See* Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324).

1

There remains a question fact as to whether the University manifested in Jim Oaks, the then-Chairman of the Board of Trustees, the authority to bind the University to the terms of the Disputed Agreement. The Taylors claim his position alone was enough of a manifestation to bind the University. [R. 38-1 at 5.] The University, however, maintains it never manifested authority – actual or apparent – in Jim Oaks to unilaterally enter the University into executory contracts, especially the Disputed Agreement. [R. 46 at 20, 23.] The Taylors respond by stating Oaks did not act unilaterally, rather the Disputed Agreement was approved by the Board during an Executive Session of the Board's April 19, 2012, meeting, and Oaks was acting in accord with the Board's approval. [*See* R. 52 at 4.] The University vehemently contends that the Disputed Agreement was never properly and fully submitted for Board ratification. [R. 46 at 23.] In support of the argument, the University cites the depositions of several Trustees who

claim the Board never took up for consideration a contract having such terms as those contained in the Disputed Agreement. [R. 46 at 26 n.11; R. 46-11 at 5-8; R. 46-13 at 3-7; R. 46-14 at 3-7.] Of course, the Taylors, on several occasions, point to purported official minutes to show that the Disputed Agreement was read to and approved by the Board in April of 2012. [R. 38-1 at 3, 8-11.] But the University disputes the authenticity of the minutes. [R. 46 at 13-15.] Whether the Board actually ratified the Disputed Agreement, which likely would have manifested apparent authority in Oaks under the Bylaws to execute the Disputed Contract, is a question of material fact that should be left to the jury.

The University also argues that Oaks, by executing the Disputed Agreement, would have been in violation of Article III, § 2, of the University's Bylaws. [R. 46 at 23; *see also* R. 46-18 at 3.] However, whether Oaks violated the University's Bylaws is a separate and distinct question from whether the University manifested authority in him. To this point, the Court should look to see whether the University, through inaction, had previously ratified contracts unilaterally executed by Oaks; if so, then it is more likely that the University manifested in Oaks the authority to bind it.

Dr. Taylor, in his affidavit, states he knew of other occasions Jim Oaks executed contracts binding the University. [*See* R. 38-6.] In fact, the Taylors contend that the University's "current President acts today pursuant to a contract signed by [Oaks], as the sole signatory on behalf of the University." [R. 38-1 at 2.] However, Dr. and Mrs. Taylor neither develop this argument further nor point to where in the record that assertion can be substantiated. There is no evidence before the Court, other than the Taylors' self-serving statements, to suggest the University ratified other contracts unilaterally executed by Oaks. Drawing all reasonable inferences in favor of the University, the Court finds that the Taylors have not satisfied their

9

burden of showing there is an absence of evidence regarding the issue of whether the University manifested authority in Jim Oaks.

2

Agency principles also require third parties to reasonably believe an agent has authority to bind her principal. *Dean*, 434 S.W.3d at 500; *Ping*, 376 S.W.3d at 594. The third parties in this case – Dr. and Mrs. Taylor – are quite different than most third parties who may be strangers to the principal. Dr. Taylor, at the time of his retirement, had been affiliated with the University of the Cumberlands for over 50 years. [R. 46-3 at 4.] For many of those years, he served as President while Mrs. Taylor served as an ambassador for the University. [R. 16 at 2.] What amounts to a "reasonable belief" in terms of Dr. and Mrs. Taylor as third parties to a contract with the University will look very different than, say, a new landscaper entering into her first grounds keeping contract with the University. The facts of this case indicate that whether Dr. and Mrs. Taylor could not have reasonably believed that Jim Oaks had authority to bind the University to the terms of the Disputed Contract remains a question best suited for the jury.

