UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. 6:16-CV-109-GFVT

| | | |
|---|---|---|
| DR. JAMES TAYLOR | ) | |
| MRS. DINAH TAYLOR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | *Electronically Filed* |
| | ) | |
| UNIVERSITY OF | ) | |
| THE CUMBERLANDS, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO EXCLUDE
## EXPERT TESTIMONY OF A. W. (PETE) SMITH

Defendant University of the Cumberlands, by and through counsel, hereby submits this *Daubert* motion to exclude Plaintiffs' expert witness A. W. (Pete) Smith, Jr., from offering expert testimony at trial:

## INTRODUCTION

This case arises out of Plaintiffs Dr. James Taylor and Mrs. Dinah Taylor's claim that the University agreed to provide them with lifetime compensation and benefits pursuant to a contract whereby they did not have to do anything in return. In particular, Dr. and Mrs. Taylor claim that the University entered into a contract with them on or about April 19, 2012 (the "Disputed Agreement"), which required it to continue to provide them upon Dr. Taylor's resignation as President and for the duration of their lives with the same salary and benefits that they were receiving while Dr. Taylor was President of the University whether or not they provided any future services to the University. Because the University's Board of Trustees never considered or approved the Disputed Agreement or its terms and instead Dr. Taylor actually had it prepared for himself, the University disavowed and refused to honor the unenforceable Disputed Agreement.

Dr. and Mrs. Taylor have sued the University seeking to enforce the Disputed Agreement and making various other baseless claims, including claims for promissory estoppel, slander, intentional infliction of emotional distress, punitive damages, and reformation. They have retained A.W. (Pete) Smith to serve as an expert witness to "opine on the reasonableness of the remuneration provided to Dr. James Taylor" by the Disputed Agreement. But Smith bases his opinion on inaccurate assumptions and unreliable methodologies. Accordingly, his opinion is too speculative to be admissible under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For these reasons and because Smith has not employed the level of intellectual rigor characteristic of an expert in his same field, the Court should exercise its gatekeeping power under Federal Rule of Evidence 702 and *Daubert* to exclude Smith's unreliable expert testimony.

## **BACKGROUND**[1]

Dr. Taylor served as President of the University for thirty-five years before stepping down from that position in October 2015 (First Amended Complaint [DE 14] at ¶¶ 4, 14). In addition, Dr. Taylor hired Mrs. Taylor, who was employed by the University through April 2016. Dr. and Mrs. Taylor allege that the Board of Trustees of the University agreed "to continue Dr. Taylor and Ms. Dinah Taylor's salary and benefits following his retirement from the position of President." (DE 14 at ¶ 8). More specifically, Dr. and Mrs. Taylor claim that the Board of Trustees unanimously approved on April 19, 2012 the Disputed Agreement, which provided for lifetime compensation and benefits for Dr. and Mrs. Taylor. (*Id.* at ¶¶ 10-11). But numerous members of the Board of Trustees have testified that they never considered or approved such an agreement or its terms. (Defendant's Response in Opposition to Plaintiffs' Motion for Summary

---

[1] Defendant's contemporaneously filed Motion for Summary Judgment contains a more complete discussion of the facts of this case.

Judgment [DE 46] at 13-14). Moreover, no copy of the Disputed Agreement was maintained in the University's records or could be found by representatives of the University until the summer of 2015, after Dr. Taylor had announced his plans to step down as President of the University. (*Id.* at 16-17).

When Dr. Taylor decided to resign from his position as President, he and former Chairman of the Board of Trustees, Jim Oaks, devised a transition and succession plan, which they revealed to the full Board of Trustees immediately prior to its October 2014 meeting. (*Id.* at 5). According to the plan, Dr. Larry Cockrum would serve as President-Elect and Chief Executive Officer of the University from October 2014 to October 2015, and Dr. Taylor would continue serving as President of the University until October 2015 at which point in time he would become Chancellor of the University and Dr. Cockrum would become President. (*Id.* at 6). The Board of Trustees planned to take up the issue of Dr. Taylor's duties and compensation in the role of Chancellor at its October 2015 meeting, and at no point in time during the Board of Trustees' consideration of the transition and succession plan was the Disputed Agreement or any other written contract with Dr. Taylor presented to the Board. (*Id.*).

Dr. Cockrum and others working at the University first learned about a supposed contract with Dr. Taylor in the summer of 2015 when he began making representations that he had a contract with the University that supposedly provided for him to receive the same amount of compensation and benefits after his resignation as he was receiving as President. (*Id.* at 6-7). Because there was no such contract maintained with or otherwise included in the University's records, Dr. Cockrum asked others at the University if they had seen it, and everyone asked indicated that they had not and were not aware of it. (*Id.* at 7). On or around July 1, 2015, the Disputed Agreement appeared on Dr. Cockrum's desk, and, according to Dr. Cockrum, there was

no indication of where it came from or who had left it.  (*Id.*). Dr. Cockrum then immediately sent

it to the current Chairman of the Board of Trustees, Jon Westbrook, who shared it with other

members of the Board, who, like Mr. Westbrook, had never before seen it. (*Id.*).

