UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. 6:16-CV-109-GFVT

| | |
|---|---|
| DR. JAMES TAYLOR MRS. DINAH TAYLOR, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| UNIVERSITY OF THE CUMBERLANDS, | ) ) ) ) |
| Defendant. | ) |

*Electronically Filed*

**DEFENDANT'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF WILLIAM T. BALDWIN, Ph. D.**

Defendant University of the Cumberlands (the "University"), by and through counsel, hereby submits this *Daubert* motion to exclude Plaintiffs' expert witness William Baldwin, Ph. D., from offering expert testimony at trial:

**INTRODUCTION**

This case arises out of Plaintiffs Dr. James Taylor and Mrs. Dinah Taylor's claim that the University agreed to provide them with lifetime compensation and benefits pursuant to a contract whereby they did not have to do anything in return. In particular, Dr. and Mrs. Taylor claim that the University entered into a contract with them on or about April 19, 2012 (the "Disputed Agreement"), which required it to continue to provide them upon Dr. Taylor's resignation as President and for the duration of their lives with the same salary and benefits that they were receiving while Dr. Taylor was President of the University whether or not they provided any future services to the University. Because the University's Board of Trustees never considered or approved the Disputed Agreement or its terms and instead Dr. Taylor actually had it prepared for himself, the University disavowed and refused to honor the unenforceable Disputed Agreement.

Dr. and Mrs. Taylor have sued the University seeking to enforce the Disputed Agreement and making various other baseless claims, including claims for promissory estoppel, slander, intentional infliction of emotional distress, punitive damages, and reformation. They have retained William T. Baldwin, Ph.D., to serve as an expert witness at trial and have provided an expert report prepared by Dr. Baldwin, which purports to "project the salary and benefits lost by Dr. and Mrs. James H. Taylor" as a result of the University's alleged breach of the Disputed Agreement. But Dr. Baldwin bases his expert opinion on inaccurate assumptions and unreliable methodologies. Accordingly, his opinion is too speculative to be admissible under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For these reasons and because Dr. Baldwin has not employed the level of intellectual rigor characteristic of an expert in his same field, the Court should exercise its gatekeeping power under Federal Rule of Evidence 702 and *Daubert* to exclude Baldwin's unreliable expert testimony.

## BACKGROUND[1]

Dr. Taylor served as President of the University for thirty-five years before stepping down from that position in October 2015 (First Amended Complaint [DE 14] at ¶¶ 4, 14). In addition, Dr. Taylor hired Mrs. Taylor, who was employed by the University through April 2016. Dr. and Mrs. Taylor allege that the Board of Trustees of the University agreed "to continue Dr. Taylor and Ms. Dinah Taylor's salary and benefits following his retirement from the position of President." (DE 14 at ¶ 8). More specifically, Dr. and Mrs. Taylor claim that the Board of Trustees unanimously approved on April 19, 2012 the Disputed Agreement, which provided for lifetime compensation and benefits for Dr. and Mrs. Taylor. (*Id.* at ¶¶ 10-11). But numerous members of the Board of Trustees have testified that they never considered or approved such an

---

[1] Defendant's contemporaneously filed Motion for Summary Judgment contains a more complete discussion of the facts of this case.

agreement or its terms. (Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment [DE 46] at 13-14). Moreover, no copy of the Disputed Agreement was maintained in the University's records or could be found by representatives of the University until the summer of 2015, after Dr. Taylor had announced his plans to step down as President of the University. (*Id.* at 16-17).

When Dr. Taylor decided to resign from his position as President, he and former Chairman of the Board of Trustees, Jim Oaks, devised a transition and succession plan, which they revealed to the full Board of Trustees immediately prior to its October 2014 meeting. (*Id.* at 5). According to the plan, Dr. Larry Cockrum would serve as President-Elect and Chief Executive Officer of the University from October 2014 to October 2015, and Dr. Taylor would continue serving as President of the University until October 2015 at which point in time he would become Chancellor of the University and Dr. Cockrum would become President. (*Id.* at 6). The Board of Trustees planned to take up the issue of Dr. Taylor's duties and compensation in the role of Chancellor at its October 2015 meeting, and at no point in time during the Board of Trustees' consideration of the transition and succession plan was the Disputed Agreement or any other written contract with Dr. Taylor presented to the Board. (*Id.*).

