**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**
**CIVIL ACTION NO. 6:16-CV-00109-GFVT**
*Electronically Filed*

| | |
|---|---|
| DR. JAMES TAYLOR and | ) |
| MRS. DINAH TAYLOR | ) |
|     Plaintiffs, | ) |
| | ) |
| V. | ) |
| | ) |
| UNIVERSITY OF THE CUMBERLANDS | ) |
|     Defendant | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF WILLIAM T. BALDWIN, Ph. D.

The Plaintiffs urge the Court to **DENY** in part the Defendant's Motion to Exclude Expert Testimony of William T. Baldwin, Ph. D. (Doc. # 74) for the following reasons:

## INTRODUCTION

The University chose to include various irrelevances in its motion for summary judgment and apparently ran out of room to discuss damages.[1] The University repeats much of that irrelevant discussion here. *See* Doc. # 74 at p. 2-6. The Taylors refer the Court to their response

---

[1] *Compare* Doc. # 70 at p. 1-20 (summarizing all of the evidence related to the authorization of the Agreement) *with* Doc. # 70 at p. 2 (recognizing that the "Court has previously considered the question of whether the University authorized the Disputed Agreement and found it to be fraught with genuine disputes of material fact.") *and* Doc. # 70 at p. 20-39 (not offering any legal argument related to the authorization of the agreement, even though the University spent the first 20 pages of its motion discussing almost exclusively that).

to the University's Motion for Summary Judgment[2] for a comprehensive refutation of the points the University appears to think it is making.

As for this motion, the University purports to discuss various deficiencies in methodology on the part of Dr. Baldwin, but in the final analysis the University's arguments all revolve around whether the identified measures of damages are available as a matter of law or under the contract and not whether they are estimated properly as a matter of economic theory.[3] While this is an acceptable use of *Daubert*[4] because it - as well as motions in limine-[5] allows discussions of relevance and since expert testimony related to damages is, of course, irrelevant if

---

[2] The original motion for summary judgment is at Doc. # 70. The Taylors' response to that motion is being filed the same day as this response.

[3] Since the University did not include these arguments related to damages in it Motion for Summary Judgment, they must not be seeking judgment as a matter of law on these issues even though its arguments here deal almost exclusively with legal concepts. Also, since the University did not provide anything to challenge Dr. Baldwin's analysis from an economics perspective, it need not be discussed here. *Cf.* Berger, Margaret, *Procedural Paradigms for Applying the Daubert Test*, 78 MINN. L. REV. 1345, 1365 (June 1994) ("the defendant . . . has to shoulder the burden of coming forward with evidence showing that the plaintiff's expert proof is inadmissible"); *Altman v. Scutt*, 2014 U.S. Dist. 137968, *116-17 (E.D. Mich. Sept. 30, 2014) (faulting the party seeking exclusion for not advancing an argument related to what was wrong with the expert testimony as an initial matter); *Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 317 fn. 90 (Mich. 2004) (citing various cases supporting the *Berger* article's conclusion). In fact, the University seems to agree that his methodology was appropriately used as to other measures of damages, at least for admissibility purposes. Doc. # 74 at. Fn. 5. Consequently, only the University arguments actually raised (i.e. that certain damages are not available as a legal or contractual matter and consequently Dr. Baldwin's testimony is irrelevant) will be refuted below. In any event, Dr. Baldwin's qualifications and methodology are available for the Court's perusal in his report. Doc. # 74-2.

[4] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (tying the standard in Fed. R. Evid. 702 requiring that expert testimony "assist the trier of fact" to basic relevance).

[5] Motions *in limine* – as well as *Daubert* motions – can be used to limit expert testimony based on basic relevancy concerns. *Cf. e.g. Automated Cutting Techs. V. BJS N. Am. E, Inc.*, 2012 U.S. Dist. LEXIS 195466 (E.D. Ky. Sept. 12, 2012) (motion *in limine* to exclude or limit testimony of Calvin D. Cranfill [the University's expert in the case at bar] on grounds of the relevancy of his analysis to the issue rather than on his qualifications); *In re Air Crash at Lexington*, 2008 U.S. Dist. 55124, *27-28 (E.D. Ky. July 17, 2008) (motion *in limine* granted in part that limited expert testimony on certain questions based on the legal relevance of the testimony to those questions).

those damages are unavailable, this motion is a permissible vehicle for discussing certain of those issues. However, as will be shown below, the University's arguments fail for reasons related to both basic misunderstandings of contractual doctrines and the specific facts of this case.

