UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. 6:16-CV-109-GFVT

| | |
|---|---|
| DR. JAMES TAYLOR ) | |
| MRS. DINAH TAYLOR ) | |
| ) | |
| PLAINTIFFS ) | |
| V ) | RESPONSE TO MOTION TO |
| ) | EXCLUDE EXPERT |
| UNIVERISTY OF THE CUMBERLANDS ) | TESTIMONY OF PETE SMITH |
| ) | |
| DEFENDANT ) | |

Come the Plaintiffs by Counsel, and for their Response to motion to Exclude Testimony of Pete Smith (Doc. # 73, state as follows:

INTRODUCTION

The University relied on the report of Phillip Blount ("the Blount Report") in its attempt to justify termination of the Disputed Agreement, and to make an insultingly low offer for Dr. Taylor's salary under a proposed one-year contract. Plaintiffs believe the flawed Blount Report was used to railroad the special subcommittee of the University Board of Trustees' Executive Committee to terminate the Disputed Agreement.

The fundamental usefulness of the report prepared by Mr. A.W. (Pete) Smith ("Mr. Smith) is to makes clear that there are alternatives to the methods used by Phillip Blount and, that in fact, the Phillip Blount report was deeply flawed. It is therefore not surprising that these experts disagree in their methodologies, but the University has argued in its Motion to Exclude (Doc. # 73) that these disagreements make Mr. Smith's methodology unreliable and require excluding his report. In general, the issues raised by the University are of the kind which might form the basis of cross-examination by the University's counsel, or counterpunching by the University's own expert, but do not justify excluding the report. Daubert itself recognizes these as the preferred methods of

1

dealing with such issues: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." *Daubert*, 509 U.S. at 596.

## BACKGROUND

Having addressed much of the factual statement contained in Defendant's Motions to Exclude Expert Witnesses, (Doc. #73 and Doc. #74), in Plaintiffs' Response to Motion for Summary Judgment (Doc. # 81), Plaintiffs will not belabor those points again. This Response will instead focus on the nits the University attempts to pick with Mr. Smith's expert report. That said, a basic understanding of what Mr. Smith's report brings to the action, and why it is relevant is helpful in providing the right context for this disagreement between experts over methodologies:

### I.     The Relevance of Reasonableness

The University's chief concern, before it questioned the authorization of the Disputed Agreement, was whether the Disputed Agreement violated the Internal Revenue Service's ("IRS") Excess Benefit Transaction rules. Fundamental to that question is the reasonableness of the compensation to be paid under the Disputed Agreement. The University has phrased its arguments on reasonableness in different ways, but all boil down to this essence: that Dr. Taylor was to be paid under the Disputed Agreement more than was reasonable. The University has even used a supposed lack of reasonableness to bolster its bald speculation that the Disputed Agreement was obtained by fraud, arguing that no responsible trustee would vote for such a "bizarre, one-sided agreement" Doc # 70: at p. 1.

Apart from a brief public policy argument made in its Response to Motion for Summary Judgment (Doc #46 at p. 36), the University has not argued that the Disputed Agreement is unenforceable because it violates the "Excess Benefit" rules. See See 26 CFR 53.4958-1.  So far

as can be gleaned from the discovery done in this case the IRS has taken no position on Dr. Taylor's compensation. Moreover, what little caselaw exists on this matter makes clear that these rules are directed at closely controlled non-profits operated for the benefit of their founders with no real charitable purpose. In the one case, *Levy v Young Adult Institute, Inc.* 2015 WL 7820497 (SDNY 2015) which appears to have addressed the question of whether a failure to comply with the excess benefit rules is a defense to the contract in question, the Court held that the rule did not grant a private right of action and did not justify withholding agreed upon compensation. While not a defense to the contract[1], the Excess Benefit Transaction Rule nonetheless may explain some Trustees' sudden memory trouble concerning the Disputed Agreement. Of obvious concern to the Trustees, and equally obvious motivation to remember very little, is the fact that the Excess Benefit Transaction Rules contemplate personal liability for those voting in favor of the transaction which runs afoul of the rules. See 26 CFR 53.4958-1(d).

**The Problems Of Expert Testimony on Reasonableness**

There are certain unavoidable problems with using experts and comparisons to determine what compensation is reasonable even though the IRS encourages just that. In part the problem arises from turning an entirely subjective factor, ie. the worth of an individual to a given organization, into something objective. The expert reports of both Mr. Blount and Mr. Smith suffer from this initial handicap, but as demonstrated below, Mr. Smith's at least makes efforts to quantify important factors like Dr. Taylor's experience and prior fundraising success, whereas Mr. Blount's report treats Dr. Taylor and the position he would fill as thoroughly average as any other replaceable cog, or in Mr. Blount's own words: "Without reliable performance information relating

---

[1] Even if it were a defense, which it unequivocally is not, it could only be a defense to that amount which is in fact excess.

to Dr. Taylor's individual years of service I thought it more reliable to compare to the average for the comparator group for the period of 1997 to 2014 calendar years . ..″ Blount Second Report at Page 7. In other words, the Blount approach to determining reasonable compensation for Lebron James would be to calculate the average NBA salary and then pay him less than the average.

