UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. 6:16-CV-109-GFVT

| | |
|---|---|
| DR. JAMES TAYLOR ) | |
| MRS. DINAH TAYLOR, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | *Electronically Filed* |
| ) | |
| UNIVERSITY OF ) | |
| THE CUMBERLANDS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF
MOTION TO EXCLUDE EXPERT TESTIMONY OF WILLIAM T. BALDWIN, Ph.D**

Defendant University of the Cumberlands (the "University"), by and through counsel, hereby submits this Reply in Further Support of its Motion to Exclude Expert Testimony of William T. Baldwin, Ph. D. [DE 74] (the "Motion"), and states as follows:

The University's motion to exclude parts of Dr. Baldwin's testimony rests on a simple premise: under Federal Rule of Evidence 402, irrelevant evidence is not admissible. Testimony about damages relating to contractual provisions that have not been breached is speculative and irrelevant evidence. Dr. and Mrs. Taylor concede in their Response [DE 79], as they must, these two fundamental tenets of law. As such, their sarcastic tone regarding the University's allegedly "less than comprehensive understanding of contractual doctrine" is misplaced. Notably, Dr. and Mrs. Taylor admit that "expert testimony related to damages is, *of course, irrelevant if those damages are unavailable*." (DE 79 at 2-3 (emphasis added)). Their greedy attempt to argue that they are somehow entitled to damages that *they admit they have not suffered* strains credulity. Dr. and Mrs. Taylor are, in fact, correct that the University is "under the impression that

plaintiffs must wait until each and every obligation under the contract is breached before they can sue for the value of all the obligations under the contract." (DE 79 at 3). This impression is based on logic and basic legal principles.[1] Dr. and Mrs. Taylor's sanctimonious demand for money for nothing is the recurring theme of this case and should not be heeded.

## ARGUMENT

I.  **Contract law demonstrates that Dr. Baldwin's testimony is irrelevant.**

Dr. and Mrs. Taylor admit, multiple times, the core principle underlying the University's Motion: Dr. Baldwin's testimony is irrelevant because *Dr. and Mrs. Taylor cannot recover damages where there has been no breach*. See *Givhan v. McGruder*, No. 2016-CA-000259, 2018 Ky. App. Unpub. LEXIS 186, *29 (Ky. Ct. App. Apr. 6, 2018) ("There was no breach, and thus, there were no damages."); *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007) ("[Plaintiff] must…prove that [Defendant] breached the contract and that he suffered damages as a result of that breach."); (*see also* DE 79 at 2-3 ("[E]xpert testimony relating to damages is, of course, irrelevant if those damages are unavailable. . . . [T]here must be a breach for there to be damages.")). Perhaps recognizing the absurdity of their argument, Dr. and Mrs. Taylor argue that the University "repudiated" the Disputed Agreement and that anticipatory breach principles apply. This confusing, undeveloped argument is unavailing.

A.  **Basic law and logic demonstrates that Dr. Baldwin's testimony is irrelevant.**

Dr. and Mrs. Taylor try to circumvent the basic premises of contract law by relying on

---

[1] The Taylors include a long and confusing footnote regarding the University's failure to file a Motion for Summary Judgment on particular items of damages. (DE 79 at 2 n.3). To the extent that they argue that the University's strategic litigation decision to file, or not file, certain motions somehow affects the substance of this Motion, they are clearly incorrect. *See Stapleton v. Stapleton (In re Stapleton)*, No. 95-20606, Adv. No. 95-2064, 1996 Bankr. LEXIS 1969, at *5 (Bankr. E.D. Ky. July 17, 1996) ("No party is required to move for summary judgment; this is a strategic decision."). Otherwise, the Taylors misunderstand the point of Federal Rule of Evidence 402 and *Daubert* motions. Here, Dr. Baldwin opines on the value of numerous categories of damages even though there has been no breach of the Disputed Agreement as to those categories of benefits. As explained in greater detail herein and in the University's Motion, such testimony is plainly irrelevant.

2

Dr. Baldwin's unfounded assumption that the University will breach the Disputed Agreement (i.e., cut off benefits that it currently provides for Dr. and Mrs. Taylor) after the trial. (*See* Baldwin Report [DE 74-2] at 4). Dr. Baldwin purports to reduce Dr. and Mrs. Taylor's future "damages" to present-day value based on this assumed breach. This logic is faulty. It hardly bears explaining, but there are two potential outcomes here with regard to Dr. and Mrs. Taylor's contract claim: (1) the University wins, or (2) Dr. and Mrs. Taylor win. Under neither scenario will Dr. and Mrs. Taylor be entitled to the "future damages" on which Dr. Baldwin's testimony is based.

