UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DR. JAMES TAYLOR and | ) | |
| MRS. DINAH TAYLOR | ) | |
| | ) | Civil Action No. 6:16-cv-00109-GFVT |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | |
| | ) | **ORDER** |
| UNIVERSITY OF THE CUMBERLANDS, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

As the above-styled civil jury trial approaches, both parties seek to exclude certain expert witnesses, noticed by the opposite side, alleging the proposed experts are unreliable, irrelevant, or will not assist the trier of fact.  Specifically, Dr. and Mrs. Taylor seek to exclude one of the University's experts, Michael J. Cooney, and the University seeks to exclude two of the Taylors' experts, A.W. (Pete) Smith, Jr. and Dr. William Baldwin.  After a thorough review of the briefings, and for the reasons set forth below, the Court finds that these witnesses should be allowed to testify, with one restriction as to Smith.

# I

Dr. James Taylor, the former President of the University of the Cumberlands, and his wife, Mrs. Dinah Taylor, have sued the University alleging breach of contract, promissory estoppel, slander, and intentional infliction of emotional distress.[1]  [R. 1.]  Dr. and Mrs. Taylor also seek punitive damages and reformation of the alleged breached contract.  [*Id.*]  The factual

---

[1] The Taylors amended their Complaint to include claims of unjust enrichment and ERISA violations, but those claims have since been dismissed.  [R. 21.]

background of this case has been set forth in greater detail in previous orders of the Court and will not be repeated here.  [*See* R. 21; R. 69.]  In short, the Taylors claim that the University approved a Disputed Agreement that would provide Dr. and Mrs. Taylor with certain benefits for the remainder of their lives following Dr. Taylor's tenure as President of the University, but that the University has failed to do so.  The University argues the Disputed Agreement was never properly vetted or approved by the University's Board of Trustees.  Trial is current scheduled for September 25, 2018.

Several months ago, the parties exchanged expert reports, prompting admissibility challenges by both sides.  The Taylors moved to exclude the testimony of Michael J. Cooney. [R. 72.]  The University filed two *Daubert* motions, wherein it seeks to exclude the testimony of A.W. (Pete) Smith, Jr., in its entirety, and the testimony of Dr. William Baldwin, in part.  [R. 73; R. 74.]  All motions have been fully briefed and are now ripe for review without the need for a *Daubert* hearing.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993) (requiring a "preliminary assessment," but not an actual hearing, when the admissibility of an expert witness is challenged ahead of trial).

## II

## A

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

2

From Rule 702 comes a three-part test for admitting expert testimony.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008).  First, the witness must be qualified. Next, the testimony must be relevant; more precisely, the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.  Lastly, the expert's testimony must be scientifically reliable.

Regarding the first prong, a witness must establish expertise by reference to 'knowledge, skill, experience, training, or education.'"  Fed. R. Evid. 702.  Generally, the courts construe this requirement liberally, but that "does not mean that a witness is an expert simply because he claims to be."  *Pride v. BIC Corp.*, 218 F.3d 566, 57 7 (6th Cir. 2000) (quoting *In re Paoli RR PCB Litig.*, 916 F.2d 829, 855 (3rd Cir. 1990)).  Proper judicial examination of the witness includes "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997).  Thus, to be qualified as an expert, the witness's training and qualifications must relate to the subject matter of her proposed testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *Smelser* 105 F.3d at 303.  The experts' qualifications are not at issue in these motions to exclude.

As for the second prong of the test, district courts "must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact." *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000).  The Supreme Court has referred to this prong as the "fit" requirement.  *Daubert*, 509 U.S. at 591-93.  Because "scientific" validity for one purpose is not necessarily scientific validity for other, unrelated purposes," courts must consider whether a particular expert's testimony will truly assist the trier of fact to understand the

evidence in the case at hand.  *Id.* at 591.

Finally, the Court must determine whether this testimony is reliable.  To be reliable, "a judge must ascertain whether it is 'ground[ed] in the methods and procedures of science.'" FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 13 (3d ed. 2011) (quoting *Daubert*, 509 U.S. at 590).  In *Daubert*, the Supreme Court explained that a district court's gatekeeping responsibility is implicit in Rule 702, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Further, the Supreme Court listed several specific factors to help determine the reliability of expert testimony based on scientific knowledge.  *See id.* at 590, n.8.  These factors include whether a theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether there is a high known or potential error rate; whether there are certain operation standards that should have been or were followed; and whether the theory or technique is generally accepted within the scientific community.  *Id.* at 592-94.  Later, in *Kumho*, the Supreme Court determined that the gatekeeping obligation and subsequent factors established in *Daubert* apply with equal force to non-scientific experts.  *Kumho*, 526 U.S. at 147. However, those factors are not definitive, and district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Notably, the Court's gatekeeping role under the case law "is not intended to supplant the adversary system or the role of the jury."  *In re Air Crash at Lexington, Kentucky, August 27, 2006*, No. 5:06-CV-316-KSF, 2008 WL 2954973, at *2 (E.D. Ky. July 30, 2008) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)).  Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Whether to admit expert testimony is a matter over which the district courts ultimately enjoy broad discretion. *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010).

