UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| DR. JAMES TAYLOR and <br> MRS. DINAH TAYLOR <br><br> Plaintiffs, <br><br> V. <br><br> UNIVERSITY OF THE CUMBERLANDS, <br><br> Defendant. | Civil Action No. 6:16-cv-00109-GFVT <br><br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

*** *** *** ***

Dr. James Taylor was employed as President of the University of the Cumberlands for 35 years beginning in August of 1980. Following his retirement from that position, and after serving as Chancellor of the University for a short time, Dr. Taylor insisted on enforcement of a contract – which is now being referred to as the "Disputed Agreement" – purportedly made between the University and Dr. Taylor and his wife Dinah. The University refused to fulfill the terms of the Disputed Agreement, which, among many other benefits, provided Dr. and Mrs. Taylor with compensation for life following Dr. Taylor's retirement as President. Subsequently, Dr. Taylor brought suit against the University alleging breach of contract, promissory estoppel, slander, intentional infliction of emotional distress, and seeking punitive damages and reformation.[1] Presently before the Court is the University's Motion for Summary Judgment [R. 70], which, for the reasons below, will be **GRANTED** in part and **DENIED** in part.

---

[1] Nearly three months after initiating this action, the Taylors amended their comlaint to include allegations of unjust enrichment and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). [R. 16.] However, the Court subsequently dismissed those claims. [R. 21.]

# I

The factual predicate of this case has been expounded upon in previous Orders of the Court and will be incorporated by reference into this Order. [*See* R. 21; R. 69.] However, the Court will provide the following relevant summation of the facts and, given the present context, will draw all facts and inferences in the light most favorable to the Taylors as the nonmoving party. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citation omitted).

Dr. James Taylor was employed as President of the University of the Cumberlands for 35 years before retiring from that role in October 2015. [R. 70 at 4.] At that time, according to the Taylors, Dr. Taylor assumed the role of Chancellor, a newly-created position at the University which was allegedly created for Dr. Taylor. [R. 81 at 4.] This transition followed a year in which Dr. Larry Cockrum served as Chief Executive Officer and President-Elect under Dr. Taylor before Dr. Cockrum assumed the role of President and Dr. Taylor assumed his Chancellor's position. [R. 70 at 5-6; R. 81 at 16.] "Dr. Taylor's employment with the University was terminated on or about April 6, 2016." [R. 70-8 at 3.] Therefore, at least from October 2015 to April 2016, Dr. Taylor served in a non-presidential capacity at the University of the Cumberlands.

From 2005 to 2015, according to the Taylors, the University's Board of Trustees, on several occasions, unanimously voted "to pay Dr. Taylor for his service as Chancellor the same salary and benefits as he was receiving when he stepped down as President." [R. 81 at 4, 9.] These votes came in October 2005, April 2012, and October 2014. [R. 81 at 9.] In the first vote, which occurred in October 2005, the Board of Trustees convened in a closed Executive Session following its regularly scheduled meeting and voted unanimously,

To continue the annual compensation and applicable benefits for Dr. and Mrs.

> James H. Taylor, which are in effect on the date of his retirement as President of the University of the Cumberlands, until his death. In the event Dr. Taylor precedes his wife, Dinah Taylor, in death then such compensation and benefits shall go to Dinah Taylor.

[R. 81 at 11; R. 81-24.] Both Chairman Jim Oaks and Trustee Dave Huff have provided Affidavits confirming this vote. [R. 81-26; R. 81-27.]

The second vote, in April 2012, also occurred in an Executive Session. [R. 81 at 14.] The Board Secretary's handwritten notes from the Executive Session stated, "Dr. Oaks comments on Dr. Taylors [sic] excellence. Pay Dr. Taylor retirement benefits read by Dr. Oaks. Motion by Scott Thompson to accept proposal. Seconded by Cookie Henson." [*Id.*] From those notes, the official meeting minutes read,

> Chair Oaks called for Executive Session. All non-Board members were dismissed. Dr. Oaks complimented Dr. Taylor's leadership of the University and read to the members a contract which Oaks recommends be approved by the Board members concerning Dr. Taylor's retirement benefits. Scott Thompson moved the contract be approved and Cookie Henson seconded the motion. All approved.

[*Id.*; R. 70-21 at 18.] Chairman Oaks and Secretary Lonnie Walden signed the official minutes. [R. 70-21 at 18.] It is at this meeting, the Disputed Agreement came into existence. [R. 81 at 15; R. 81-14.]