In analyzing apparent authority, the Sixth Circuit has stated that it is unreasonable for third parties to "rely upon an agent's ostensible authority if the third party knows that the agent is not authorized to act in a particular manner." *Anderson v. Int'l Union, United Plant Guard Workers of America*, 370 F.3d 542, 551 (6th Cir. 2004). In *Anderson*, the Sixth Circuit reversed a lower court's determination that high-ranking union officials reasonably relied upon the apparent authority manifested in the union's President and the union's International Executive Board. *Id.* at 545. The high-ranking union officials were the Vice President and two Regional Directors of the union. *Id.* at 546. Those officials claimed the President and International Executive Board had authority to bind the union to certain pension benefits. *Id.* at 549-50. In

fact, the union officials not only had the President's assurance that the pension benefit plan in question had been cleared by attorneys and accountants but also the union attorney's assurance that the plan was legal. *Id.* at 549. Still, the Sixth Circuit held the Vice President and Regional Directors "had actual knowledge of the limitations of pension benefits imposed by [the union's] constitution and should have known the appropriate procedures for amending [the union's] constitution." *Id.* at 551-52. Thus, the union's President and International Executive Board did not have apparent authority to bind the union to the disputed pension benefits. *Id.* at 552.

Similarly, Dr. Taylor was no stranger to the University's practices and procedures due to his longtime tenure as President of the University of the Cumberlands. In fact, the Bylaws were amended in 2009, during Dr. Taylor's presidency. [*See* R. 46-18.] Dr. Taylor knew well the importance of procedure and the need to have Bylaws amended in order to implement certain hierarchical changes. [*See* R. 46-1 at 6; R. 46-3 at 3.] Additionally, Dr. Taylor testified at his deposition that he approached Steve Moore to draft the terms of the Disputed Contract, even though Moore had no previous experience drafting such contracts for the University. [R. 46-1 at 37-41.] Indeed, at least according to the record, there was never any back-and-forth between the parties and Moore concerning the terms to be included in the Disputed Agreement. [*See* R. 52-10.] Dr. Taylor also never asked attorneys Jim Guenther or James Jordan to review the contract drafted by Moore even though Guenther and Jordan consistently served the University and its Board during 2012. [*Id*. at 35-36.]

The Bylaws, as amended in 2009, contained a provision that limited the Chairman's ability to execute contracts. [R. 46-18 at 3.] Article III, § 2, of those Bylaws specifically states, "The Chair shall . . . execute, with the Secretary assisting, contracts and instruments authorized or issued by authority of the Board requiring the Chairman's signature." [*Id.*] Lonnie Walden

11

was the Board's Secretary in 2012 when the Disputed Agreement was purportedly executed. [*See* R. 46-12 at 18.] Although Walden's signature appears in the meeting's minutes directly below a section detailing the occurrence of an Executive Session during the Board meeting held April 19, 2012 – the Executive Session in which the Taylors claim the Disputed Agreement was approved – that section contains absolutely no details concerning the terms of the Disputed Agreement. [*Id.*] In fact, Walden testified that the terms contained in the Disputed Agreement were never read to the Board, and Walden never voted to approve such terms. [R. 46-11 at 5-8.]

Dr. Taylor had actual knowledge of the restrictions placed on the Chairman's authority to execute certain contracts; after all, he was the President of the University when they Bylaws were enacted placing such limitations on the Chairman's authority. [*See* R. 46-18.] Like the Vice President and Regional Directors in *Anderson*, Dr. Taylor should have known the appropriate procedures of executing contracts such as the Disputed Agreement. *See Anderson*, 370 F.3d at 552. Although Dr. and Mrs. Taylor may have believed Oaks had the authority to bind the University to the terms of the Disputed Agreement, Dr. Taylor's actual and imputed knowledge likely renders such belief unreasonable in light of the facts articulated above.[3] Because this element of apparent authority is "chiefly factual, and because "reasonable in this context is usually a question for the trier of fact," the determination as to the reasonableness of Dr. and Mrs. Taylor's belief concerning Oaks's authority is best left to the jury.[4] *See Orchard*