The Disputed Agreement [DE 14-1] sets forth the following extravagant and excessive

obligations to be undertaken by the University:

1. The University shall pay to Dr. and Mrs. Taylor, the yearly salary of President
   Taylor to Dr. and Mrs. Taylor for the rest of both of their individual lives.

2. The manner of payment: monthly, quarterly or otherwise shall be established
   by Dr. or Mrs. Taylor in written form and delivered to the Chairman of the
   Board of Trustees.

3. The amount of yearly compensation to be paid to Dr. and/or Mrs. Taylor shall
   be determined by the amount of Dr. Taylor's salary, upon the date of the
   execution of this Agreement, or the salary of Dr. Taylor upon the date of Dr.
   Taylor's retirement as President, whichever yearly salary is greater.

4. The Board of Trustees shall appoint Dr. Taylor as Chancellor of The
   University of the Cumberlands upon Dr. Taylor's retirement as President of
   the University of the Cumberlands.

5. The University will continue to provide and/or pay all benefits to Dr. and Mrs.
   Taylor, for the rest of their joint lives that they are currently receiving upon
   the date of the execution of this Agreement, including but not limited to, all
   health benefits.

6. The University shall provide and/or pay to Dr. and Mrs. Taylor amounts for
   long term health care, for the rest of their joint lives, including but not limited
   to, any assisted living facilities chosen by Dr. and Mrs. Dinah Taylor, or their
   legally authorized representative(s).

7. The University will also continue to allow Dr. Taylor's brother, Stan Edward
   Taylor, to live in his residence, in Williamsburg, for the rest of his life and
   will continue to charge Stan Taylor or his wife, Lois Taylor, two hundred
   dollars ($200.00) per month rent.  The University will continue to pay the
   maintenance, taxes and insurance on the property where Dr. Taylor's brother
   resides for the rest of Stan Edward Taylor['s] and his wife, Lois Taylor['s],
   natural lives.

8. The University will provide an apartment or residence for Dr. Taylor and/or
   Mrs. Taylor, after Dr. Taylor's retirement as President of the University of the

Cumberlands, in Williamsburg, Kentucky for Dr. Taylor to perform his duties
as Chancellor and if there is not an agreeable apartment or other residence for
Dr. Taylor and/or Mrs. Taylor to reside in Williamsburg, then the University
will provide Dr. and/or Mrs. Taylor a room at the Cumberland Inn free of
charge.

9. The University grees that Dinah Taylor will be designated the beneficiary of
the insurance policy the University has on the life of Dr. Taylor, for 1 million
dollars and that Dinah Taylor will receive the entire proceeds of said
insurance policy (one million dollars), free and clear, upon the death of Dr.
Taylor.

(DE 14-1 at § I). Conversely, the Disputed Agreement only states as follows regarding Dr. and

Mrs. Taylor's obligations to the University:

1. Dr. Taylor agrees to continue to serve as President of The University of the
Cumberlands until he may decide to retire and that upon his retirement as
President, Dr. Taylor agrees to accept the position of Chancellor of the
University of the Cumberlands for as long as he may desire to perform the
duties of Chancellor.  Mrs. Taylor agrees to always be an Ambassador for the
University of the Cumberlands.  Both Dr. Taylor and Mrs. Taylor agree to
serve the University in any capacity requested and agree to continue their
fundraising efforts in identifying, cultivating and stewarding donors and/or
potential donors of the University of the Cumberlands.

2. That Dr. Taylor and Mrs. Taylor, the University of the Cumberlands and the
Board of Trustees of The University of the Cumberlands agree that the
compensation and other benefits included in this agreement are not
conditional upon Dr. Taylor remaining as the President of The University of
the Cumberlands or accepting the position as Chancellor upon Dr. Taylor's
retirement as the President of The University of the Cumberlands.
Furthermore, Dr. and Mrs. Taylor, The University of the Cumberlands and the
Board of Trustees agree that the compensation and benefits contained in this
agreement is/are for the past decades of duties and/or work performed by Dr.
and Mrs. Taylor all for the benefit of The University of the Cumberlands.

(*Id.* at § II). In other words, according to its terms, Dr. and Mrs. Taylor are not required to do

anything in order to receive the benefits outlined in the Disputed Agreement.