Dr. Cockrum and others working at the University first learned about a supposed contract with Dr. Taylor in the summer of 2015 when he began making representations that he had a contract with the University that supposedly provided for him to receive the same amount of compensation and benefits after his resignation as he was receiving as President. (*Id.* at 6-7). Because there was no such contract maintained with or otherwise included in the University's records, Dr. Cockrum asked others at the University if they had seen it, and everyone asked indicated that they had not and were not aware of it. (*Id.* at 7). On or around July 1, 2015, the

3

Disputed Agreement appeared on Dr. Cockrum's desk, and, according to Dr. Cockrum, there was no indication of where it came from or who had left it. (*Id.*). Dr. Cockrum then immediately sent it to the current Chairman of the Board of Trustees, Jon Westbrook, who shared it with other members of the Board, who, like Mr. Westbrook, had never before seen it. (*Id.*).

The Disputed Agreement [DE 14-1] sets forth the following extravagant and excessive obligations to be undertaken by the University:

1. The University shall pay to Dr. and Mrs. Taylor, the yearly salary of President Taylor to Dr. and Mrs. Taylor for the rest of both of their individual lives.

2. The manner of payment: monthly, quarterly or otherwise shall be established by Dr. or Mrs. Taylor in written form and delivered to the Chairman of the Board of Trustees.

3. The amount of yearly compensation to be paid to Dr. and/or Mrs. Taylor shall be determined by the amount of Dr. Taylor's salary, upon the date of the execution of this Agreement, or the salary of Dr. Taylor upon the date of Dr. Taylor's retirement as President, whichever yearly salary is greater.

4. The Board of Trustees shall appoint Dr. Taylor as Chancellor of The University of the Cumberlands upon Dr. Taylor's retirement as President of the University of the Cumberlands.

5. The University will continue to provide and/or pay all benefits to Dr. and Mrs. Taylor, for the rest of their joint lives that they are currently receiving upon the date of the execution of this Agreement, including but not limited to, all health benefits.

6. The University shall provide and/or pay to Dr. and Mrs. Taylor amounts for long term health care, for the rest of their joint lives, including but not limited to, any assisted living facilities chosen by Dr. and Mrs. Dinah Taylor, or their legally authorized representative(s).

7. The University will also continue to allow Dr. Taylor's brother, Stan Edward Taylor, to live in his residence, in Williamsburg, for the rest of his life and will continue to charge Stan Taylor or his wife, Lois Taylor, two hundred dollars ($200.00) per month rent.  The University will continue to pay the maintenance, taxes and insurance on the property where Dr. Taylor's brother resides for the rest of Stan Edward Taylor['s] and his wife, Lois Taylor['s], natural lives.

8. The University will provide an apartment or residence for Dr. Taylor and/or Mrs. Taylor, after Dr. Taylor's retirement as President of the University of the Cumberlands, in Williamsburg, Kentucky for Dr. Taylor to perform his duties as Chancellor and if there is not an agreeable apartment or other residence for Dr. Taylor and/or Mrs. Taylor to reside in Williamsburg, then the University will provide Dr. and/or Mrs. Taylor a room at the Cumberland Inn free of charge.

9. The University agrees that Dinah Taylor will be designated the beneficiary of the insurance policy the University has on the life of Dr. Taylor, for 1 million dollars and that Dinah Taylor will receive the entire proceeds of said insurance policy (one million dollars), free and clear, upon the death of Dr. Taylor.

(DE 14-1 at § I). Conversely, the Disputed Agreement only states as follows regarding Dr. and Mrs. Taylor's obligations to the University:

1. Dr. Taylor agrees to continue to serve as President of The University of the Cumberlands until he may decide to retire and that upon his retirement as President, Dr. Taylor agrees to accept the position of Chancellor of the University of the Cumberlands for as long as he may desire to perform the duties of Chancellor. Mrs. Taylor agrees to always be an Ambassador for the University of the Cumberlands. Both Dr. Taylor and Mrs. Taylor agree to serve the University in any capacity requested and agree to continue their fundraising efforts in identifying, cultivating and stewarding donors and/or potential donors of the University of the Cumberlands.