## ARGUMENT

### I. The University's Incomplete Understanding of Various Contractual Doctrines

The University repeats a number of the same arguments as effecting various measures of damages. These arguments – indeed all of the University's arguments do this – essentially criticize Dr. Baldwin for not being a good enough lawyer to determine whether certain damages are recoverable as a matter of law rather than whether they are appropriately considered as a matter of economic analysis. These arguments are dispensed with in general terms here and then the principles discussed in this section are applied to specific measures of damages in the next section.

#### a. Breach and Its Consequences

The University criticizes Dr. Baldwin for basing some of this calculations on items that are still being provided. The University appears to be under the impression that plaintiffs must wait until each and every obligation under the contract is breached before they can sue for the value of all of the obligations under the contract; the observation this impression is based on - that there must a be a breach for there to be damages -[6] is true enough but incomplete.

In a number of situations, the plaintiff may sue for the entire contract even if it is not entirely breached. These fall under the rubric of "total breach," which gives the plaintiff the right to sue for all of the remaining benefits under the contract. This is contrasted with "partial

---

[6] Doc. # 74 at p. 11.

breach" – which only gives the right to sue for those parts of the contract that have actually been breached.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 236 (1981).[7]  Total breach exists "if [the breach] discharges the injured party's [in this case, the Taylors] remaining duties to render such performance"[8] or, as relevant here, if there is "a breach by non-performance accompanied or followed by a repudiation."[9]  The injured party's remaining duties are discharged if, among other things, there is an "uncured material failure by the other party to render any [ ] performance due at an earlier time" and the material failure is no longer curable.  RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981); *see* RESTATEMENT (SECOND) OF CONTRACTS § 225(2) (1981).

(1.) <u>The University has both breached and repudiated the contract</u>

Assuming that the University entered into an enforceable contract on the terms laid out in the Agreement, the University has breached.  For one example, it has stopped paying the salary required by the terms of the agreement.  The university has also repudiated the Agreement.  The University's refusal to recognize the existence of a binding contract based on its allegation that there was never an enforceable agreement authorized, is – assuming the University is wrong on those points – an effective repudiation of the Agreement.  This is true even though the University continued to provide certain benefits called for by the Agreement because they have rejected the idea that they are under any legal obligation to do so (i.e. a repudiation of the contract).  *Cf. Jordon v. Nickell*, 253 S.W.2d 237 (renunciation of a contract [which the University has accomplished by disclaiming any obligations under the Agreement] is a repudiation under this doctrine).  The foregoing being true, the University is in total breach of the Agreement and the

---

[7] Even if the University was correct, all this would mean was that the Taylors may have additional lawsuits against the University in the future assuming the Taylors win this case.
[8] RESTATEMENT (SECOND) OF CONTRACTS § 243(1) (1981).
[9] RESTATEMENT (SECOND) OF CONTRACTS § 243(2) (1981) (there is an exception to subsection 2 in subsection 3; however, it does not apply because the Taylors have not completely performed)

Taylors can reduce the value of all of the benefits under the contract – whether presently breached or not – to judgment.

        (2.) The University's breach was material

While the University's breach and repudiation is enough to justify the Taylors' decision to sue for the entirety of the contract, the materiality of the breach does likewise. Materiality is governed by multi-factor tests. *See Bluegrass Equine & Tourism Found., Inc. v. Commonwealth*; 2013 Ky. App. Unpub. LEXIS 380, *76; RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981). Here, the University has admittedly breached the vast majority of the Contract as measured in dollar amount (failure to pay salary and removing Mrs. Taylor as beneficiary of the life insurance). The other benefits are collateral to the payment of salary. This is especially true of benefits like insurance, which is only situationally useful. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 241(a) & (b) (1981). Further, assuming that the jury agrees that the Agreement was authorized, it is hard to imagine how the University could be found to be likely "to perform or to offer to perform [to] cure [its] failure" or how the University's conduct could "comport[ ] with standards of good faith and fair dealing" given the nature of its actions. RESTATEMENT (SECOND) OF CONTRACTS § 241(d) & (e) (1981). It is also unclear how the University will suffer forfeiture from the complete enforcement of the contract at this point. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 241(c) (1981). The material breach is no longer curable because there is no going back to having both sides perform; this relationship has soured beyond repair. Given all of this, the breach was total and Dr. Baldwin's inclusion of all damages is justified.