## ARGUMENT

The University insists the following issues justify exclusion of Mr. Smith's Report: (1) Mr. Smith improperly opines on legal matters outside his expertise;[2] (2) Mr. Smith's opinion is based on flawed compensation methodologies; (3) Mr. Smith uses an inappropriate comparator group as the basis for his Report; (4) Mr. Smith's Report is based on unreliable data; and (5) Mr. Smith's Report employs flawed statistical methodologies. Ironically many of the items above are symptoms of the University's own expert's opinion. In fact, despite the ominous headings of the University's Motion, and its attempts to bring its qualms within the ambit of generic pronouncements about admissibility of expert testimony, the actual controversies are much less impressive.

The Court should view each of these teacup tempests in light of the standard for admissibility in this area: "[T]he court's gatekeeper role under *Daubert"* is not intended to supplant the adversary system or the role of the jury." Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." *In re Air Crash at Lexington*, No. 5:06-CV-316 - KSF, 2008 U.S. Dist. LEXIS 58483, at *18 (E.D. Ky. July 30, 2008) (Internal citations omitted.)

---

[2] Before turning to those matters upon which the parties do not agree, Plaintiffs must first concede this point. Any opinion expressed by Mr. Smith concerning the enforceability of the Disputed Agreement at issue in this action is outside Mr. Smith's expertise, and he will not be called upon to testify to any opinion on the enforceability of that contract.

4

I.      **Mr. Smith Uses Acceptable Compensation Methodologies.**

The University's argument with Mr. Smith's compensation methodologies stems from two things: first that Mr. Smith performed a backward-looking compensation analysis of Dr. Taylor's entire thirty-five year career (Doc. #73 at p. 11), and second that his analysis was not done prior to the University entering into the Disputed Agreement. Neither of these arguments by the University hold up. The "reasonableness" standard in this area is not a scientific standard, but necessarily is one set by the law, as the standard to be met is a legal standard identified in the IRS regulations. The University's expert, Mr. Blount acknowledged during his deposition (the transcript of which is attached at Exhibit A hereto) what the law itself makes clear, that past compensation may be taken into account. (Blount Deposition at Pg. 15 Line 12- 22.) See also 26 CFR 53.4958-4(a)(1).

In fact, Mr. Blount acknowledged having been asked to do such reviews of previous under-compensation himself. (Blount Deposition Pg. 14 Lines19-24). He further acknowledged that there is no statute or caselaw of which he is aware that imposes any limit or cap on how far back an expert might look in a compensation analysis. (Blount Deposition Pg. 15 Line23 -Pg 16 Line 4.) Given that there is no maximum lookback and previous underpayment is a factor in determining reasonableness of current compensation, the University's argument that looking to past underpayment for thirty-five years is not methodologically sound is simply wrong. In fact, given his admitted knowledge of this factor, Mr. Blount's failure to take into account past under-compensation - without justification for failing to do so - seems to be the less methodologically sound approach.

The University's argument that Mr. Smith did not perform his comparative study prior to the decision to award the Disputed Agreement is silly on its face. Neither Mr. Smith, nor for that matter

5

Mr. Blount was asked to opine on the reasonableness of the compensation to Dr. Taylor before the Disputed Agreement was entered. Given that neither of these gentlemen has testified to any hidden talent for time-travel, neither of the expert reports in this case was done prior to entry into the Disputed Agreement. The only thing changed by that fact is that neither of their studies would qualify the Disputed Agreement for the rebuttable presumption of reasonableness under the Internal Revenue Code. This is hardly the basis for saying that the expert reports on reasonableness use improper methodology.