If the University wins at trial, it will immediately stop providing any and all benefits to Dr. and Mrs. Taylor, because the Disputed Agreement will have been deemed enforceable. Under this scenario, the Taylors would, of course, not be entitled to any damages whatsoever, including the damages for the half-dozen categories of benefits at issue here. If, on the other hand, Dr. and Mrs. Taylor prevail at trial, the Disputed Agreement will have been deemed enforceable and the University will have to honor it. At that point, the Taylors *still* would not be entitled to any damages for the half-dozen categories of benefits at issue here because the University would only be required to continue providing them with the benefits that it is already providing them. At no point, under any potential scenario, will Dr. Baldwin's testimony regarding the benefits that the University continues to provide to the Taylors be relevant.

To Dr. and Mrs. Taylor's chagrin, the facts are what they are—the University continues to provide them with certain benefits as purportedly required under the Disputed Agreement. As to those benefits, at best, Dr. and Mrs. Taylor will only be entitled to continue receiving what they already receive. They are not entitled to recover damages that they have not suffered. It is not a surprising notion to exclude counterfactual testimony about damages that might have been

3

if the facts were different.

### B. Dr. and Mrs. Taylor's repudiation theory fails.

Dr. and Mrs. Taylor's specious repudiation theory fails with even a cursory review of the relevant case law. The University's statements and litigation position that the Disputed Agreement is unenforceable do not represent a repudiation of the contract. Anticipatory breach jurisprudence is inapposite to the facts of this case and Dr. and Mrs. Taylor are not entitled to an acceleration of the value of the Disputed Agreement.

The sole case that Dr. and Mrs. Taylor cite in support of their repudiation theory is contrary to their argument. In *Jordon v. Nickell*, a tenant abandoned his lease, and the landlord sought to recover all rent due for the term of the lease at once. *See Jordon v. Nickell*, 253 S.W.2d 237, 237-38 (Ky. Ct. App. 1952). The *Jordon* court *rejected* this acceleration argument, the same one the Taylors inexplicably attempt to advance, holding: "[T]he doctrine of anticipatory breach is recognized in Kentucky. . . . However, we do not regard the rule as justifying the acceleration of payments under a contract where the due dates of such payments are definitely fixed by the contract." *Id.* at 239. The Disputed Agreement did not itself specify the due dates for the provision of benefits, but did contemplate that such benefits, by their nature, would be provided periodically. The contract could only be breached then, if at all, when the "instalments [sic] . . . severally mature." *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 680 (1936) ("[A] party to a contract who has no longer any obligation of performance on his side but is in the position of an annuitant…may be compelled to wait for the instalments as they severally mature, just as a landlord may not accelerate the rent for the residue of the term because the rent is in default."). Accordingly, the University did not repudiate the contract, especially as to the benefits that it continues to provide for Dr. and Mrs. Taylor. *See Hampton v. Safeco Ins. Co. of Am.*, No. 13-39,

4

2014 U.S. Dist. LEXIS 106940, at *8 (E.D. Ky. Aug. 5, 2014) ("[T]he only thing Defendant repudiated here is Plaintiff's meritless interpretation of the contract.").

Even if Dr. and Mrs. Taylor could prove that the Disputed Agreement is enforceable, and that the University breached it by not paying Dr. Taylor's salary (in return for nothing), it is still undisputed that the University has continued to provide the numerous benefits at issue in the Motion. Permitting testimony on damages that have not been incurred serves no purpose other than to potentially confuse the jury into awarding double damages. *Viglas*, 297 U.S. at 678 ("For breach short of repudiation . . . , the damages . . . do not exceed the benefits in default at the commencement of the suit.").

### C. Dr. and Mrs. Taylor's "alternative contracts" argument is premature.

While again mocking the University for its purported "less than comprehensive understanding of contractual doctrine," Dr. and Mrs. Taylor launch into a confusing and premature argument about the measure of damages with "alternative contracts." (DE 79 at 7). But they forget that the only issue before the Court in this Motion is the admissibility of Dr. Baldwin's economic analysis that purports to reduce future damages to present value; the specific values he calculated and the University's expert are not at issue here.

The University attacked Dr. Baldwin's analysis as unreliable because, for several categories of benefits, he assumed one particular manner of performance or one particular outcome with no consideration of alternatives or contingencies (some of which were specified in the Disputed Agreement). The University is not obligated, at this point, to present any evidence to rebut the facts of Dr. Baldwin's testimony, as they appear to argue. (*See* DE 79 at 8 ("Calvin D. Cranfill – and consequently the University – have elected to sit this argument out."). The University can, and will, present evidence at trial to contradict Dr. Baldwin's conclusions.