**B**

Collectively, the parties have filed three *Daubert* motions. [R. 72; R. 73; R. 74.] In doing so, the Taylors seek to exclude one of the University's expert witnesses, while the University seeks to exclude testimony from two of the Taylors' experts. The Court will address the motions in the order they were filed.

**1**

The University seeks to introduce the testimony of Michael J. Cooney, a specialist in the field of higher education governance and compensation issues. He plans to testify to two opinions, as set forth in his report, which concern university governance and non-profit executive compensation. [R. 78 at 3.] Specifically, Cooney's opinions target the manner in which the University's Board of Trustees allegedly approved the Disputed Agreement, how the University maintained its records regarding the Disputed Agreement, and whether those activities were in accord with "the norms expected from a tax-exempt college or university in the United States." [R. 78 at 4.] Further, Cooney's opinions attempt to undermine the substantive support for the provisions contained in the Disputed Agreement based on "common practice among tax-exempt colleges and universities in the United States," and whether such an agreement might implicate fiduciary duties or IRS liability. [*Id.*]

The Taylors two chief complaints about Cooney's proposed testimony is that it is irrelevant and that it will not assist the trier of fact. [R. 72.] According to the Federal Rules of

5

Evidence, "[e]vidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  The Taylors argue that unless the University's Board of Trustees usually followed best practices, failing to follow best practices with regard to the Disputed Agreement "has no tendency to make the Disputed Agreement more or less likely." [*Id.* at 3.] The University disputes this allegation and states, "[i]t is both relevant and valuable for the jury to hear why best practices matter and how board actions can be undermined when best practices are not followed." [R. 78 at 6.]  The Taylors also seem to suggest the Board did not follow best practices.  [R. 72 at 4 ("[I]t appears that every instance in which some benefit for Dr. Taylor was conferred since 2005, sealed minutes were created.  If each of these sealed minutes violates best practices, as Mr. Cooney claims, then the Board's routine was to violate best practices." ).]  This is an overgeneralization of Cooney's report [*see generally* R. 72-1] and undermines the issue on which his opinions are offer, that is whether it is likely that the Board of Trustees considered and approved the Disputed Agreement.

The case presents a factual dispute as to whether the Board properly considered and approved the Disputed Agreement in such way that would make the provisions within enforceable.  As such, Cooney's testimony is relevant as it would make that fact more or less probable. *See* Fed. R. Evid. 401.  Indeed, this entire action rests on the authenticity of the Disputed Agreement's approval, and it is within the province of the trier of fact to make that determination.  Cooney's expert testimony is being offered to assist the trier of fact in that regard, and, at this stage, is properly admissible.  Of course, the Taylors will be free to vigorously cross-examine Cooney and offer contrary evidence, if they so choose. *See Daubert* 509 U.S. 596.  For these reasons, the Taylor's motion will be denied.

6

**2**

Next, the Taylors seek in elicit the testimony of A.W. (Pete) Smith, Jr. to discredit the methods used by the University's expert, Phillip Blount.  [R. 80 at 1.]  The University aims to exclude Smith's testimony by attacking his "inaccurate assumptions and unreliable methodologies."  [R. 73.]  The University sets forth the following foundational complaints regarding Smith's proposed testimony: (1) Smith's opinions are irrelevant and unreliable; (2) Smith opines on legal matters outside of his expertise; (3) Smith's opinions are based on flawed methodologies; (4) Smith's opinions are based on an inappropriate comparator group; (5) Smith's opinion is based on unreliable data; and (6) Smith's opinions employed flawed statistical methodologies.  [*Id.*]  Smith's expert report proports to evaluate the reasonableness of the value that the Disputed Agreement conferred upon Dr. Taylor upon his retirement.  [*See generally*, R. 80.]  Additionally, the Taylors' Response suggests Smith will be called upon to rebut the testimony of Mr. Blount, one of the University's expert.  [*See id.*]

Regarding the University's first complaint, the Court finds that under Fed. R. Evid. 401 Smith's opinion as to whether the value of the Disputed Agreement's provisions was reasonable is relevant and tends to make a fact—that is whether the Board approved the Disputed Agreement—more or less probable.  The parties agree on the University second contention; Smith's opinion on the enforceability of the Dispute Agreement is outside of his expertise. Therefore, the Court will not analyze this argument, and Smith will be prohibited from testifying on this issue.