There was a third vote. This occurred in Executive Session in October 2014. The Board of Trustees approved,

> That the office of Chancellor be established and that Dr. James H. Taylor be and hereby is elected to that office. Dr. Taylor's duties as Chancellor shall commence upon the adjournment of the Board's October, 2015, Board meeting. The duties of the office of Chancellor shall be as assigned by the Board. The salary and benefits of the Chancellor shall be those in effect for Dr. Taylor on the date of the October, 2015, Board meeting.

[R. 81 at 16; R. 70-6 at 14-15.] The minutes from this meeting also indicate,

> The Benefit Package for Dr. Taylor which includes the salary for Dr. Taylor that is

3

> in effect on January 1, 2015, and all previously approved insurance for Jim and Dinah Taylor, plus all other perks he now receives were presented to the Board. Motion was made by Dick Knock and seconded by Jon Westbrook to approve the Benefit Package for Dr. Taylor. All approved.

[R. 70-6 at 15.] Again, Chairman Oaks and Secretary Walden signed these minutes. [*Id.*] These minutes were approved at the Board's next meeting in April 2015. [R. 81 at 16; R. 81-5.]

In the latter part of 2014, Jon Westbrook assumed the role of Chairman of the Board of Trustees and Dr. Cockrum began serving as Chief Executive Officer and President Elect. [R. 70-6 at 9.] In an August 2015 conference call of the Board's Executive Committee, Westbrook established a sub-committee "to study the University's duties and obligations with respect to the office of Chancellor." [R. 81-2.] "[T]he scope of the committee's review include[d] the respective duties and obligations between the University and both Dr. and Mrs. Taylor following Dr. Taylor's transition from the Office of President." [*Id.*] According to the minutes from the regularly scheduled Board meeting in October 2015, after which Dr. Taylor was to retire as President and assume his new role as Chancellor, there was no mention of Dr. Taylor serving in either position or his transition to Chancellor. [*See* R. 81-7.] Additionally, the minutes reflect no report from the sub-committee, although there was an Executive Session at which University's legal counsel "delivered a report to the Board at the request of Board Chairman Westbrook and the Executive Committee." [*See id.*] According to the minutes, the Executive Session resulted in a "Resolution of the Executive Committee of October 12, 2015," but there is no indication in the record as to what that resolution resolved.

In January 2016, the University retained Phillip Blount and Associates, Inc., which provided to the University an opinion on an "appropriate Total Reportable Compensation range for a Chancellor with the part-time job description provided. . . ." [R. 81-36.] According to

4

Phillip Blount and Associates, Inc., an appropriate Total Reportable Compensation for Dr. Taylor as Chancellor with part-time responsibilities ranges between $125,000 and $145,000. [*Id.* at 4.] This assumes a guaranteed one-year term of employment, which would be subject to renewal based on performance. [*Id.*] If, however, the term of employment was extended to two years, regardless of performance, the appropriate Total Reportable Compensation range would be adjusted to $90,000 to $108,000 per year. [*Id.*]

In late March 2016, the ad hoc sub-committee made a recommendation to the Executive Committee that, among other things, the University continue to employ Dr. Taylor "to promote the interests of the University on substantially the terms and conditions set out on the attached Exhibit to this recommendation, subject to his written acceptance of the offer." [R. 81-3.] However, the exhibit is not included in the record. Additionally, no member of the sub-committee or the Executive Committee signed the recommendation, and there is no indication whether the recommendation was approved. [*See id.*]

In early April 2016, the University, through counsel, offered Dr. Taylor a one-year contract as Chancellor with a compensation package totaling approximately $152,000. [R. 70-8; R. 81-37.] Dr. Taylor did not accept that offer. [R. 81 at 26.]

Approximately two months later, on June 13, 2016, Dr. and Mrs. Taylor brought suit against the University of the Cumberlands. [R. 1.] Two days later, on June 15, 2016, the University issued a press release providing its version of the facts. [R. 70-29.] It is the statements contained in that press release that the Taylors argue support their claim of slander. [R. 81 at 29-31, 34-39.]

Previously, the University moved to dismiss this action for failure to state a claim alleging the Disputed Agreement lacked valid consideration. [R. 12.] The University also

5

claimed the Disputed Agreement was unenforceable as a matter of law as it was "terminable at will . . . because it has no definite end date but instead purports to require the University to continue paying Dr. and Mrs. Taylor into perpetuity." [*Id.* at 2.] Furthermore, according to the University, the remaining claims built upon the enforceability of the Disputed Agreement and therefore should also be dismissed. [*Id.* at 10, n.4.] The Court rejected these claims and denied the University's Motion as to the Taylors' claims of breach of contract, promissory estoppel, slander, intentional infliction of emotional distress, punitive damages, and reformation. [R. 21.]