---

[3] The Court recognizes its Memorandum Opinion & Order addressing the University's 12(b)(6) Motion states the Taylors never received notice of any kind that would suggest the Disputed Agreement could not be relied upon. [*See* R. 21 at 24.] This statement seems to contradict the analysis here. However, the University's 12(b)(6) Motion required the Court to construe the Complaint's facts, and all reasonable inferences therefrom, in favor of the Plaintiff. *See DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Here, analyzing the Taylors' Motion for Summary Judgment requires the Court to review the facts and draw all reasonable inferences in favor of the University. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

[4] The Taylors cite *Suhail v. Univ. of the Cumberlands*, 107 F. Supp. 3d 748 (E.D. Ky. 2015), to support their claim of apparent authority. However, the *Suhail* plaintiff who sought a breach of employment contract claim was positioned very differently that Dr. Taylor is here. Dr. Suhail had not previously been employed with the University, but had enrolled as a graduate student there and had accepted a faculty position to commence at a later

12

*Group, Inc.*, 135 F.3d at 426 n.1; *Dean*, 376 S.W.3d at 594.

**3**

Finally, agency principles require a third party's belief to be directly traceable to the principal's manifestations. *See Dean*, 434 S.W.3d at 500; *Ping*, 376 S.W.3d at 594. The Taylors contend that other Trustees notified Dr. Taylor that the Board approved the Disputed Agreement in the April 19, 2012, Executive Session, and that the minutes from that meeting "unambiguously state that the [Disputed] Agreement was read to and approved by the Board." [R. 38-1 at 2.] The Taylors, therefore, claim that any belief they had regarding Oaks's authority directly stems from the University's manifestations. [*See id.* at 7.] The University argues any belief the Taylors had cannot be traced to the University's representations. [R. 46 at 27.]

Based on the analysis of apparent authority to this point, the Court need not weigh in on whether the Taylor's beliefs are directly traceable to the University's manifestations. As the Court previously stated, "There are significant factual disputes surrounding the drafting, signing, and execution of the [D]isputed [A]greement as well as competing interpretations of University Board minutes and closed Executive Session minutes." [R. 21 at 14.] Those factual disputes remain, rendering whether apparent authority existed a question for the jury. Again, drawing all reasonable inferences in favor of the University, the Court finds that the Taylors have failed to establish an absence of evidence to support the University's position.

**B**

In the apparent authority analysis above, the Court cites to several depositions. Dr. and Mrs. Taylor argue that it is inappropriate to allow parol evidence in an attempt to contradict the

---

date. *Suhail*, 107 F. Supp. 3d at 751. Therefore, Dr. Suhail was not as intimately involved with the University's administrative processes as Dr. Taylor. Dr. Suhail, being an outsider to faculty and university governance, is much like the hypothetical landscaper mentioned above. Thus, what amounts to a "reasonable belief" in terms of Dr. and Mrs. Taylor as third parties to a contract with the University looks very different than that of Dr. Suhail.

13

official minutes of the University's Board meetings. [R. 38-1 at 8-11.] In support of its argument, the Taylors cite several cases from Kentucky's high court. [*Id.*] However, the cases the Taylors cite also cut against their argument. The Taylors first cite *Bennett v. Madison Sales Co.*, 95 S.W.2d 604 (Ky, 1936), for the proposition that "The minutes of private corporations are the best evidence of actions of the board of directors referred to therein, and the general rule is that parol evidence cannot be received to prove what was done if the minutes are accessible." *Bennett*, 95 S.W.2d at 608. However, the *Bennett* Court also stated that "it is recognized in all jurisdictions that where corporate minutes appear on their face to be incomplete or are ambiguous, parol evidence is admissible to supply the omission or to aid in ascertaining their true meaning." *Id*.