The University quickly determined that the Disputed Agreement had not been authorized

by its Board of Trustees and, therefore, refused to honor it and disavowed its terms. (*See* DE 46

at 15-16).  The University sought to negotiate with Dr. Taylor regarding his continued

5

employment with the University and what would be a reasonable compensation package to provide in exchange for the duties that he would be required to perform upon officially stepping down as President. (*Id.* at 16-17). Because of the University's non-profit status, the Board of Trustees retained an opinion from compensation consultant Phillip Blount regarding what would qualify as "reasonable compensation" for the new, part-time position of Chancellor in order to comply with IRS guidelines prohibiting non-profit organizations from engaging in excess benefit transactions. (*Id.* at 17). Obtaining such an opinion results in a presumption in favor of the reasonableness of the compensation provided. *See* 26 C.F.R. § 53.4958-6. Ultimately, the negotiations with Dr. Taylor proved unsuccessful, the University severed its employment relationships with Dr. and Mrs. Taylor, and Dr. and Mrs. Taylor filed this lawsuit. (DE 46 at 17).

Dr. and Mrs. Taylor disclosed Smith as a testifying expert witness and provided his expert report on or about February 2, 2018. (Exhibit 1, Smith Expert Report). Smith's report purports to "opine on the reasonableness of the remuneration [allegedly] provided to Dr. James Taylor" through the Disputed Agreement. (*Id.* at 1). He opines that the compensation provisions of the Disputed Agreement "offered to make up for past low compensation and to serve as Chancellor are all clearly reasonable from a market perspective and in terms of the regulations." (*Id.* at 5). Specifically, Smith purports to calculate the compensation Dr. Taylor supposedly should have received over his career by comparing his compensation to that of a certain comparator group of presidents at other colleges and universities.  (*Id.* at 7). Because, however, Smith's opinions are based on incorrect assumptions and faulty methodologies, this Court should exclude his expert testimony at trial.

6

## ARGUMENT

**I.       This Court Should Exclude Smith's Opinions As Irrelevant And Unreliable.**

The Court should exercise its gatekeeping power under Federal Rule of Evidence 702 and

the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579 (1993), and exclude the unreliable opinions of Smith.[2]

Federal Rule of Evidence 702 mandates that a district court exclude expert testimony

unless it consists of "scientific, technical, or other specialized knowledge" that will "help the

trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Pursuant to Rule 702, expert testimony is only admissible if it satisfies a four-part test:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will
> > help the trier of fact to understand the evidence or to determine a fact
> > in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts
> > of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 589-593; *Kumho Tire*, 526 U.S. at 147-53

(1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-146 (1997). While Rule 702 "does not

require anything approaching absolute certainty[,] . . . not everything a knowledgeable person

says is 'knowledge' under Rule 702, no more than everything a scientist says is 'scientific.'"

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671, 677 (6th Cir. 2010).

---

[2] The testimony contained herein demonstrates that Smith's expert opinion is inadmissible under Rule 702 and *Daubert*. To the extent that the Court believes that additional information would be helpful to reach a decision on this motion, the University requests that the Court schedule a *Daubert* hearing to evaluate the proffered opinions. *See, e.g.*, *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (discussing a district court's discretion to order a *Daubert* hearing); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000) (same).

The purpose of this rule is to ensure that expert testimony is helpful to the fact-finder by being "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (citation omitted). Likewise, expert testimony that is based on questionable "fact[s], data, principles, methods or their application" should be excluded because an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 149, 152. Where an expert's testimony is questioned, "it is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Opinion evidence that arises "only by the *ipse dixit* of the expert" does not establish admissibility by a preponderance of proof. *Kumho Tire*, 526 U.S. at 157.

Even when an expert is qualified to render an opinion, the expert's testimony must not be speculative.[3] *Daubert*, 509 U.S. at 590 (explaining that an expert's "knowledge" requires "more than subjective belief or unsupported speculation"); *see Tamraz*, 620 F.3d at 671 (cautioning that "[n]o matter how good experts' credentials may be, they are not permitted to speculate") (internal quotation marks and citations omitted); *Demaree v. Toyota Motor Corp.,* 37 F. Supp. 2d 959, 961 (W.D. Ky. 1999) (an expert's subjective belief or unsupported speculation is not admissible). While it is "well established" that an expert witness "may extrapolate from known facts to form a conclusion," it is not appropriate for an expert witness to support his or her opinion with "mere speculation":

> An expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds based on what is known. The expert's conclusions . . . must have a basis in established fact and

---

[3] For purposes of this Motion only, the University assumes that Smith's credentials are accurate and qualify him as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

cannot be premised on mere suppositions. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.

*Tovey v. Nike, Inc.*, No. 1:12-cv-448, 2014 U.S. Dist. LEXIS 93905, *28-30 (N.D. Ohio Apr. 2, 2014) (citing *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)) (internal quotation marks, alterations, and citations omitted). And "[l]ike all expert testimony, an expert witness's calculations of [damages] are inadmissible under [Rule 702] if based on 'unsupported speculation.'" *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012).