2. That Dr. Taylor and Mrs. Taylor, the University of the Cumberlands and the Board of Trustees of The University of the Cumberlands agree that the compensation and other benefits included in this agreement are not conditional upon Dr. Taylor remaining as the President of The University of the Cumberlands or accepting the position as Chancellor upon Dr. Taylor's retirement as the President of The University of the Cumberlands. Furthermore, Dr. and Mrs. Taylor, The University of the Cumberlands and the Board of Trustees agree that the compensation and benefits contained in this agreement is/are for the past decades of duties and/or work performed by Dr. and Mrs. Taylor all for the benefit of The University of the Cumberlands.

(*Id.* at § II). In other words, according to its terms, Dr. and Mrs. Taylor are not required to do anything in order to receive the benefits outlined in the Disputed Agreement.

The University quickly determined that the Disputed Agreement had not been authorized by its Board of Trustees and, therefore, refused to honor it and disavowed its terms. (*See* DE 46

5

at 15-16). After engaging in unsuccessful negotiations to work out a different arrangement with Dr. Taylor, the University severed its employment relationships with Dr. and Mrs. Taylor. In particular, Dr. and Mrs. Taylor's salaries were discontinued as of April 7, 2016, and Mrs. Taylor's health benefits were discontinued as of May 31, 2016. (Exhibit 1, Affidavit of C. Rolph, at ¶¶ 4-5). On or about June 16, 2016, the University ceased providing for Dr. and Mrs. Taylors' mobile phone service—although it allowed them to keep the phones that the University had provided for them—and on or about September 21, 2016, it retrieved from Dr. and Mrs. Taylor the University-leased vehicle that it had allowed them to use. (*Id.* at ¶¶ 6-7). Finally, in or around mid-February 2017, the University removed Mrs. Taylor as the beneficiary of a $1 million life insurance policy maintained by the University on Dr. Taylor's life. (*Id.* at ¶ 8). The University never has stopped providing, however, the following:[2]

- Dr. Taylor's health insurance premiums (medical, dental, and vision coverage);
- Dr. and Mrs. Taylor's long-term care insurance premiums;
- An apartment on campus for Dr. and Taylor's use when in Williamsburg; and
- The residence for Dr. Taylor's sister-in-law, Lois Taylor, at a below-market monthly rental fee

(*Id.* at ¶ 9). In fact, the University has covered the entire cost of the above policies even though the cost was previously shared with Dr. and/or Mrs. Taylor when they were employed by the University. (*Id.* at ¶ 10).

Dr. and Mrs. Taylor disclosed Dr. Baldwin as a testifying expert witness and provided his expert report on or about February 2, 2018. (Exhibit 2, Dr. Baldwin Expert Report). Dr. Baldwin's report purports to detail his opinion regarding the salary and benefits lost by Dr. and Mrs. Taylor "as a result of an April 7, 2016 breach of a contract by the University." (*Id.* at 1). He opines that, as expressed in present value dollars, the total loss of salary and benefits for Dr. and

---

[2] Dr. Baldwin acknowledges in his expert report that many of the benefits contemplated by the Disputed Agreement still are being provided by the University.

6

Mrs. Taylor is $4,575,119, and details the bases for his calculations in his report. (*Id.* at 5-6). Specifically, Dr. Baldwin provides a present value calculation for the following categories of benefits for Dr. and Mrs. Taylor: Dr. Taylor's salary; an apartment; a vehicle; mobile phones; health benefits (medical, dental, and vision insurance); long-term care insurance; death benefits pursuant to the $1 million policy on Dr. Taylor's life; and the residence for Dr. Taylor's brother and sister-in-law (*Id.* at 1-3). Because, however, Dr. Baldwin's opinions are based on incorrect assumptions and/or are irrelevant to the damages recoverable by Dr. and Mrs. Taylor for the claims asserted, this Court should exclude Dr. Baldwin's expert testimony at trial.

### ARGUMENT

**I.   This Court Should Exclude Dr. Baldwin's Opinions As Irrelevant And Unreliable.**

The Court should exercise its gatekeeping power under Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and exclude the irrelevant and unreliable opinions of Dr. Baldwin.[3]

Federal Rule of Evidence 702 mandates that a district court exclude expert testimony unless it consists of "scientific, technical, or other specialized knowledge" that will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In particular, expert testimony is only admissible if it satisfies the four-part test in Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>   (b) the testimony is based on sufficient facts or data;

---

[3] The testimony contained herein demonstrates that Dr. Baldwin's expert opinion is inadmissible under Rule 702 and *Daubert*. To the extent that the Court believes that additional information would be helpful to reach a decision on this motion, the University requests that the Court schedule a *Daubert* hearing to evaluate the proffered opinions. *See*, *e.g.*, *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (discussing a district court's discretion to order a *Daubert* hearing); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000) (same).