(3.) <u>Dr. Baldwin's inclusion of the benefits that are still being paid is entirely appropriate</u>

Given that the University's breach was total, what Dr. Baldwin did was entirely appropriate: giving the University credit for the benefits they are still providing while at the same time recognizing that the Taylors have the right to reduce all of the benefits (for both breached and unbreached terms of the contract) to judgment after trial. The Taylors will then no longer have an obligation to deal with the University outside seeking satisfaction for the judgment. To the extent the University wants to argue that its breach is not total – which would be difficult to do in the circumstances – it can, but that is not a comment on the validity of Dr. Baldwin's methods. Further, assuming that the University is liable for total breach, the University could have contested the amounts that are appropriate damages for the benefits the University is still providing; however, the University has chosen to sit this one out. Doc. # 74-3 (Report of Calvin D. Cranfill, the University's expert, which omits discussion of damages related to benefits the University is still providing).

### b. **Alternative Contracts and the Effect of Selection**

The University also repeatedly argues that since certain terms of the Agreement allow alternative methods of performance, Dr. Baldwin's analysis was deficient because he did not consider the value of those alternatives. This line of reasoning is – again – a legal argument masquerading as an economic analysis argument. There is no real criticism of the determination of the value of, for example, the apartment on campus; the real criticism is that Dr Baldwin did not consider the value of a hotel room instead. There is no evidence provided indicating that this is deficient as a matter of economic doctrine, leaving the reader to assume that the deficiency relates to the law of contracts and how this particular contract works. Unfortunately for the

University, this is another area where it demonstrates a less than comprehensive understanding of contractual doctrine.

### (1.) Alternative Contracts in General

When a contract allows for alternative performances, the lower cost option serves as the measure of damages if the selection of performance was at the election of the defendant. *See* 11 CORBIN ON CONTRACTS § 59.4; *cf. White v. Green*, 19 Ky. 155, 155-56 (Ky. 1826). Where, as here, the plaintiff has proven the measure of damages based on one of the possible alternatives, it is on the defendant to prove a lower cost measure. This derives from the fact that "'[g]enerally, it is the party who has breached the contract who bears the burden of proof in establishing matters asserted by him in mitigation or reduction of damages.'" *Cf. Legacy Builders, LLC v. Andrews*, 335 P.3d 1063, 1070 (Wy. 2014) (*quoting Graham v. State*, 16 P.3d 712, 715 (Wy. 2001)); *John Thurmond & Assocs. v. Kennedy*, 668 S.E.2d 666, 669 (Ga. 2008) ("[i]n response, the defendant has the burden to present any contradictory evidence challenging the reasonableness or proportionality of those damages and where appropriate, evidence of an alternative measure of damages for the jury's consideration"); *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 543 (Tenn. Ct. App. 2005) ("'We hold that the plaintiffs do not have the burden of offering alternative measures of damages'") (*quoting Nutzell v. Godwin*, 1989 Tenn. App. LEXIS 485, *3 (Tenn. Ct. App. July 13, 1989)). Kentucky recognizes this principle by requiring the defendant to prove the plaintiff failed to mitigate damages. *Cf. Morgan v. Scott*, 291 S.W.3d 622, 640-41 (Ky. 2009); CETRULO, 2 KENTUCKY INSTRUCTIONS TO JURIES § 39.21 (stating that the proof must show failure to mitigate rather than show that damages were in fact mitigated; the comment to the instruction clarifies that this is so because the burden is on the defendant).

The most common instance in which the issue comes up is in damages to property – whether in contract or tort. In those cases, the measure of damages is the lower of diminution in fair market value or the cost of repair. *See Ellison v. R & B Contr., Inc.*, 32 S.W.3d 66 (Ky. 2000); *Legacy Builders, LLC*; *John Thurmond & Assocs.*; *GSB Contractors, Inc. v. Hess.* Notably, once the plaintiff has offered evidence on one of those measures, it is up to the defendant to refute that evidence or offer evidence that the alternative is lower. *See Ellison*; *Legacy Builders, LLC*; *John Thurmond & Assocs.*; *GSB Contractors, Inc.* Kentucky does the plaintiff one better, in that the jury can reject the defendant's proof on an alternative measure even if the plaintiff has offered no evidence on that measure. *See Ellison* at 74-77. In any event, Calvin D. Cranfill – and consequently the University – have elected to sit this argument out. Doc. #74-3.