### II.     Mr. Smith's Comparator Group is Proper, and is in fact Mr. Blount's Group.

Mr. Blount chose a group of 14 Christian colleges and universities and determined the average paid by those schools to their development officers. The Blount report does not determine the reasonable salary to be paid to Dr. Taylor as Chancellor in comparison with amounts paid to other Chancellors or retired presidents because Mr. Blount claims that data is not readily available. Mr. Blount then removed Wheaton College from the group as an outlier (i.e. it pays too much) and then determined that a reasonable salary for Dr. Taylor would be less than the average, with no justification cited for this. Mr. Smith chose the same group of Christian Schools[3] to determine the underpayment of Dr. Taylor in comparison to the average payments of presidents of those schools in prior years. For the University to now argue that a group (which its own expert put together as being sufficiently similar to the University) is an inappropriate comparator group, is almost laughable. Mr. Smith is no doubt equally correct that the use of any other group would have resulted in allegations of "cherry picking" by the University. From that comparator group, originally selected by Mr. Blount, Mr. Smith determined that the gross amount of under-compensation in prior years amounted to approximately $3.4 million and that a compensation

---

[3] There are two schools in Mr. Blount's group which were not part of Mr. Smith's group, however their inclusion would only have made the under-compensation more pronounced.

package that paid Dr. Taylor that amount over his remaining lifetime would be reasonable --- not accounting any value for Dr. Taylor's expected contributions in the future.

Mr. Blount, in his second report (p. 11 Summary Table), takes a different group of schools (of comparable size) and calculates the <u>average</u> compensation of presidents of those schools in the period from 1997-2014 (from 990 data) and finds that Dr. Taylor's cash compensation for that period was $1.4 Million less than the average. This becomes even more telling when we recall that Mr. Blount ignored any real characteristics or comparative abilities of Dr. Taylor, simply treating him as "average." Mr. Smith used a longer period and attempted to take experience and abilities of Dr. Taylor into account, and not surprisingly, came up with a larger amount of undercompensation.

### III.     The Data Relied Upon by Mr. Smith was Sound.

The University next seeks to undermine the reliability of Mr. Smith's report by arguing that his use of 990 forms, the federal tax return forms for institutions exempt from income tax, results in unreliable data. This argument is simply grasping at straws, given that the university's own expert used 990 form data. On Page 2 of Mr. Blount's first report he states: "In the second comparison, we reviewed the desired activities of the Chancellor position going forward and based on those accountabilities we conducted a Form 990 analysis…" His report goes on to say later, "Our third comparison included a Form 990 analysis . . . " Blount First Report at 2. These 990 forms provide reliable data that experts in this field use. To the extent the University would like to argue that its reporting to the IRS is in some way so flawed as to render use of its 990 forms unreliable, the Service would no doubt be interested to hear that information.

In addition, the University argues that because Mr. Smith extrapolated a three percent per year increase in compensation over the years prior to 1998, his data is unreliable. Mr. Smith, who

has broad experience throughout the world of nonprofit organizations used what he identified as the average annual increase in compensation "across the nonprofit world." This is simple extrapolation and in no way compromises the reliability of the data Mr. Smith used.

### IV.     Mr. Smith's opinion Does Not Use Flawed Statistical Methodologies.

Here the University's notion of flawed statistical methodologies is that Mr. Smith tried to account for Dr. Taylor's experience level at different points in his career, and horror of horrors, used Excel software to calculate certain percentages. Mr. Blount of course used Excel as well, (Blount Deposition at pgs. 22-23) (suggesting at least that this type of calculation is accepted in their area of expertise),but failed to try to account for any experience that Dr. Taylor had at any point in his career. Regarding the assigning of certain percentiles at certain points of Dr. Taylor's career, this at least attempts to account for experience; which Mr. Blount never does. Using Plaintiffs' NBA analogy: Mr. Smith's methodology is like determining the reasonableness of Lebron James' salary by taking the average NBA salary during his time in the league and to the extent that LeBron was paid less than the average of the top 25% of the players in the league, determining that Lebron James should be paid at least enough to make up the difference. It may still not adequately compensate LeBron, or Dr. Taylor, but it comes closer than Mr. Blount's approach in taking into account Dr. Taylor's experience at different periods of his career.

### CONCLUSION

For the foregoing reasons, Mr. Smith's Report meets the required showings of reliability to permit it to be presented to the trier of fact. Any disagreements the University may have with the data or methodology do not rise to the level of requiring exclusion but simply create opportunities for the University to cross examine Mr. Smith and to present contrary testimony. The same is true for Mr. Blount's report. Making the most of these opportunities is what our adversary system is based upon, and Mr. Smith, subject to that adversary system, should be

8

permitted to testify regarding the reasonableness of Dr. Taylor's compensation under the Disputed Agreement.

Respectfully Submitted,

/s/ John M. Sosbe
D. Duane Cook
John M. Sosbe
Cook & Watkins, PLC
306 N. Hamilton Street
Georgetown, KY 40324
(502) 570-0022
duane@cookwatkins.com
john@cookwatkins.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2018, a copy of the foregoing was served on all counsel of record via the Court's ECF system.

/s/ John M. Sosbe
John M. Sosbe