5

Instead, as this is a *Daubert* motion, the University is only attacking his *methodology*. Put differently, it is not the University's (nor, for that matter, Dr. or Mrs. Taylor's) responsibility at this stage to prove that "there is a different apartment available somewhere that can be had for a lower rent" than the apartment presently being provided to the Taylors. *Id.* Likewise, it is neither party's burden, at the *Daubert* motion stage, to "prove damages [by] submitting proof of all possible alternatives." *Id.* Instead, at this stage, Dr. and Mrs. Taylor plainly carry the burden of demonstrating that Dr. Baldwin's testimony is admissible. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) ("It is the proponent of the testimony that must establish its admissibility by a preponderance of proof.") (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)); Fed. R. Evid. 702 Advisory Comm. Notes, 2000 Amendments ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met a by preponderance of the evidence."). They have not done so, because they have not successfully rebutted the University's argument that his testimony is methodologically unsound.

Dr. and Mrs. Taylor miss the point. The University simply points out that Dr. Baldwin cannot reliably calculate the present value of future damages without a comprehensive analysis and determination of what those future damages will be. His failure to fully explain his assumptions that certain contingencies would be met or that certain decisions would be made, highlights the danger of speculating on future damages. *See Edney v. Moylan*, No. K10C-10-045, 2012 Del. Super. LEXIS 1104 at *7 (Del. Super. Dec. 6, 2012) ("The projection of future damages is inherently a task fraught with the risk of speculation."). Dr. Baldwin's analysis is unreliable as it is incomplete and speculative; thus, it is inadmissible.

**II.      Dr. Baldwin's irrelevant testimony is inadmissible under *Daubert*.**

Dr. and Mrs. Taylor essentially argue that so long as Dr. Baldwin's math is correct, his

testimony should be admissible. The University assumes that Dr. Baldwin's addition and subtraction are accurate but seeks instead to exclude his testimony as irrelevant, since the future damages he purports to calculate have not occurred and will not occur. Put differently, it matters not that Dr. Baldwin's calculations are mathematically sound since the damages that he purports to calculate are unavailable or, at best, speculative.

### A.    Williamsburg residence

First, and foremost, the University is still providing an apartment for Dr. and Mrs. Taylor—*there are no damages to recover*. (*See* DE 74-2 at 2 (admitting that "the university is still providing this apartment to the Taylors")). Moreover, Dr. and Mrs. Taylor admit that Dr. Baldwin's methodologies were unreliable for including "damages" for the Williamsburg residence beyond Dr. Taylor's life and concede that Dr. Baldwin's testimony regarding this item should be excluded. (*See* DE 79 at 11 n.10). Dr. and Mrs. Taylor further grudgingly admit that the provision of the apartment under the Disputed Agreement "was in some sense tied to [Dr. Taylor] serving as chancellor" and that he is not so serving. (DE 79 at 11). Dr. Baldwin similarly conceded in his report that Dr. Taylor is not currently serving as Chancellor. (DE 74-2 at 2). Despite recognizing these examples of the irrelevance of the value of the apartment, Dr. and Mrs. Taylor assert that the Williamsburg residence was still a benefit to which Dr. Taylor was entitled for life and for which he should recover damages.

In all respects the provision of the apartment was tied to him serving as Chancellor—the text of the Disputed Agreement clearly states "The University will provide an apartment or residence for Dr. Taylor and/or Mrs. Taylor . . . *for Dr. Taylor to perform his duties as Chancellor*." (Disputed Agreement [DE 14-2] at ¶ 8 (emphasis added)). Moreover, Dr. and Mrs. Taylor's unsupported position that the University's breach "robbed" Dr. Taylor of the position is

7

merely a self-serving mischaracterization of the undisputed fact that he was offered a reasonable employment contract to serve as Chancellor, which he refused.[2]