The University's third argument attacks Smith's compensation methodologies and claims they are unreliable and buttressed only by Smith's own unsupported statements.  [R. 73 at 11.] This argument goes to Smith's backward-looking compensation analysis.  Smith seems to

suggest his analysis calculates the compensation shortfall during Dr. Taylor's thirty-five-year tenure as President of the University, which could support a finding that the Disputed Agreement amounts to an "excess benefit transaction," even though such a transaction might create tax liability for tax-exempt universities and their directors. [*See* R. 73-4 at 5; R. 80 at 5-6]; *see also* 26 C.F.R. § 53.4958-1. The University's main objection to this evidence is that Smith does not articulate any basis for his methodology. [R. 73 at 11.] While the University cites to depositional testimony suggesting Smith may have never conducted such a long-term lookback analysis [*see id.*], the Court finds that Smith's expert report [*see* R. 73-1 at 6-8] provides sufficient, although not abundant, support for the methodology used in conducting the compensation lookback analysis.

For additional support, the University argues that because "the IRS regulations governing excess benefit transactions suggest that compensation for services performed in prior years . . . is only appropriate on a much shorter time scale, such as five years," [R. 73 at 12, n.12 (citing 26 C.F.R. § 53.4958-3(a)(1))], Smith's lookback period of thirty-five years in methodologically flawed. The University's reliance on this specific regulation is misplaced. This regulation simply defines the scope of a "disqualified person" based on that terms definition; it does not restrict an excess benefit transaction's so-called lookback period to five years. *See* 26 C.F.R. § 53.4958-3(a)(1). Indeed, concerning excess benefit transactions, the regulations seem to place no restriction on what the University coins a "lookback period" with regard to compensation analyses and, instead, indicate that reasonable compensation "includes *all* economic benefits provided by an applicable tax-exempt organization in exchange for the performance of services." *See* 26 C.F.R. §53.4958-4 (emphasis added).

Next, the University contends Smith selected an inappropriate peer group when

8

attempting to determine a reasonable compensation for Dr. Taylor as President of the University through the years.  [R. 73 at 13-14.]  The University argues that Smith's peer group is both procedurally and substantively unreliable: "Smith's comparison to [the eleven schools used in the comparator group] is flawed because his unreliable method yielded a peer group that is substantially dissimilar to the University."  [R. 73 at 14.]  But the University does not state how the schools in Smith's comparator group are dissimilar to the University except to say two of Smith's comparator schools have a different student population composition.  [*See* R. 73 at 16, n.6.]  In fact, Smith's peer group was developed by selecting certain institutions identified by the University's expert, Phillip Blount, when the University conducted a salary comparison for the Chancellor position in 2016.  The University also complains that Smith, without explanation, removed two of Blount's comparator schools when Smith did his analysis.  [R. 73 at 15.]  Smith admits he used the same, or ostensibly the same, comparator group that Blount used in 2016 [*see* R. 80 at 6], but, in his report, provides some cursory explanation and justification for using this comparator group.  [R. 73-1 at 5-8.]

The University's fifth argument revolves around the reliability of the data used by Smith in his compensation analysis.  [R. 73 at 18.]  The University contends the data is unreliable because Smith, rather than relying on IRS Form 990 data, could have used other means of measuring comparable compensation and because there was no basis for Smith projecting a 3% annual growth in compensation for specific years of his analysis.  [*Id.* at 18-19.] Smith's report provides some justification for using the Form 990 information and annual projection compensation data, which Smith states is "supported by various surveys that measure annual compensation increases."  [R. 73-1 at 7.]  As for the 3% annual salary growth projections, Smith states that such a salary increase is "supported by various surveys that measure annual

compensation increase percentages." [*Id.*]  The Court finds, then, that there is a factual dispute as to the reliability of the data used, and the University will be free to cross-examine Smith and present contrary evidence to rebut Smith's opinions on these issues.

Lastly, the University asserts that Smith used flawed statistical methodologies when opining:

> Dr. Taylor should have received compensation in the 25th percentile of salary among peer institutions for the first ten years of his career, at the 50th percentile for the middle ten years, and at or above the 75th percentile for the final part of his career and that to the extent that he was not paid at these levels he was underpaid.