Subsequently, the Taylors moved for summary judgment alleging the University's former Chairman of the Board of Trustees, Dr. Jim Oaks, had apparent authority to bind the University to the Disputed Agreement. [R. 38.] However, the Court found there to be a genuine issue as to whether Dr. Oaks had such apparent authority and, thus, denied the Taylors' motion. [R. 69.]

Now, the University moves for summary judgment claiming the Disputed Agreement is unenforceable as a matter of law because it is not supported by valid consideration. [R. 70 at 22-26.] Additionally, the University argues summary judgment is appropriate on the Taylors' claims of slander, intentional infliction of emotional distress, and reformation because there exists no evidence to support those claims. [*Id.* at 26-39.] The Taylors vehemently contest summary judgment on their breach of contract and slander claims, but agree that their intentional infliction of emotional distress claim should be dismissed. [R. 81.] Furthermore, the Taylors do not address their claims for punitive damages or reformation in their Response. [*See id.*]

## II

### A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56. "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The movant has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the nonmoving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris,* 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the

nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

B

The University asserts that summary judgment is appropriate on the Taylors' breach of contract claim simply because the Disputed Agreement suffers from a want of consideration. [R. 70 at 2-3.] While this argument formed the foundation of the University's previous Motion to Dismiss [R. 12], which the Court denied [R. 21], the University has renewed the argument following discovery and the depositions of Dr. and Mrs. Taylor. [*See* R. 84 at 8.] Ostensibly, the argument goes, because both Dr. and Mrs. Taylor have "admitted that the Disputed Agreement was for past work only and that they were not required to do anything to receive the lifetime benefits allegedly guaranteed thereunder," the Disputed Agreement lacks valid consideration and is therefore unenforceable as a matter of law. [*Id.*]

As stated in the Court's previous Order [R. 21], to prove that there has been a breach of contract under Kentucky law, "the complainant must establish three things: 1) the existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App 2009) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007)). Therefore, "[t]o establish a breach of contract claim under Kentucky law, the plaintiff must show clear and convincing evidence that an agreement existed between the parties." *MidAmerican Distrib., Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 666-67 (E.D. Ky. 2011), *aff'd*, 485 F. App'x 779 (6th Cir. 2012). Furthermore, it is a fundamental tenet of contract law that an agreement that lacks in consideration or that is based solely on past consideration is unenforceable as a matter of law. *See Sawyer v. Mills*, 295 S.W.3d 79, 86-87 (Ky. 2009); *Greenup v. Wilhoite*, 279 S.W. 665,

666 (Ky. 1926).

Looking at the four corners of the Disputed Agreement [R. 16-1], the Court believes the Disputed Agreement contains provisions of consideration concerning both parties. The Disputed Agreement acknowledges the years of service the Taylors provided the university, indicates that the Taylors exceeded expectations in "raising hundreds of millions of dollars for the University," and states that "Dr. and Mrs. Taylor have and will agree to continue to serve as the Chancellor (Dr. Taylor) for The University of the Cumberlands and Ambassador (Mrs. Dinah Taylor) for The University of the Cumberlands after their tenure as President and First Lady and including the rest of their lives[.]" [*Id.*]

The Disputed Agreement goes on to itemize the obligations of the University and the obligations of the Taylors. [*See id.*] On the one hand, the University was obligated, among other things, to pay Dr. Taylor's presidential salary to the Taylors "for the rest of both of their individual lives," to appoint Dr. Taylor to the position of Chancellor of the University upon his retirement as President, and to continue providing to the Taylors all benefits it was providing at the time the Disputed Agreement was approved. [*Id.*] On the other hand, Dr. Taylor was obligated "to accept the position of Chancellor for as long as he may desire to perform the duties of Chancellor," "Mrs. Taylor was obligated to always be an Ambassador for the University," and "[b]oth Dr. Taylor and Mrs. Taylor agree to serve the University in any capacity requested and agree to continue their fundraising efforts in identifying, cultivating and stewarding donors and/or potential donors of the University." [*Id.*]

However, the Disputed Agreement contains language, on which the University relies, that states, "the compensation and benefits contained in this agreement is/are for the past decades of duties and/or work performed by Dr. and Mrs. Taylor all for the benefit of The University of the

9

Cumberlands." [*Id.* at 3-4; R. 70 at 23-24.] The Disputed Agreement also states, "the compensation and other benefits included in this agreement are not conditional upon Dr. Taylor remaining as the President of The University of the Cumberlands or accepting the position as Chancellor upon Dr. Taylor's retirement as the President. . . ." [R. 16-1 at 3.]