The Taylors also cite *Harlan-Kellioka Coal Co. v. Kelly*, 262 S.W. 259 (Ky. 1924), which held that parol evidence was inadmissible to alter or vary terms related to the salaries of employees where the minutes of the meeting affix certain salaries to certain positions and state from where those moneys should be paid. *See Kelly*, 262 S.W. at 260. *Kelly*, though, is distinguishable from the case at bar. In *Kelly*, the salary amounts are fixed and stated in the minutes of the meeting. *Id.* Additionally, the dispute in *Kelly* related only to those salary amounts memorialized in the minutes. *Id.* at 259. Here, though, the Disputed Agreement contains benefits over and above what Dr. Taylor's salary would be upon retirement or during his tenure as Chancellor. [*See* R. 16-1.] Many of the disputed terms never appear unambiguously in the minutes of the University's Board meetings. In fact, the April 19, 2012, minutes contain absolutely no information related to the terms of the Disputed Agreement. [*See* R. 46-12.] The only minutes that contain information from which one could argue provided guidance for drafting the Disputed Agreement were "Closed Minutes of University of the

14

Cumberlands Board of Trustees, Executive Session, October 21, 2005." [*See* R. 46-9.] However, these minutes were sealed, and, according to the record, one reviewing the unsealed official minutes might never have known that the Close Minutes even existed. [*See* R. 46-1 at 6-13.] Further, these Closed Minutes are ambiguous on their face. One looking to interpret the terms of the retirement agreement from the Closed Minutes would necessarily need to consider parol evidence to determine, for example, what is meant by "the annual compensation and applicable benefits." [*See* R. 46-9 at 1.] Those terms are not made clear within the four corners of the documents. [*See* R. 46-9.]

*Kelly-Koett Mfg. Co. v. Goldenberg*, 270 S.W. 15 (Ky. 1924), also cited by the Taylors, recognizes that "Corporate books are not, as a general rule, conclusive. . . . The minutes of corporation meetings and other like corporate records are only prima facie evidence of the proceedings, and parol testimony is admissible for the purpose of proving what actually occurred." *Goldenberg*, 270 S.W. at 17-18. Dr. and Mrs. Taylor also cite *Martin v. Holian*, 126 S.W.2d 465 (Ky. 1939), for its proposition that, generally speaking, "the records of the corporation cannot be varied by parol evidence except in cases of fraud and then they must be directly attacked for that purpose and not collaterally." *Martin*, 126 S.W.2d at 467. The University's Response in Opposition is riddled with claims of fraud. [*See, e.g.,* R. 46 at 2, 20, 28-29.] Because the Taylors do not cite authority expressly precluding the Court from considering parol evidence to address this Motion, and because of the ambiguous nature of most of the Board minutes concerning Dr. and Mrs. Taylor's disputed benefits, the Court finds it appropriate to look to parol evidence here.

## III

Summary judgment is improper when there exists a genuine dispute as to a material fact. *See* Fed. R. Civ. P. 56. Unfortunately, for the Taylors, this case presents many disputes as to material facts. Regarding their breach of contract claim, Dr. and Mrs. Taylor argue that summary judgment is appropriate under agency principles, specifically the principle of apparent authority. Kentucky has held that the party asserting agency and apparent authority carries the burden of proving it exists. *Hogan*, 785 S.W.2d at 267. The three elements of apparent authority present fact intensive questions best suited for the trier of fact. *See Orchard Group, Inc.*, 135 F.3d at 426 n.1; *Dean*, 434 S.W.3d at 500. There remain many fact intensive questions surrounding the Disputed Agreement and what authority, if any, the University manifested in Jim Oaks to execute the agreement. For the reasons stated above, and construing all reasonable inferences in favor of the University, the Court finds that the Taylors have failed to meet their burden of demonstrating an absence of any genuine issue of material fact regarding their breach of contract claim against the University.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that the Taylors' Motion for Partial Summary Judgment [**R. 38**] is **DENIED.**

This the 29th day of March, 2018.

Gregory F. Van Tatenhove
United States District Judge