Courts in the Sixth Circuit have identified a number of "red flags that caution against certifying an expert," including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *S.S. v. Leatt Corporation*, No. 1:12-CV-483, 2013 U.S. Dist. LEXIS 98366, *7-9 (N.D. Ohio July 15, 2013) (citing *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) *and Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)); *see also Mackenzie v. JLG Indus., Inc.*, No. 3:13-CV-01046, 2014 U.S. Dist. LEXIS 177545, *5 (W.D. Ky. Dec. 29, 2014); *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1060, 1125-28 (E.D. Tenn. 1999). Likewise, the failure to fully articulate the methodology used in forming an opinion will result in exclusion of the expert testimony. *See Tovey*, 2014 U.S. Dist. LEXIS 93905, at *19-20 (explaining that there is no evidence from which the Court can determine whether the expert's conclusion is "the product of reliable principles and methods" or whether they "reliably applied the principles and methods to the facts of the case," when that expert does not fully articulate the steps used in their analysis) (quoting Fed. R. Evid. 702).

Furthermore, courts have rejected expert testimony when the data set analyzed was an unrepresentative sample. *See, e.g., Allgood v. GMC*, No. 1:02-cv-1077-DFH-TAB, 2006 U.S. Dist. LEXIS 70764, *33 (S.D. Ind. Sept. 18, 2006) (finding the expert's testimony was unreliable

due to selection bias and explaining that "[q]uestions as to Dr. Molholt's choice in data sampling go to the heart of his methodology"); *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill 2005) (finding the expert testimony was not reliable when the expert used comparative financial data of eight other companies to estimate damages, but could not explain why the eight companies were given as comparisons).

Here, Smith fails to employ the intellectual rigor characteristic in his field. He bases his opinion on false assumptions, unsupported speculation, and flawed methodology.[4] Accordingly, the Taylors have failed to meet their burden of showing that Smith will provide reliable expert testimony, and, therefore, his testimony should be excluded.

## II.   Smith Improperly Opines On Legal Matters Outside Of His Area Of Expertise.

As an initial matter, Smith's testimony must be excluded because he purports to opine on disputed facts and ultimate legal conclusions about which he admittedly is unqualified to testify. Smith's expert report contains various statements regarding the enforceability of the Disputed Agreement, even concluding that the University breached that contract. (Exh. 1 at 4-5 ("The Board's decision to terminate and replace the agreed contract is questionable in many respects. A contract is a contract. Inducing an active President to resign through promises of retirement benefits and then reneging on those benefits is unethical.")). Experts are not permitted to offer legal conclusions and factual conclusions outside of their area of competence. *See Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *cf. Ross Bros. Constr. Co. v. MarkWest Hydrocarbon, Inc.*, 196 Fed. Appx. 412, 415 (6th Cir. 2006) ("This is

---

[4] The University addresses in this motion only those aspects of Smith's testimony that disqualify him from offering expert testimony at trial. There are many other aspects of Smith's proposed testimony that it intends to challenge through its own experts' testimony at trial if Smith is allowed to testify. (*See* Exhibt 2, Phillip Blount Expert Report; Exhibit 3, Michael Cooney Expert Report).

not a factual conclusion *within the expert's competence.*") (emphasis added). Indeed, even Smith acknowledged that these factual and legal matters are not issues on which he is qualified to testify. (*See, e.g.*, Exhibit 4, Excerpts of Smith Depo., at 167 ("Q: Were you asked to give an ethics opinion? . . . A: I probably over-stepped there.")). Thus, Smith's testimony regarding the enforceability of the Disputed Agreement and the facts of the case must be excluded.

## III.    Smith's Opinion Is Based On Flawed Compensation Methodologies.

Smith's testimony also must be excluded because his opinion is fundamentally flawed since he has not and cannot provide any justification for performing a backward-looking compensation analysis over Dr. Taylor's thirty-five-year career. In particular, Smith purports to calculate the amount that Dr. Taylor was underpaid throughout his tenure in order to justify the reasonableness of the compensation supposedly provided under the Disputed Agreement. However, Smith is unable to point to any authority—academic, legal, or even past personal experience—that provides any basis for performing such a comprehensive look back:

> Q:  Have you ever done an analysis for any school, any time in your career, where you went back 40 years and did a calculation for what you call the "shortfall" to determine how much that person should be paid in the future? Have you ever done that before?
> A:  Not for schools…I've done this a number times for non-profits.
> Q:  For 40 years?
> A:  I can't remember where – some of them I've done way back, whether it's 25 or 30 or 15 or 40, I can't remember.
> Q:  But you can't name any of those?
> A:  No.