7

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 589-593; *Kumho Tire*, 526 U.S. at 147-53 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-146 (1997). While Rule 702 "does not require anything approaching absolute certainty[,] . . . not everything a knowledgeable person says is 'knowledge' under Rule 702, no more than everything a scientist says is 'scientific.'" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671, 677 (6th Cir. 2010).

The purpose of this rule is to ensure that expert testimony is helpful to the fact-finder by being "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (citation omitted). Likewise, expert testimony that is based on questionable "fact[s], data, principles, methods or their application" should be excluded because an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 149, 152. Where an expert's testimony is questioned, "it is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Opinion evidence that arises "only by the *ipse dixit* of the expert" does not establish admissibility by a preponderance of proof. *Kumho Tire*, 526 U.S. at 157.

Even when an expert is qualified to render an opinion, the expert's testimony must not be speculative.[4] *Daubert*, 509 U.S. at 590 (explaining that an expert's "knowledge" requires "more than subjective belief or unsupported speculation"); *see Tamraz*, 620 F.3d at 671 (cautioning that "[n]o matter how good experts' credentials may be, they are not permitted to speculate")

---

[4] For purposes of this Motion only, the University assumes that Dr. Baldwin's credentials are accurate and qualify him as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

8

(internal quotation marks and citations omitted); *Demaree v. Toyota Motor Corp.*, 37 F. Supp. 2d 959, 961 (W.D. Ky. 1999) (an expert's subjective belief or unsupported speculation is not admissible). While it is "well established" that an expert witness "may extrapolate from known facts to form a conclusion," it is not appropriate for an expert witness to support his or her opinion with "mere speculation":

> An expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds based on what is known. The expert's conclusions . . . must have a basis in established fact and cannot be premised on mere suppositions. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.

*Tovey v. Nike, Inc.*, No. 1:12-cv-448, 2014 U.S. Dist. LEXIS 93905, *28-30 (N.D. Ohio Apr. 2, 2014) (citing *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)) (internal quotation marks, alterations, and citations omitted). And "[l]ike all expert testimony, an expert witness's calculations of [damages] are inadmissible under [Rule 702] if based on 'unsupported speculation.'" *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012).

Courts in the Sixth Circuit have identified a number of "red flags that caution against certifying an expert," including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *S.S. v. Leatt Corporation*, No. 1:12-CV-483, 2013 U.S. Dist. LEXIS 98366, *7-9 (N.D. Ohio July 15, 2013) (citing *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) *and Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)); *see also Mackenzie v. JLG Indus., Inc.*, No. 3:13-CV-01046, 2014 U.S. Dist. LEXIS 177545, *5 (W.D. Ky. Dec. 29, 2014); *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1060, 1125-1128 (E.D. Tenn. 1999). Likewise, the failure to fully articulate the methodology used in forming an opinion will result in exclusion of the expert testimony. *See Tovey*, 2014 U.S. Dist. LEXIS 93905, at *19-20 (explaining that there is no evidence from which the Court can determine whether the expert's conclusion is "the product of

reliable principles and methods" or whether they "reliably applied the principles and methods to the facts of the case," when that expert does not fully articulate the steps used in their analysis) (quoting Fed. R. Evid. 702)).

Here, Dr. Baldwin fails to employ the intellectual rigor characteristic in his field. He bases his opinions on false assumptions, unsupported speculation, and flawed methodology. Accordingly, the Taylors have failed to meet their burden of showing that Dr. Baldwin will provide reliable expert testimony, and, therefore, his testimony should be excluded.