Not requiring the plaintiff to analyze and offer proof related to every possible alternative makes sense practically. For example, the Agreement in this case requires the University to provide a suitable apartment or, if that is not available, a room at the Cumberland Inn. Doc. # 74 at p. 5. If the burden was on the plaintiff to show the value of all potential alternatives, the defense could play games forever by always speculating that there is a different apartment available somewhere that can be had for a lower rent. The plaintiff could never prove damages without submitting proof of all possible alternatives. The burden in this situation must be on the defendant. *Cf. Franklin Sugar Refining Co. v. Howell*, 118 A. 109, 115 (Pa. 1922) (defendant able to lower the amount of damages when it defaulted on a contract to purchase a certain number of barrels of sugar by proving it could have purchased barrels of a different weight or lower grade than those the plaintiff based its damages calculation on).

This is true in expert testimony as well. The cases the University cites fault the expert not for failing to consider alternative measures of damages, but for other reasons. *See e.g. Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 528-29 (6th Cir. 2012) (affirming the district court's decision because the expert failed to take into account other possible causes of the injury, rather than alternative measures of damages); *S.S. v. Leatt.*, 2013 U.S. Dist. LEXIS 98366, *42-49, 49-58, 62 (the University cites this case for the proposition that the failure to consider other causes is a red flag, but the experts in the case were excluded because they did not actually have expertise relevant to questions related to liability; this was not a case about alternative measures of damages). Furthermore, it cannot be that one expert must testify as to all possible measures of damages. In certain instances, the alternative measure will not be in the expert's bailiwick. For example, in this case the University faults Dr. Baldwin for not considering the subjective value of a car and phone to the Taylors; but how can Dr. Baldwin testify as to someone else's subjective value. Consider another example; in a construction defect case, the measure of damages will be the cost of repair or diminution in fair market value. You would have to have a contractor testify as to one and an appraiser testify as to the other. You could not fault each for failing to invade the province of the other.

(2.) <u>Selection turns an alternative contract into a regular one</u>

As will be discussed below regarding the particular benefits to which the University's alternative contract argument applies, it has already settled upon how it will perform the obligations it denies having. Consequently, there is no need for proof related to any alternative avenue of performance because "where there is an alternative contract and the electing party has already exercised the right to choose, the contract is no longer properly conceived of as an alternative contract. Thus, in circumstances where a mode of performance has already been

selected, damages should be assessed based on the selected method of performance." Alarie & Dinning, *Remedies and Alternative Contracts*, 44 AM. BUS. L.J. 639, 653 (Winter 2007) (citing RESTATEMENT (FIRST) OF CONTRACTS § 344, which the article identifies as the source of "[t]he vast majority of U.S. jurisprudence dealing with alternative contracts").

As is hinted at in the preceding paragraph, it is here that the University's two repetitive arguments – that it is still providing certain benefits so there are no damages *and* that it could have provided different benefits so Dr. Baldwin is wrong for having ignored those possibilities – collapse under their own weight into a black hole of incoherence. Disingenuously, in one breath the University claims that there was no breach because they continued to provide [fill in described benefit] and in the next breath exclaims "look at all the different ways we could have performed this contract. Dr. Baldwin is incompetent for not having considered them all. Everything's is speculative." The University's position is, in a word, incorrect.

## II. **The University's Misapprehension of the Law and the Terms of the Contract, Applied to Specific Examples**

In addition to the University's misapprehension of the law discussed above, its particularized analysis as to each item of damages discussed is also faulty.

a. The Williamsburg Residence

The University's argument that this is not an appropriate measure of damages because it is still being provided is incorrect for the reasons discussed above. It is also incorrect to say that alternatives should have been considered, as the method of performance (i.e. the provision of a particular apartment) had already been determined. Moreover, this provision was not solely within the control of the University, as the Agreement called for an "agreeable apartment" so

both sides had some say in the matter. In any event, the apartment has in fact been agreed on, which is what Dr. Baldwin based his analysis on.