### B. Health insurance

Again, the University is still providing health insurance to Dr. Taylor—*there are no damages to recover*. (*See* DE 74-2 at 2 (admitting that the University is "still funding Dr. Taylor's health insurance")). Notably, Dr. and Mrs. Taylor concede a flaw that the University pointed out in Dr. Baldwin's testimony regarding his assumption that "the Taylors would continue paying for a portion of their health insurance." (DE 79 at 11). Regardless of who benefits from this undisputedly false assumption, the fact remains that it undermines the credibility and reliability of Dr. Baldwin's methodology. Despite Dr. and Mrs. Taylor's "demand[] that the University only continue to pay its typical share," there is no escaping that the University now pays for *all* of Dr. Taylor's health insurance. (*Id.*; *see* DE 74-1 at ¶ 10). Dr. and Mrs. Taylor shamelessly demand additional "damages" for the value of health insurance for which they are not paying and for which they in fact owe the University, at least in part. Where there has been no loss, there can be no recovery. *See Tex. Capital Bank, N.A. v. First Am. Title Ins. Co.*, 822 F. Supp. 2d 678, 682 (W.D. Ky. 2011) ("Kentucky law requires three elements for a breach-of-contract claim: (1) a contract between the parties; (2) a breach of that contract; and (3) damages caused by the breach."). And where expert testimony is based on questionable "fact[s], data, principles, methods or their application," it should be excluded. *See Kumho Tire*

---

[2] After the Disputed Agreement surfaced, the University quickly determined that it had not been authorized by its Board of Trustees. (Defendant's Motion for Summary Judgment [DE 70] at 17). Accordingly, the University sought to negotiate with Dr. Taylor regarding his continued employment with the University and what would be a reasonable compensation package to provide in exchange for the duties that he would be required to perform as Chancellor upon officially stepping down as President. (*Id.* at 17-18) Ultimately, the Board of Trustees voted to give Dr. Taylor a one-year renewable contract for the position of Chancellor, with compensation and benefits totaling $152,005.82. (*Id.* at 18; s*ee* DE 70-26.) Dr. Taylor, however, refused to accept this offer or otherwise negotiate for any form of compensation less than receiving, for life, the same salary and benefits that he was receiving as President. (DE 70 at 18; *see* First Amended Complaint [14] at ¶ 15).

*Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

### C. Long-term care insurance

Dr. and Mrs. Taylor miss the point of the University's argument regarding long-term care insurance. Regardless of which contractual provision Dr. and Mrs. Taylor rely on in seeking damages for this benefit, the fact remains that the University is still providing them with long-term care insurance—*there are no damages to recover*. (*See* DE 74-2 at 2 ("This coverage is still being provided by the University.")). Moreover, Dr. and Mrs. Taylor concede that Dr. Baldwin failed to consider the actual costs of potential long-term care, which renders his testimony unreliable. Even assuming that Dr. and Mrs. Taylor should receive the value of the long-term care insurance plus any amounts for long-term care that insurance does not cover, on top of the actual receipt of long-term care insurance—which they undoubtedly should not—they throw their own argument out the window by admitting that "they have no evidence of what those amounts above the polies [sic] coverage would be." (DE 79 at 12). As such, the Taylors concede that the "damages" they seek are entirely speculative. (*See also* Excerpts of Baldwin Depo. [DE 74-4] at 120 ("Q. Did you investigate or consider at all the average costs of long-term healthcare or the probability of the Taylors needing long-term healthcare? A. I didn't investigate that. I think people probably do need long-term care, but that's just, you know, my opinion.")).

### D. Sister-in-law residence

Dr. and Mrs. Taylor admit that the "University is correct that Baldwin's testimony on this matter is irrelevant." (DE 79 at 13). Importantly, they also acknowledge that the reason the testimony is irrelevant is because "no one must testify as to the value of the specific performance *so long as the University continues to provide it*." *Id.* (emphasis added). Put differently, Dr. and Mrs. Taylor admit, as they must, that Dr. Baldwin's testimony about Lois Taylor's residence is

9

irrelevant because the University is still providing that benefit. The fact that it is *also* irrelevant because Dr. and Mrs. Taylor could not enforce the provision even if it was breached only further proves why Dr. Baldwin must be prevented from testifying on this topic. Logically, Dr. and Mrs. Taylor's admission should also be extended to the other categories of damages because there is nothing to distinguish this benefit that the University is still providing from the other benefits that the University is still providing. The Court should follow Dr. and Mrs. Taylor's own reasoning. (*See* DE 79 at 13 (asserting that testimony about the value of a particular benefit is prohibited while the University is still providing that benefit)).

### E. Value of death benefits

Dr. and Mrs. Taylor fail to adequately respond to the flaws in Dr. Baldwin's methodology regarding the value of the $1 million life insurance policy. Instead of providing any authority as to why Dr. Baldwin's failed to consider the effect of potential contingencies on the value of the life insurance policy, Dr. and Mrs. Taylor again resort to sarcasm as their sole rhetorical device. The University is, of course, not alleging that Dr. Taylor will participate in "extreme sports, space travel, [or] war with Russia or North Korea." (DE 79 at 13). Factual arguments regarding specific reasons why the life insurance might not pay out are inappropriately raised at this stage. Instead, the problem with Dr. Baldwin's testimony is that he admitted to a methodological failure; he did not even consider the possibility of the life insurance policy not paying out or the possibility that Dr. and Mrs. Taylor would only be entitled to recover only the cost of the premiums, which, logically, affects how it is valued.