[R. 73 at 20.]  The Taylors offer up little to rebut the University's contention, but Smith, again in his report, offers some justification for attributing his opinions to certain data points.  For instance, Smith compares Dr. Taylor's cash compensation for the early part of his tenure as President to the 25th percentile of the peer group's compensation because the 25th percentile is "generally assumed to be relatively new or inexperienced executives."  [R. 73-1 at 6.]  The Taylors' Response offers very little legal support for Smith's report, but the Court again finds just enough refuge in Smith's report to determine exclusion is not the appropriate remedy at this juncture.

The University makes strong arguments as to why Smith's testimony should be excluded, and the Taylors seem content on using abstract sports metaphors and responding by proclaiming, "Well, the University's expert did it, so we should be allowed to do it, too."  This is not an effective rebuttal strategy.  Luckily, for the Taylors, Smith provided just enough justification for the use of certain methods and data to allow his testimony to survive this motion to exclude. Despite recognizing Smith presents a very close call, and acknowledging that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence," *see Daubert*, 509 U.S. at 596, the Court will allow Smith to testify as an expert for the Taylors. Under *Daubert*, and subsequent case law, "rejection of expert testimony is the exception, not the rule." Fed. R. Evid. 702, advisory committee's note, 2000 amend.; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530. While Smith's reasoning and methodologies underlying certain opinions are indeed questionable, and certainly open to contradiction, the Rule is "broad enough to permit testimony that is the product of competing principles and methods in the same field." Fed. R. Evid. 702, advisory committee's note, 2000 amend. The Court finds that Smith and, by extension, the Taylors have shown by a preponderance of the evidence that Smith's testimony should not be excluded at this point. However, Smith may not testify as to the enforceability of the Disputed Contract.

**3**

In the final motion, the University seeks to exclude Dr. William Baldwin's testimony regarding certain portions of his expert report. [R. 74.] Baldwin's expert report proports to opine on the value the Taylors' lost salary and benefits. [*See generally* R. 74-2.] The University argues that the testimony it seeks to exclude is not only irrelevant and unreliable but also includes irrelevant damages. [R. 74.] Baldwin acknowledges the University still provides the Taylors some of the benefits for which he calculated a lost value. [*See* R. 74-2] Therefore, according to the University, the "[t]estimony . . . related to contractual provisions that have not been breached is speculative and irrelevant evidence." [R. 87 at 1.] The Taylors contend that the University not only breached, but also repudiated, the Disputed Agreement, which amounts to a "total breach" and allows the Taylors to sue for all remaining benefits under the Disputed Agreement. [R. 79 at 3-4.]

"Whether a party to a contract has repudiated, so as to commit an anticipatory breach, must be resolved by the trier of fact to the extent such a determination turns on disputed facts." *Bank One, N.A. v. Echo Acceptance Corp.*, 380 Fed. App'x 513, 517 (6th Cir. 2010) (citations omitted). Here, as stated in the Court's previous Order [R. 69], "this case presents many disputes as to material facts," not the least of which is whether the Disputed Agreement is enforceable. Accordingly, whether the University breached or repudiated the Disputed Agreement is a question for the trier of fact. If the trier of fact determines that breach and/or repudiation occurred, it will be within the province of the jury to determine what damages, if any, are appropriate. Thus, Baldwin's testimony would be relevant to that determination, and the Court will allow Baldwin to testify as an expert.

### III

The Court's gatekeeping role under the case law "is not intended to supplant the adversary system or the role of the jury." *In re Air Crash at Lexington, Kentucky, August 27, 2006*, No. 5:06-CV-316-KSF, 2008 WL 2954973, at *2 (E.D. Ky. July 30, 2008). Acknowledging again that "rejection of expert testimony is the exception, not the rule," *see In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530, the Court will allow Cooney, Smith, and Baldwin to testify as experts in this case. Smith's testimony will be restricted, though, and he may not opine on the enforceability of the Disputed Agreement.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Taylors' Motion to Exclude Testimony of Michael J. Cooney **[R. 72]** is

    **DENIED;**

2. The University's Motion to Exclude Testimony of A.W. (Pete) Smith, Jr. **[R. 73]** is

**DENIED**, however Smith **SHALL NOT** testify or opine on the enforceability of the Disputed Contract; and

3. The University's Motion to Exclude Testimony of William T. Baldwin, Ph.D. **[R. 74]** is **DENIED.**

This the 5th day of September, 2018.

Gregory F. Van Tatenhove
United States District Judge