Furthermore, the University cites to Dr. and Mrs. Taylor's depositions to support their argument. [R. 70 at 24.] According to the University's Motion, Dr. Taylor testified in his deposition that "the Disputed Agreement was for 'past services . . . rendered' and confirm[ed] his position that the University still owed him under the agreement even if he did not do anything." [*Id.*] However, the portion of Dr. Taylor's deposition attached to the Motion does not contain the quotation cited by the University; therefore, the University has not pointed to the record to support its claim of Dr. Taylor's under-oath admission. Mrs. Taylor's deposition, on the other hand, indicates her understanding of the Disputed Agreement meant *she* did not have to continue working for her and Dr. Taylor to receive the disputed benefits. [*Id.*; R. 70-4 at 49-50 (emphasis added).] The University also points to a letter purportedly from Dr. Taylor to Trustee Roland Mullins in 2015 in which Dr. Taylor states, "The payments are for past work and I don't know why that is a problem." [R. 70 at 24; R. 70-12.] In that same letter, though, Dr. Taylor reconfirms his commitment to perform the duties of Chancellor. [R. 70-12.] Additionally, then-Chair Jim Oaks testified that his understanding was that Dr. Taylor "would perform duties as chancellor." [R. 70-3 at 50.] At a bare minimum, then, there exists a genuine issue as to whether the Disputed Agreement required Dr. Taylor to perform duties as Chancellor for him to receive the benefits identified in the Disputed Agreement.

The University, as it did in its Motion to Dismiss [R. 12], cites *Sawyer v. Mills*, 295 S.W.3d 79 (Ky. 2009), for the proposition that the Taylors' past performance cannot provide the

10

necessary consideration to make the Disputed Agreement enforceable. [R. 70 at 23.] The University contends that "Dr. and Mrs. Taylor's mere continued employment by the University, after the Disputed Agreement was purportedly executed, does not constitute valid consideration." [R. 70 at 24 (citing *Charles T. Creech, Inc. v. Brown*, 433 S.W.3d 345, 345 (Ky. 2014)).] However, as the University states, the *Brown* court found that because the employee / employer relationship had not changed following the signing of the disputed contract, the agreement lacked consideration. Here, there is no doubt that the Taylors' relationship with the University changed; Dr. Taylor retired as President.

The University then argues that the Disputed Agreement's requirement that Dr. Taylor continue as President and subsequently serve as Chancellor neither imposed new work obligations nor changed the nature of Dr. Taylor's existing obligations to the University. [R. 70 at 25.] However, if the Disputed Agreement required Dr. Taylor to serve as Chancellor, which the Court has already acknowledged is a genuine issue of material fact, then there is no doubt that the Disputed Agreement would impose responsibilities on Dr. Taylor that he previously did not have, that is he would be obligated to perform certain duties following his decision to retire as President. That alone would significantly change Dr. Taylor's then-existing obligations to the University and suffice for consideration under the Disputed Agreement.

As the Court has articulated on more than one occasion, this case presents multiple disputes as to material facts. The University seems to agree with that assessment. [R. 70 at 23 (acknowledging factual disputes concerning the Board of Trustees authorization of the Disputed Agreement).] Taking the facts in the light most favorable to the Taylors, the Court finds that the University has not satisfied its burden to show a lack of a genuine issue of material fact concerning the consideration of the Disputed Agreement. Thus, the Court cannot, at this point,

11

determine that as a matter of law the Disputed Agreement lacked valid consideration. The Court understands that many educational institutions maintain Chancellor positions, which simply allows the institution to continue holding out its relationship with whomever holds the position of Chancellor. In the corporate world, this would be akin to a business's good-will value. In the present context, imposing Chancellor obligations on Dr. Taylor would amount to valid consideration. Therefore, the Court will deny summary judgment on this issue.