(Exh. 4 at 148). Given Smith's failure to provide *any* basis for his methodology, other than his own *ipse dixit*, the Court must find that his testimony is unreliable and exclude it. *See Kumho Tire*, 526 U.S. at 157 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Tovey*, 2014 U.S. Dist. LEXIS 93905, at *24-25 (recommending exclusion of an

expert's testimony when the plaintiff "failed to demonstrate either that [the expert] employed a reliable method in forming her opinion . . . or that her experience reliably supported her conclusion").

Smith's unreliability is further belied by his concession that his opinion was not developed in accordance with the applicable provisions of 26 C.F.R. § 53.4958-6, even though he falsely indicated in his expert report that it was.[5] (Exh. 4 at 275 ("Q: So your opinion was not completely consistent with those regulations you cited to. Correct? A: In that respect, yes.")). While Smith purports to opine that "there is no basis for the IRS . . . to find the [Disputed Agreement] unreasonable" based on his analysis, the regulations suggest otherwise. There is only a rebuttable presumption that a transaction is not an excess benefit transaction if a non-profit organization meets the conditions prescribed in 26 C.F.R. § 53.4958-6. But that regulation requires, in part, that the entity obtain "*appropriate* data as to comparability *prior* to making its determination" regarding the compensation arrangement in question. 26 C.F.R. § 53.4958-6(a)(2). Smith admits that this is not the case here; the rebuttable presumption of reasonableness accordingly could not apply. (Exh. 4 at 275 ("The university did not [obtain a contemporaneous analysis] here.")). Smith's admittedly inaccurate application of the relevant methodology requires exclusion of his testimony. *See* Fed. R. Evid. 702(d) (requiring reliable application of an expert's principles and methods to the facts of the case); *see also Tovey*, 2014 U.S. Dist. LEXIS

---

[5] Additionally, Smith's use of a thirty-five-year look-back period is almost certainly inappropriate. Notwithstanding his inability to justify the thirty-five-year period, the IRS regulations governing excess benefit transactions suggest that compensation for services performed in prior years (or "make-up for past low compensation" as Smith calls it) is only appropriate on a much shorter time scale, such as five years. *See* 26 C.F.R. § 53.4958-3(a)(1) (defining the five-year "lookback" period ending on the date of the transaction as the relevant time frame to determine if the beneficiary of the potential excess benefit transaction was a "disqualified person" or "any person who was in a position to exercise substantial influence over the affairs of an applicable tax-exempt organization") (*see also* Exh. 3 at 14 ("Attempting to provide such a "make up" for more than just a few years is difficult to justify given the unreliability of the data related to compensation paid many years ago and the fact that free market economics would suggest that the amount paid and accepted as payment were adequate.")).

93905, at *23-24 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (on remand)).

## IV.    Smith's Opinion Is Based On An Inappropriate Comparator Group.

Smith's testimony also must be excluded because he uses an inappropriate peer group to make his proffered opinion. To determine whether an individual's compensation is reasonable for purposes of complying with IRS excess benefit restrictions, one must first determine an appropriate peer group with which to compare that individual's compensation. 26 C.F.R. § 53.4958-4(b)(1)(ii)(A) (reasonable compensation must be determined by comparing the "amount that would ordinarily be paid for like services by like enterprises . . . under like circumstances."). But Smith arbitrarily selects irrelevant "comparators," which introduces significant unreliability into several steps of his analysis. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (quoting Fed. R. Evid. 702 advisory committee's note, 2000 amend.); *see also Allgood*, 2006 U.S. Dist. LEXIS 70764, at *33 (finding the expert's testimony was unreliable due to selection bias and explaining that "[q]uestions as to Dr. Molholt's choice in data sampling go to the heart of his methodology"); *Loeffel Steel Products, Inc.*, 387 F. Supp. 2d at 812-13 (finding the expert testimony was not reliable when the expert used comparative financial data of eight other companies to estimate damages, but could not explain why the eight companies were given as comparisons).

Specifically, Smith compares Dr. Taylor's compensation to the compensation received over thirty-five years by the presidents of the following eleven Christian colleges and universities: Abilene Christian University, Biola University, George Fox University, Hope International University, Oral Roberts University, Seattle Pacific University, Cedarville

13

University, University of Northwestern – St. Paul, Wheaton College, Whitworth University, and William Jessup University. (Exh. 1 at 7). These eleven institutions were selected because they were used in the January 6, 2016 report that Phillip Blount prepared for the University regarding the reasonable compensation for the University's new Chancellor position. (Exhibit 5, Phillip Blount Report regarding Chancellor compensation, at 1). Smith's only explanation in his report for using these eleven schools as a peer group for comparison to Dr. Taylor's compensation as President of the University, is that "[t]his seems to us a reasonable comparison group, and if we had developed an alternative group, it would have raised questions of 'cherry picking' the comparators." (Exh. 1 at 7). Smith's comparison to these eleven institutions is flawed because the method that he used to select the schools is procedurally unreliable and because this unreliable method yielded a peer group that is substantially dissimilar to the University. *See Reynolds v. Freightliner LLC*, No. 05-70, 2006 U.S. Dist. LEXIS 97244, at *27 (E.D. Ky. June 21, 2006) ("[Defendant's] major criticism of [Plaintiff's expert's] report – that it lacks any methodology at all – is well-taken. Without any identifiable method of reasoning, [Plaintiff's expert's] testimony is facially unreliable.").