**II.     Dr. Baldwin Erroneously Includes Over $1 Million In Irrelevant Damages In His Lost Salary And Benefits Calculations.**

Dr. Baldwin's testimony must be excluded because it includes over $1 million in irrelevant damages, some of which were calculated using unreliable methods.[5] A large portion of the calculated damages relate to benefits that the University is *still providing* to Dr. and Mrs. Taylor. Dr. Baldwin's expert report expressly acknowledges this but still "assume[s] that they will cease following the trial in this case." (Exh. 2 at at 3). He improperly fails to give any explanation for the basis of this assumption. *See Tovey*, 2014 U.S. Dist. LEXIS 93905, at *19-20. Moreover, even assuming that the alleged contract was enforceable and the categories of damages that Dr. Baldwin calculates were proper, his calculations are unreliable because he fails to account for possible, if not likely, contingencies that would reduce the amount of alleged damages and gives no explanation at all for his failure to consider such alternatives. *See Leatt Corp.*, No. 1:12-CV-483, 2013 U.S. Dist. LEXIS 98366, at *7-9. As such, Dr. Baldwin's testimony regarding the following categories of alleged damages must be excluded: $128,629 for the "lost value" of the Taylors' Williamsburg residence; $52,935 for Dr. Taylor's "lost" health

---

[5] While the University is not seeking to exclude other aspects of Dr. Baldwin's testimony, including his opinion regarding the appropriate discount rate for calculating the present value of the Taylors' alleged losses, it intends to challenge these opinions through its own expert's testimony at trial. (*See* Exhibit 3, Calvin Cranfill Expert Report).

benefits; $38,498 for Dr. and Mrs. Taylor's "lost" long-term care insurance; $778,493 for "lost" life insurance benefits; $50,690 for the "loss" of Lois Taylor's reduced rent; and $156,392 for the "lost value" of the Taylors' University-provided vehicle and cell phones.

### A. Dr. Baldwin's report includes over $427,000 in non-existent damages.

It is a fundamental principle of contract law that there must be a breach in order to recover damages. *See, e.g.*, *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007) ("[Plaintiff] must…prove that [Defendant] breached the contract and that he suffered damages as a result of that breach."). Dr. Baldwin's testimony about "damages" related to non-existent breaches of contract is irrelevant and must be excluded. *See Daubert*, 509 U.S. at 591 (explaining that testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted); *Andler*, 670 F.3d at 727 ("Like all expert testimony, an expert witness's calculations of [damages] are inadmissible under [Rule 702] if based on 'unsupported speculation.'").

#### 1. *The University still provides the Taylors with a Williamsburg residence.*

Dr. Baldwin calculates $128,689 in alleged damages to Dr. and Mrs. Taylor relating to the "loss" of their residence at 346 West Sycamore Street. (Exh. 2 at Tables 1 & 2). However, as Dr. Baldwin admits, "*the university is still providing this apartment to the Taylors.*" (*Id.* at 2 (emphasis added)). As the University never ceased providing the Taylors an apartment in Williamsburg, there has been no breach of § I.8 of the Disputed Agreement entitling Dr. and Mrs. Taylor to damages for the loss of the apartment. Dr. Baldwin's testimony relating to this category of damages is therefore irrelevant and must be excluded. *See Daubert*, 509 U.S. at 591.

Even if a breach had occurred, the provision in the Disputed Agreement requiring a residence to be provided for Dr. and Mrs. Taylor does not require the University to provide them

11

the exact residence located at 346 West Sycamore Street. (DE 14-1 at § I.8). Rather, that provision expressly contemplates that the University may choose a different residence, which the Taylors may reject, and, if rejected, the University could still meet its alleged obligation by providing Dr. and Mrs. Taylor with a room at the Cumberland Inn when they are in Williamsburg. Dr. Baldwin's expert report and deposition testimony confirms that he failed to consider or calculate this alternative. (Exhibit 4, Excerpts of Baldwin Depo., at 76 ("Q: [Y]ou didn't consider or investigate the cost of a room at the Cumberland Inn, correct? A: I did not do that, no."). His failure to do so renders his opinion unreliable. *See Leatt Corp.*, 2013 U.S. Dist. LEXIS 98366, at *7-9.