The University also argues - apparently without irony - that since Dr. Taylor is no longer chancellor, he no longer needs an apartment to fulfill his duties as chancellor. It is the University's breach that robbed Dr. Taylor of his position. It was Dr. Taylor's intention to continue to serve the University as called for. Even though the apartment was in some sense tied to him serving as chancellor, it was still a personal benefit within the terms of the contract so long as he wasn't barred from the apartment while not on official business. *See* INTERNAL REVENUE SERVICE, FRINGE BENEFIT GUIDE, at p. 48 (Jan. 2014) (available at https://www.irs.gov/pub/irs-pdf/p5137.pdf) (accessed on July 7, 2018) (hereinafter FRINGE BENEFIT GUIDE). No one has claimed that he was. Consequently, damages related to the apartment are allowable for so long as Dr. Taylor would have been alive.[10] Again, nothing in this section criticizes Dr. Baldwin as an economist; the University's argument relies rather a faulty understanding of the legal principles.

b. Health Insurance

The University's argument that this is not an appropriate measure of damages because it is still being provided is incorrect for the reasons discussed above. The University's other argument, that Dr. Baldwin overvalued the damages by assuming the Taylors would continue paying for a portion of their health insurance, is exactly backwards. Dr. Baldwin's assumption actually works in favor of the University, as it reduces damages rather than increasing them.

---

[10] In any event, Dr. Baldwin prepared two tables as part of his report, one showing the damages up to Dr. Taylor's expected death (the earlier of the two), and one showing damages from Dr. Taylor's death onward. Doc. #74-2 at p. 9-10. Consequently, it is entirely possible to figure out the amount of damages until Dr. Taylor's death and no reason to exclude all of Dr. Baldwin's testimony on the matter.

Whether or not the contract calls for the Taylors to continue to pay for their typical portion of the health insurance premium is an issue of contractal interpretation. The Taylors have stated their position by demanding that the University only continue to pay its typical share; the fact that the University pays all of it now is not dispositive.

   c. <u>Long-Term Care Insurance</u>

The fact that the University continues to provide the long-term care coverage does not prevent it from being a measure of damages for the reasons discussed above. Also for the reasons discussed above, that fact that they University could have – conceptually at least – fulfilled its obligations by paying long-term care costs directly instead of providing insurance is of no moment. It is for the University to prove that it could have performed for less money under a different method. In any event, the method of performance having been identified, damages are properly calculable based on it.

The Agreement can also be read to differently: Not only is there a specific provision for long-term care, there is a more general provision for the University to continue paying "all benefits to Dr. and Mrs. Taylor, for the rest of their joint lives." Doc # 74 at p. 4. Long-term care insurance is general considered to be a type of benefit. FRINGE BENEFIT GUIDE, at p. 26. The University has an obligation under this more general provision to continue to provide the insurance it had always provided. The more specific provision regarding long-term care puts the University on the hook for anything not covered by the insurance policy. The Taylors concede that they have no evidence of what those amounts above the polies coverage would be, but that does not affect the propriety of their claim for damages related to the policy and Dr. Baldwin's analysis regarding the same.

d. Sister-in-law's Residence

The University's arguments are somewhat correct on this point. While the Taylors have a right to enforce this promise, the only remedy appears to be specific performance or perhaps nominal damages. *See* RESTATEMENT (SECOND) OF CONTRACTS § 305 cmt. a (1981). In any event, no one must testify as to the value of the specific performance so long as the University continues to provide it. The University is correct that Baldwin's testimony on this matter is irrelevant.

e. Value of Death Benefits

The University makes a similar argument related to alternative performance that it has made before: that it could have continued to paid (or given Mrs. Taylor the present value of) the premiums so it is not appropriate for Dr. Baldwin to estimate based on the payout of the life insurance contract. As discussed above, it is for the University – not on the Taylors or their expert – to prove a lower cost alternative. Also, the University inappropriately assumes that Mrs. Taylor could obtain a new life insurance policy for a man now older than when the policy was put in force. The University additionally makes the specious argument that the Agreement never required the University to pay the death benefit to Mrs. Taylor; however, the University does agree to name her the beneficiary of $1,000,000.00 of the payout (Doc. # 74 at 5), which is to the same effect. The University also speculates that Dr. Taylor might die in a way not covered by the policy; however; it never identifies any provision that might apply to Dr. Taylor or his circumstances, so it is difficult to evaluate what, if anything, Dr. Taylor might be inclined to do (e.g. extreme sports, space travel, war with Russia or North Korea, etc.) that might result in exclusion under the policy.