### F. Work equipment

Dr. and Mrs. Taylor again attempt to lure the University into a premature argument about the substance of Dr. Baldwin's conclusions regarding the damages related to Dr. and Mrs.

Taylor's cell phones and vehicle. The measure of damages that Dr. Baldwin reaches is not the issue here. His flawed methodology and incorrect assumptions are the basis for the University's Motion. For example, Dr. Baldwin admits that he did not consider the possibility that the Taylors may stop driving at some point (if, for example, they are admitted to long-term care facilities) or that they may choose a more practical vehicle in the future. (DE 74-4 at 87 ("I did not consider that, no…I did not factor that in, specifically.")). These are obvious possibilities, if not likelihoods, that would affect the present value of future damages. Dr. Baldwin's failure to even consider how his analysis might be affected by likely changes in the facts is an improper speculation on future alleged harms that renders his testimony unreliable. *See Leatt Corp.*, 2013 U.S. Dist. LEXIS 98366, at *7-9 (explaining that "improper extrapolation [and] failure to consider other possible causes" are "red flags that caution against certifying an expert"). Likewise, his testimony is irrelevant given that the University provided cell phones and a vehicle for Dr. and Mrs. Taylor only for their convenience as employees and not as "benefits" that even arguably could be covered by the Disputed Agreement. *Id.*; (DE 74 at 16-17).

Likewise, Dr. Baldwin fails to adequately explain and support his decision to calculate damages by using the price paid by the University for these alleged lost benefits. It is well-established that the actual loss to the plaintiff is the correct measure of damages in a breach-of-contract claim. *See Anchor v. Linton*, No. 99-3702, 2000 U.S. App. LEXIS 24077, at *19 (6th Cir. Sept. 25, 2000) ("A party's expectation interest represents the *actual* worth of the contract to him and therefore recovery is limited to the loss he has actually suffered by reason of the breach."). Dr. Baldwin should have used the replacement cost of the vehicle and cell phone plans to the Taylors and Dr. Baldwin admits that he did not even consider the actual damages allegedly suffered by the Taylors when reaching his conclusions. (DE 74-4 at 97 ("[E]ven if I knew what

11

those costs were, I probably wouldn't factor that in.")); *see Assocs. Commer. Corp. v. Rash*, 520 U.S. 953 (1997) (explaining that, in comparable bankruptcy contexts, when valuing the loss of use of property, one must tie "valuation to the actual disposition or use of the property"). Dr. and Mrs. Taylor claim that the replacement costs are speculative and subjective but, this is simply not true, because they presumably have a car and cell phones—the replacement cost is obviously the cost to them of these necessities of modern life. (*See* DE 79 at 15 (incorrectly asserting that the University argues that "Dr. Baldwin should have measured the lost based on the Taylors' own esoteric valuation of the vehicle and phone")). Dr. Baldwin's testimony is fundamentally unreliable because he fails to adequately explain his methodology, which does not accurately reflect the *actual losses* to Dr. and Mrs. Taylor.

## CONCLUSION

The Court should not be distracted by Dr. and Mrs. Taylor's arguments, which are designed to trick the Court into allowing them to seek double recovery on benefits that they are currently receiving, worth hundreds of thousands of dollars. For the reasons contained herein and in the University's Motion to Exclude Expert Testimony of William T. Baldwin, Ph. D., the University respectfully requests that this Court grant its Motion.

Respectfully submitted,

 /s/ Barbara B. Edelman
Barbara B. Edelman
Haley Trogdlen McCauley
DINSMORE & SHOHL LLP
250 W. Main Street, Suite 1400
Lexington, KY 40507
(859) 425-1000
(859) 425-1099 (fax)
barbara.edelman@dinsmore.com
haley.mccauley@dinsmore.com

and

James D. Jordan
GUENTHER, JORDAN & PRICE, P.C.
2100 West End Avenue, Suite 1150
Nashville, TN 37203
(615) 329-2100
(615) 329-2787 (fax)
JDJordan@GJPLaw.com
*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed this 27th day of July, 2018, using the Court's CM/ECF system, which will send notice of filing to the following:

D. Duane Cook
John M. Sosbe
Cook & Watkins, PLC
306 North Hamilton Street
Georgetown, KY 40324
*Counsel for Plaintiffs*

 /s/ Barbara B. Edelman
*Counsel for Defendant*

13119438v1