## C

Count Three of the Taylors' Amended Complaint alleges a claim of slander. [R. 16 at 5.] The language of the allegation asserts "agents of the University have made false statements, which were published to third parties, to the effect that Dr. Taylor hid the Taylor Agreement from the University and from the Board of Trustees, and that he had the contract drawn up in a deceitful and scheming manner." [*Id.*] The Taylors claims that Dr. Taylor was harmed by the non-privileged publication of the false statements, which "are actionable as slander per se." [*Id.*]

"Words are slanderous per se when they 'are presumed by law actually and necessarily to damage the person about whom they are spoken.'" *Disabled Am. Veterans, Dept. of Kentucky, Inc. v. Crabb*, 182 S.W.3d 541, 547 (Ky. Ct. App. 2005) (quoting *Elkins v. Roberts*, 242 S.W.2d 994, 995 (Ky. 1951)). Although the University articulates the difference between libel and slander in its motion, the Taylors seem to miss this distinction and proceed as if their argument was under a general claim of defamation. [*See* R. 70 at 27; R. 81 at 1.] It was not; it was under a clear claim of slander. [*See* R. 16 at 5.] Even still, the Taylors never identify a speaker or any spoken words that would be slanderous per se. Thus, summary judgment will be granted in favor

of the University on the Taylors' slander claim.[2]

**D**

Lastly, the University moves for summary judgment on the Taylors' claims of intentional infliction of emotional distress, reformation, and, in a perfunctory footnote, punitive damages. [R. 70 at 31-39; R. 70 at 39, n.9.] The Taylors "concede that they do not have expert or scientific proof of severe emotional distress," which is required to substantiate a claim of intentionally infliction of emotional distress under Kentucky law. [R. 81 at 39]; *see also Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). Therefore, summary judgment is appropriate on this claim.

The Taylors also do not attempt to rebut the University's arguments as to their reformation claim. [*See generally* R. 81.] The basis of the Taylors' claim for reformation involved the allegation that "[t]he Board of Trustees voted to continue Mrs. Taylor's salary at the level at which she was paid at the time of Dr. Taylor's retirement as president . . ., [but] the Taylor Agreement arguably does not include a provision for continuation of her salary" [R. 16 at 7.] During discovery, the University obtained an email purportedly from Plaintiffs' counsel acknowledging, "Although our complaint made a claim for Mrs. Taylor's salary, we have abandoned that claim." [R. 70 at 38.] Based on the record before it, the Court determines that summary judgment is appropriate as to the Taylors' reformation claim.

Likewise, the Taylors make no mention of their punitive damages claim in their Response to the University's Motion for Summary Judgment. According to the Amended Complaint, the

---

[2] While the University makes other arguments as to why summary judgment is appropriate on the Taylors' claim of slander, the Court need not address those arguments on the merits because the slander claim, as amended, cannot be supported without evidence of spoken defamatory comments.

University, with malice and oppression, undertook certain actions "to coerce Dr. Taylor to accept a new contract, and slandered him personally, and threatened the discontinuance of benefits relied upon by him and his wife." [R. 16 at 7.] Under Kentucky law, "a plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." Ky. Rev. Stat. § 411.184(2). The Court finds that the Taylors have not developed this claim further and does not attempt to rebut the University's argument on punitive damages. While it is true that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," *see McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997), the University's perfunctory assertion that the punitive damages claim should be dismissed was supported by "some effort at developed argumentation." [R. 70 at 39, n.9.] Thus, the Court will grant summary judgment in favor of the University on the Taylors' claim for punitive damages.

**III**

Summary judgment is appropriate when the moving party shows the case is void of any genuine disputes as to material facts. Related to the Disputed Agreement, there remains numerous genuine disputes of material facts. Taken the facts in the light most favorable to the Taylors, the University has not shown the Disputed Agreement lacked consideration; therefore, summary judgment is not appropriate on the Taylors' breach of contract claim. However, the University has shown that there exist no genuine disputes as to material facts regarding the Taylors' claims of slander, intentionally infliction of emotional distress, reformation, and punitive damages.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED:**

1. The Defendant's Motion for Summary Judgment [**R. 70**] is **DENIED IN PART** and **GRANTED IN PART**;

2. The Defendant's Motion for Summary Judgment [**R. 70**] is **DENIED** as to the Taylors' breach of contract claim; and

3. The Defendant's Motion for Summary Judgment [**R. 70**] is **GRANTED** as to the Taylors' claims of slander, intentional infliction of emotional distress, reformation, and punitive damages.

This the 7th day of September, 2018.

Gregory F. Van Tatenhove
United States District Judge