1.       **Smith's selection of the peer group is procedurally unreliable.**

The eleven schools that Smith uses as peer institutions were arbitrarily selected. Smith conducted no analysis as to whether these institutions were an appropriate peer group to compare to the University as of the date of his report, much less over the thirty-five year period covered by his report. (*See, e.g.*, Exh. 4 at 255 ("Q: As you sit here today, you still have no data on your own that supports that any of those eleven schools were a good match as peer group schools. Correct? A: That's right.")). Instead, Smith merely selected them because Blount had used them for an earlier, different analysis. Smith completely ignored that Blount had selected these schools

14

for the unique and fundamentally different comparison of compensation for the University's part-time Chancellor position. Smith also ignored that Blount only cautiously and reluctantly selected these institutions for his earlier analysis due to a lack of better comparators. (*See* Exh. 5 at 1; Exh. 2 at 2).

Even if Blount's earlier peer group was appropriate for comparison for Smith's opinion, Smith's methodology is still unreliable because he arbitrarily removed two institutions from the thirteen colleges and universities in that the group that Blount initially used, Messiah College and Pepperdine University. (*Compare* Exh. 1 at 7, *with* Exh. 5 at 3). Smith improperly fails to acknowledge, much less explain, this discrepancy in the group that he selected or why it is appropriate to use eleven comparators instead of thirteen or some other larger number. *See Loeffel Steel*, 387 F. Supp. 2d at 812-13 (discussing the expert's "facile…methodology" for similar lapses in methodological rigor). Smith's testimony therefore must be excluded because his peer group selection renders his opinion procedurally unreliable. *See Allgood*, 2006 U.S. Dist. LEXIS 70764, at *33 (finding the expert's testimony was unreliable and explaining that "[q]uestions as to [an expert's] choice in data sampling go to the heart of his methodology"); *Loeffel Steel*, 387 F. Supp. 2d at 812-13 (finding the expert testimony was unreliable when the expert could not explain why the comparators were selected).

## 2.  Smith's selection of the peer group is substantively unreliable.

Notwithstanding the procedural unreliability of Smith's method for selecting a peer group to compare to the University, his opinion is substantively unreliable because the peer group that he used is inappropriate. In fact, the peer group that Smith used to form his opinion even contradicts his own explanation of how a peer group should be selected, as he testified: "I would have looked at colleges of the same size; I would have looked at colleges with the same kind of

scope of the programs and offerings of degrees and so on and so forth." (Exh. 4 at 251). Smith did not do any of these things, however, and, instead, "on average [Smith's peer group institutions] were [financially] bigger than the University of the Cumberlands." (*Id.* at 253). To be sure, in terms of revenue, expenses, and assets, the University is significantly smaller than nine of the institutions in Smith's peer group, four of which were approximately twice as large as the University.[6] (*See* Exh. 2 at 4; *cf.* Exh. 4 at 253 (explaining that one must look at the "size" of the university, including "the expenses, the assets" to determine a peer group)). In addition, Smith gave no consideration to whether the peer group institutions represented good comparators for each year of the thirty-five-year period in which he was using them for a comparison to Dr. Taylor's compensation. To perform an accurate and reliable comparison, however, one would need to make sure the peer group used is appropriate for each year or period of years it is used because institutions can change significantly over time.

In his attempt to justify his flawed methodology, Smith admits to disregarding the IRS regulations relating to reasonable compensation. While 26 C.F.R. § 53.4958-4(b)(1)(ii)(A) requires a comparison between the "amount that would ordinarily be paid for *like services by like enterprises . . . under like circumstances*," Smith explains that he did not consider any of these factors. Instead, Smith assumed that the institutions previously used by Blount for his analysis of reasonable compensation for the Chancellor position were appropriate—even though they related to a different, unusual part-time role—simply because "any of those colleges could have easily