Finally, Dr. Baldwin fails to account for the fact that the University's alleged obligation to provide a residence for Dr. and Mrs. Taylor was only for Dr. Taylor "*to perform his duties as Chancellor.*" (DE 14-1 at § I.8). Dr. Taylor is not serving as Chancellor, which Dr. Baldwin admits. (Exh. 4 at 84 ("Q: But you were aware that Dr. Taylor is no longer providing any duties to the University; is that correct? A: That's correct.")). Dr. and Mrs. Taylor are, therefore, not entitled to a University-provided Williamsburg residence under the terms of the Disputed Agreement. Similarly, Dr. Baldwin fails to explain why he calculates several years of damages for Mrs. Taylor following Dr. Taylor's actuarial death. (Exh. 2 at Table 2). By definition, Dr. Taylor cannot perform any duties as Chancellor if he is deceased, and, therefore, by the plain terms of the alleged contract, Mrs. Taylor certainly would not be entitled to a University-provided Williamsburg residence if Dr. Taylor predeceases her. Again, Dr. Taylor's failure to account for these contingencies in his opinion makes it unreliable. *See Leatt Corp.*, 2013 U.S. Dist. LEXIS 98366, at *7-9.

12

2.  *The University still provides health insurance for Dr. Taylor.*

Dr. Baldwin calculates $52,935 in alleged damages to Dr. Taylor relating to the "loss" of his health insurance. (Exh. 2 at Table 1). Again, Dr. Baldwin admits that the University is "still funding Dr. Taylor's health insurance." (*Id.* at 2). As with the value of the Williamsburg residence discussed above, Dr. Baldwin's testimony regarding the value of Dr. Taylor's "lost" health insurance must be excluded because it is irrelevant; there undeniably has not been a breach of any provision requiring the University to continue providing health insurance for Dr. Taylor. *See Daubert*, 509 U.S. at 591.

Not only has Dr. Taylor not suffered any alleged damages for a failure to provide health insurance, but he actually has come out ahead on this category. While before his termination he was paying for a portion of his health insurance premiums through a payroll deduction, the University now pays for all of them. (Exh. 1 at ¶ 10). Accordingly, Dr. Baldwin's report is further unreliable because he admits that, despite knowing that the University was paying for all of Dr. Taylor's health insurance premiums, he assumed for his calculations that Dr. Taylor would continue covering a portion of those costs. (Exh. 4 at 107 ("Q: And so you've assumed, for purposes of your loss calculations, they would continue to cover a portion of their healthcare costs, correct? A: For the purpose of my projections, yes.")). This plainly overvalues the alleged loss even if there had been a breach. *See Kumho Tire,* 526 U.S. at 149 (explaining that expert testimony that is based on questionable "fact[s], data, principles, methods or their application" should be excluded).

3.  *The University still provides long-term-care insurance for the Taylors.*

Dr. Baldwin calculates $38,498 in alleged damages to Dr. and Mrs. Taylor resulting from "lost [long-term-care] insurance." (Exh. 2 at Tables 1 & 2). But he again admits that "[t]his

13

coverage is still being provided by the university." (*Id.* at 2). Accordingly, Dr. Baldwin's testimony relating to this category of alleged damages is irrelevant as it does not relate to any breach of the Disputed Agreement and must be excluded. *See Daubert*, 509 U.S. at 591.

Notwithstanding the fact that there is no breach for which Dr. and Mrs. Taylor are entitled to damages for "lost" long-term-care insurance, Dr. Baldwin's calculations are improper based on the language of the Disputed Agreement. It does not require long-term-care insurance, but provides that "the University shall provide and/or pay to Dr. and Mrs. Taylor amounts for long term health care." (DE 14-1 at § I.6). There is no mention of insurance, and the provision at issue instead contemplates reimbursement for long-term-care expenses actually incurred, none of which Dr. and Mrs. Taylor have provided any evidence of having incurred. Dr. Baldwin's failure to even consider what the amount of these actual expenses might be undermines his credibility and the reliability of his opinions and highlights the irrelevance of his calculations regarding this category of alleged damages. (Exh. 4 at 120 ("Q: Did you investigate or consider at all the average costs of long-term healthcare or the probability of the Taylors needing long-term healthcare? A: I didn't investigate that. I think people probably do need long-term care, but that's just, you know, my opinion.")); *see Andler*, 670 F.3d at 727 ("[A]n expert witness's calculations of [damages] are inadmissible under [Rule 702] if based on 'unsupported speculation.'").