The University also claims that Dr. Baldwin failed to assign a probability to the question of whether Dr. Taylor would die first, but that is what the life tables he relied on already provide. Estimating that Dr. Taylor would die first based on life tables is fundamentally no different than estimating lost salary based on life tables, but the courts expressly allow this and even leave it up to the jury to decide what the actual life expectancy is. *Cf. Walker v. Metro Urology, P.S.C.*, 2016 Ky. App. Unpub. LEXIS 267, *21-22 (Ky. Ct. App. April 8, 2016) (acknowledging that Kentucky courts have allowed the jury to determine life expectancy without expert testimony or mortality tables); *Procaccini v. Lawrence & Mem. Hosp., Inc.*, 168 A.3d 538, 565 (Conn. Ct. App. 2017). If the jury determines from the evidence (including the life tables) that Dr. Taylor would die first, then Dr. Baldwin's testimony regarding the discounted value of the expected payout is both appropriate and relevant. The University has offered nothing demonstrating that this situation is different from other situations in which the jury is allowed to make an estimation as to life expectancy.

   f. University Provided Equipment

Dr. Baldwin is not a lawyer, though the University seems to think otherwise. There is no other explanation for it faulting him for not considering whether the phone and vehicle were a benefit within the terms of the Agreement or even questioning him about it at his deposition. Whether the car or phone were within the definition of benefit is a question of law for the court or, in some situations, a question of fact for the jury. *Cf. Prime Finish, LLC v. ITW Deltar IPAC*, 2017 U.S. Dist. LEXIS 69316 (E.D. Ky. May 5, 2017). It is not a question to be resolved by experts. The University makes several unsupported statements to the effect that neither the Taylors nor the University considered the car and phone to be benefits. The University did not

restrict these items to business use only, so this is untrue. FRINGE BENEFIT GUIDE at p. 14 (cell phone) & 54 (employer provided vehicles).

The University makes the same alternative contract based argument here that has been demonstrated as faulty so many times above: that the University could provide another vehicle than the one it was already providing. This should be rejected for the same reasons as above. They make a similar argument with regard to actual lost: that Dr. Baldwin should have measured the lost based on the Taylors' own esoteric valuation of the vehicle and phone. Strangely, the University goes on to say that the measure should be based on replacement cost, but the estimated cost to the University over time (which is what Dr. Baldwin analyzed) is the same as the cost to the Taylors to replace the same exact thing. Once the Taylors have established evidence of their measure of damages, it is for the University to provide a lower cost alternative within the scope of the contract to reduce the amount of damages. As the University admits, the cost of the replacement is evidence of the measure of damages. *Cf. Ellison v. R & B Contr., Inc.*, 32 S.W.3d 66 (Ky. 2000) (the cost of repair [or in this case replacement] stands as evidence for the value of property, with the defendant having to provide a lower alternative.). It is for the University to prove that the alternative measure would have been lower.

The University argues that since the Taylors might stop driving, Dr. Baldwin should have considered that; however, the Agreement does not tie the provision of this benefit to them continuing to drive. Doc. # 74 at p. 4-5. So long as we are speculating, someone could have driven them.[11]

---

[11] The University also argues that Dr. Baldwin used the wrong dates. Doc. #74 at p. 17 fn. 7. This is a potential issue of fact to be determined at trial.

### III.  Conclusion

The University faults Dr. Baldwin for not begin a lawyer.  This motion fails to provide any criticism of him as an economist; rather, it argues that he should not have made certain assumptions given the legal framework in which breach of contract is analyzed.  As discussed above, Dr. Baldwin's assumptions are correct given the law.  Except as stated with regard to the value of the apartment after the death of Dr. Taylor and the value of the apartment to the sister-in-law, the University's motion must be **DENIED**.

Respectfully Submitted,
/s/ D. Duane Cook
D. Duane Cook
John M. Sosbe
Cook & Watkins, PLC
306 N. Hamilton Street
Georgetown, KY 40324
duane@cookwatkins.com
john@cookwatkins.com
502-570-0022

CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2018, a copy of the foregoing was served on all counsel of record via operation of the Court's Electronic filing system.

/s/ D. Duane Cook
D. Duane Cook