---

[6] In addition, there are differences in enrollment and in the scope of academic programs between Smith's peer group and the University. The University has a total student population of 7,652 (3,041 of whom are undergraduate students), whereas Whitworth University, for example, has 2,634 students (2,297 undergraduate), and Hope International University has just 1,372 students (961 undergraduate). (*See CollegeNavigator – University of the Cumberlands*, National Center for Education Statistics, https://nces.ed.gov/collegenavigator/?q=university+of+the+cumberlands&s=all&id=156541; *CollegeNavigator – Whitworth University*, National Center for Education Statistics, https://nces.ed.gov/collegenavigator/?q=whitworth+university&id=237066; *CollegeNavigator – Hope International University*, National Center for Education Statistics, https://nces.ed.gov/collegenavigator/?q=hope+international+university&id=120537). Moreover, less than 40% of University's students are undergraduates, whereas nearly 90% of Whitworth University's students are undergraduates. (*See id.*)

been a place that might recruit somebody like Dr. Taylor." (Exh. 4 at 253). Rather than looking at the compensation of individuals at similar institutions performing similar duties, Smith arbitrarily decided to select schools that he believed might have tried to recruit Dr. Taylor, if they had conducted a search for a new president, but there is no indication in the record that Dr. Taylor ever was approached by any of these schools or that there is any other support for employing such a methodology in selecting an appropriate peer group. Smith merely speculates on this point, but mere speculation cannot be the basis for an expert opinion. *See Tamraz*, 620 F.3d at 671 (cautioning that "[n]o matter how good experts' credentials may be, they are not permitted to speculate") (internal quotation marks and citations omitted).

There is simply no justification for comparing Dr. Taylor's compensation in the full-time position of President of the University to the compensation data from eleven schools, which were chosen, with significant reservations, as comparators in determining reasonable compensation for the part-time Chancellor position. Without a reliable comparison group, any executive compensation comparison that is made is fundamentally flawed (*See* Exh. 1 at 7 (acknowledging that "selection of the peer organizations is an important step" in performing a compensation analysis)). Because of these substantive flaws, Smith's opinion is unreliable, and his testimony must be excluded. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) ("*[A]ny* step that renders the analysis unreliable…renders the expert's testimony inadmissible.") (quoting Fed. R. Evid. 702 advisory committee's note, 2000 amend.); *see also Allgood*, 2006 U.S. Dist. LEXIS 70764, at *33 (finding the expert's testimony was unreliable and explaining that "[q]uestions as to [an expert's] choice in data sampling go to the heart of his methodology"); *Loeffel Steel*, 387 F. Supp. 2d 794 (finding the expert testimony was unreliable when the expert could not explain why the comparators were selected).

17

V.      **Smith's Opinion Is Based On Unreliable Data.**

Even if Smith's methodology for selecting a peer group was sound, which for the reasons explained above it is not, his comparisons also are unreliable because they are substantially based on inaccurate or highly questionable data. First, Smith relied solely on IRS Form 990 compensation data and failed to perform any independent confirmation of the accuracy of the information that he used to form his opinion. (*See* Exh. 4 at 256 (explaining that he obtained the salary numbers "from the 990 forms")). Even though Smith was also provided with W-2 forms for Dr. and Mrs. Taylor, he did not compare the reported compensation amounts from these two sources of information, even though there were discrepancies between them. (*Id.* at 259 ("No, I did not check the W2s against the 990s.")). Smith's fundamental failure to employ reliable data is, by itself, reason enough to exclude his testimony.  *Kumho Tire,* 526 U.S. at 149, 152 (explaining that testimony based on questionable "fact[s], data, principles, methods or their application" should be excluded because an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

Even assuming that the Form 990 data used by Smith is reliable, Smith acknowledges that he has no compensation data whatsoever for the first half of Dr. Taylor's career, from 1980 to 1997. (Exh. 4 at 264 ("Q: Am I correct your peer group data only goes back to 1998? A: That's correct.")). In an attempt to "rectify" this lack of data, Smith arbitrarily estimated the amount of Dr. Taylor's and his comparators' compensation over these eighteen years by assuming a steady three-percent increase in compensation each year. (Exh. 1 at 7). Moreover, Smith testified that he did this because that represents the average annual increase in compensation "across the nonprofit world." (Exh. 4 at 264). There is no demonstrable support for this approach in Smith's report, and he did not provide any justifiable basis for employing it

18

during his deposition either. Smith's only explanation in his report for selecting this rate as a means to determine Dr. Taylor's and his comparators' compensation from 1980 to 1997 is that it is "supported by various surveys that measure annual compensation increase percentages," but he does not even identify any surveys therein. (Exh. 1 at 7, Sched. 1; *see* Exh. 4 at 267). When questioned about this during his deposition, Smith asserted that he relied on two publications, one by the U.S. Department of Labor and one by the private organization WorldatWork, but still provided no viable reason for his reliance on them. (Exh. 4 at 267-68).