        4.    *The University still provides Dr. Taylor's sister-in-law a residence for below-market rent.*

Dr. Baldwin calculates $50,691 in alleged damages for Dr. Taylor sister-in-law's, Lois Taylor's, loss of residence, but admits that she "continues to reside on the property." (Exh. 2 at Table 3, 3). In fact, Lois Taylor not only continues to reside at the University-owned residence, but also continues to be charged the same below-market rent as set forth in the Disputed Agreement. (Exh. 1 at ¶ 11). Accordingly, as with the other "benefits" described above, there has

14

been no breach of contract, and Dr. Baldwin's testimony relating to this category of damages must be excluded as irrelevant. *See Daubert*, 509 U.S. at 591.

Even if there was a breach, this would not entitle Dr. and Mrs. Taylor to recover damages for the loss to Lois Taylor. In fact, if a breach of § I.7 of the Disputed Agreement had occurred, Dr. and Mrs. Taylor would not be the injured parties, as they would be in the same contractual position with the University regardless of its rental arrangement with Lois Taylor. *See Barnett*, 233 S.W.3d at 727 ("In an action for breach of contract, the measure of damages is that sum which will put the injured party into the same position he would have been in had the contract been performed.") (internal quotation marks omitted). Dr. Baldwin even admitted that Dr. and Mrs. Taylor would not be harmed by a breach of this provision. (Exh. 4 at 131 ("It actually benefits, I guess specifically, Lois Taylor.")). Dr. Baldwin's calculations of damages on these items are irrelevant and must therefore be excluded. *See Daubert*, 509 U.S. at 591.

**B. Dr. Baldwin assumes $778,493 in "lost" death benefits based on highly speculative and unlikely contingencies.**

Dr. Baldwin places a present value of $778,493 on the death benefits allegedly lost by Mrs. Taylor as a result of the University's breach of the Disputed Agreement. He reaches this number by discounting to present value the full $1 million death benefit under the policy that is still maintained by the University, but this calculation improperly assumes numerous contingencies. For example, it assumes that Dr. Taylor will definitely predecease Mrs. Taylor and that his death will be covered by the terms of the policy and not meet any of the policy's exclusions[6]—both of these contingencies would have to occur for Mrs. Taylor to ever be entitled to recover the proceeds of the life insurance policy as she alleges she is entitled to do.

---

[6] Dr. Baldwin also assumes without explanation that Dr. and Mrs. Taylor would be entitled to recover the value of the death benefit rather than the value of the premiums due on the policy, even though the University never had any obligation to pay out the death benefit under the policy.

15

Dr. Baldwin, however, fails to adequately explain his assumption that the life insurance proceeds would definitely have been paid out to Mrs. Taylor had the alleged breach not occurred. (*See, e.g.*, Exh. 4 at 129 ("Q: But for purposes of how you valued the life insurance policy, you didn't give any sort of probability value to the chance that she might predecease Dr. Taylor; is that correct? A: That's—that's correct.")). His failure to account for these contingencies in any way in formulating his opinion regarding the value of the losses allegedly sustained by Dr. and Mrs. Taylor makes his opinion on this subject matter unreliable. *Cf. S.S.*, No. 1:12-CV-483, 2013 U.S. Dist. LEXIS 98366, at *7-9 (identifying "failure to consider other possible causes" as a "red flag" that cautions against the admissibility of expert testimony). Accordingly, this testimony should be excluded.

      **C.    Dr. Baldwin improperly calculates $156,392 in "lost value" of University-provided work equipment based on improper valuation assumptions.**

Dr. Baldwin calculates $156,392 in alleged damages to the Taylors for the "lost value" of their University-provided cell phones and leased vehicle. (Exh. 2 at Tables 1 & 2). Not only does he make these calculations using flawed and unreliable methodologies, but these are not even "benefits" that the University was obligated to continue providing to Dr. and Mrs. Taylor under the terms of the Disputed Agreement. In fact, the vehicle and mobile phones were considered work equipment throughout Dr. and Mrs. Taylor's employment with the University and were only provided to them to assist with the performance of their duties as employees. Neither the University nor the Taylors considered the value of these items as benefits or income while they were employed by the University. As such, by the plain terms of the Disputed Agreement, they cannot be considered lost benefits. (*See* DE 14-1 at § I.5 (only requiring the University to "continue to provide and/or pay all benefits to Dr. and Mrs. Taylor, for the rest of their joint lives that they are currently receiving upon the date of the execution of this Agreement")). Moreover,

16

Dr. Baldwin admits that he did not consider whether the vehicle and mobile phones were considered "benefits." (Exh. 4 at 100 ("It just wasn't something I would have considered.")). Thus, Dr. Baldwin's calculations of erroneous damages, where there has been no breach, are irrelevant and must therefore be excluded. *See Daubert*, 509 U.S. at 591.