In truth, there is no reason to believe that Dr. Taylor's and his comparators' compensation actually increased at a steady three-percent rate each year from 1980 to 1998. (*See* Exh. 4 at 268 (explaining that according to the surveys relied upon, salaries actually rose three-percent on average, but "[s]ome years a little bit more, some years a little bit less")). Nor is there any indication that this percentage represents a rational estimate for compensation increases for leaders in higher education, much less for leaders of *religious* institutions in higher education. (*Id.* at 268, 251 ("Q: [D]o you have a survey that speaks to colleges and universities? A: No. No, there isn't one. . . . I would have looked at colleges that were religious in nature, because often they pay lower than colleges that aren't religious in nature.")). Despite his belief that the information does not exist, Smith admits he made absolutely no effort to determine the actual compensation of Dr. Taylor and his comparators over this eighteen-year period. (Exh 4. at 269).

Given the unreliability and non-existence of the necessary compensation data, Smith's attempt to calculate Dr. Taylor's alleged compensation shortfall over thirty-five years was an exercise in futility. He had to fabricate data just to reach his conclusions. In light of this, Smith's testimony lacks any indicia of reliability and must be excluded. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an expert's testimony amounts to 'mere guess or

speculation,' the court should exclude his testimony."); *see also McLean*, 224 F.3d at 801 ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.").

## VI.   Smith's Opinion Employs Flawed Statistical Methodologies.

Finally, Smith's opinion regarding the reasonableness of the compensation that Dr. and Mrs. Taylor allege they are entitled to receive under the Disputed Agreement also is flawed because it rests on an arbitrary statistical assumption that is further undermined by inaccurate math. Smith opines that Dr. Taylor should have received compensation at the 25th percentile of salary among peer institutions for the first ten years of his career, at the 50th percentile for the middle ten years, and at or above the 75th percentile for the final part of his career and that to the extent that he was not paid at these levels he was underpaid. (*See* Exh. 4 at 147). Smith has not pointed to any facts or established methodology that supports this approach and conclusion. *See McLean*, 224 F.3d at 801 ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."). Smith has not explained, for example, why Dr. Taylor should be considered "underpaid" if not paid at the 75th percentile in 2003 if he was paid within the range of what was considered reasonable at that time and if that is what he accepted as compensation to serve as President of the University at that time. Nor has Smith explained how other factors, such as cost of living differences or the conservative compensation practices of an institution, affect a determination of underpayment.

Even if his application of these percentiles was legitimate, Smith is entirely unable to explain how the percentile calculation is made or why it is relevant—he simply "put all the numbers in a spreadsheet and said, 'Excel, calculate.'" (Exh. 4 at 128). Smith's statistical calculations, even if he did understand and could properly explain them, are incorrect. To

accurately present percentile data for "CEO Total Remuneration," Smith should have calculated the median and percentiles for that specific data set. (*See* Exh. 2 at 4). Instead, he calculated those statistics for the "Cash Compensation" data set and for the "Benefits" data set, and then added those two values together to present a sum as the statistical calculation for the "CEO Total Remuneration," but this is statistically unsound. (*Id.*).

In short, when one examines the methodology that Smith used to calculate Dr. Taylor's alleged compensation shortfall, it becomes clear that Smith used made-up statistical analyses on made-up data in order to reach the conclusion his clients, Dr. and Mrs. Taylor, wanted him to reach. In the absence of any sort of discernable methodology or sound mathematics, Smith's testimony must be excluded. *Tovey*, 2014 U.S. Dist. LEXIS 93905, at *24 (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) ("[T]he *Daubert* court instructed district courts that their primary function as 'gatekeepers' is 'to determine whether the principles and methodology underlying the testimony itself are valid.'").

## CONCLUSION

For the foregoing reasons, the University requests that the Court exercise its gatekeeping power under Rule 702 and *Daubert* to exclude the speculative opinions of A. W. (Pete) Smith.

Respectfully submitted,

/s/ Barbara B. Edelman
Barbara B. Edelman
Haley Trogdlen McCauley
DINSMORE & SHOHL LLP
250 W. Main Street, Suite 1400
Lexington, KY 40507
(859) 425-1000
(859) 425-1099 (fax)
barbara.edelman@dinsmore.com
haley.mccauley@dinsmore.com

and

James D. Jordan
GUENTHER, JORDAN & PRICE, P.C.
2100 West End Avenue, Suite 1150
Nashville, TN 37203
(615) 329-2100
(615) 329-2787 (fax)
JDJordan@GJPLaw.com
*Counsel for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was filed this 6th day of June, 2018, using the Court's CM/ECF system, which will send notice of filing to the following:

D. Duane Cook
John M. Sosbe
Cook & Watkins, PLC
306 North Hamilton Street
Georgetown, KY 40324
*Counsel for Plaintiffs*

/s/ Barbara B. Edelman
*Counsel for Defendant*

22