Even if a breach had occurred, Dr. Baldwin's calculations still are faulty and unreliable. First, with regard to the leased vehicle, Dr. Baldwin failed to adequately explain his assumption that the Taylors would continue leasing a Ford Explorer at a monthly cost of $645.83 for the rest of their lives. He also failed to account for the possibility that one or both of them would stop driving at some point. Dr. Baldwin admits that he did not consider any alternatives to the high-value Ford Explorer lease. (Exh. 4 at 87 ("I did not consider that, no.")). Dr. Baldwin also admits that he did not consider the possibility that the Taylors may not continue driving until the day they die. (*Id.* ("I did not factor that in, specifically.")). Dr. Baldwin's improperly extrapolated calculation of $125,970 in "lost value" to the Taylors for the leased Ford Explorer is unreliably calculated based on untenable assumptions and therefore his testimony on this issue must be excluded. *See Leatt Corp.*, 2013 U.S. Dist. LEXIS 98366, at *7-9 (explaining that "improper extrapolation [and] failure to consider other possible causes" are "red flags that caution against certifying an expert").

Second, with regard to both the vehicle and the cell phones, Dr. Baldwin's calculations are unreliable because, at most, he should have used the replacement value to the Taylors; the price that the University paid for these items is an improper measure of damages.[7] It is well-established that the actual loss to the plaintiff is the correct measure of damages in a breach-of-contract claim. *See Anchor v. Linton*, No. 99-3702, 2000 U.S. App. LEXIS 24077, at *19 (6th

---

[7] Dr. Baldwin's calculations are also flawed as he incorrectly assumes that the University ceased providing the Taylors with a University-leased vehicle on June 23, 2016, and with mobile phone service on April 6, 2016. Rather, those things occurred on September 21, 2016, and June 16, 2016, respectively. (Exh. 1 at ¶¶ 6-7).

17

Cir. Sept. 25, 2000) ("A party's expectation interest represents the *actual* worth of the contract to him and therefore recovery is limited to the loss he has actually suffered by reason of the breach."). Dr. Baldwin admits that the calculations reflect the prices paid by the University to provide those items to the Taylors, not the *actual damages* suffered by the Taylors, which would be reflected by the replacement costs for the vehicle or cell phones that the Taylors actually use. (Exh. 4 at 97 ("[E]ven if I knew what those costs were, I probably wouldn't factor that in.")); *see Assocs. Commer. Corp. v. Rash*, 520 U.S 953 (1997) (explaining that, when valuing the loss of use of property in bankruptcy contexts, one must tie "valuation to the actual disposition or use of the property"). Dr. Baldwin's failure to adequately explain why he believed these figures accurately reflect the *actual losses* the Taylors have or will allegedly suffer renders his testimony fundamentally unreliable as a measure of damages.

## CONCLUSION

For the foregoing reasons, the University requests that the Court exercise its gatekeeping power under Federal Rule of Evidence 702 and *Daubert* to exclude the speculative opinions of William Baldwin, Ph. D, as outlined above.

Respectfully submitted,

 /s/ Barbara B. Edelman
Barbara B. Edelman
Haley Trogdlen McCauley
DINSMORE & SHOHL LLP
250 W. Main Street, Suite 1400
Lexington, KY 40507
(859) 425-1000
(859) 425-1099 (fax)
barbara.edelman@dinsmore.com
haley.mccauley@dinsmore.com

and

James D. Jordan
GUENTHER, JORDAN & PRICE, P.C.
2100 West End Avenue, Suite 1150
Nashville, TN 37203
(615) 329-2100
(615) 329-2787 (fax)
JDJordan@GJPLaw.com
*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed this 6th day of June, 2018, using the Court's CM/ECF system, which will send notice of filing to the following:

D. Duane Cook
John M. Sosbe
Cook & Watkins, PLC
306 North Hamilton Street
Georgetown, KY 40324
*Counsel for Plaintiffs*

 /s/ Barbara B. Edelman
*Counsel for Defendant*

12971388v2